**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

———————————————————x

| | |
|---|---|
| MATERIAL YARD WORKERS LOCAL 1175 BENEFIT FUNDS, Individually and on Behalf of All Others Similarly Situated, : | Civil Action No. 4:09-cv-03265 |
| : | CLASS ACTION |
| Plaintiff, : | |
| : | DEMAND FOR JURY TRIAL |
| vs. : | |
| MEN'S WEARHOUSE INC., GEORGE ZIMMER and NEILL P. DAVIS, : | |
| Defendants. : | |

———————————————————x

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF FEDERAL SECURITIES LAWS**

Lead Plaintiff Iron Workers Local 55 Pension Fund alleges the following based upon the investigation of its counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Men's Wearhouse Inc. ("Men's Wearhouse" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, interviews with former employees of the Company, and media reports about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of purchasers of the common stock of Men's Wearhouse between March 7, 2007 and January 9, 2008, inclusive (the "Class Period"), against Men's Wearhouse and two of its senior officers for violation of the Securities

Exchange Act of 1934 (the "Exchange Act") arising out of the Defendants' false and misleading statements concerning the Company's business and earnings and revenues projections for fiscal 2007.[1]

2.      Throughout the Class Period, Defendants issued materially false and misleading statements representing that notwithstanding the weakening economy, the Company was on track to exceed the GAAP diluted earnings per share of $2.71 achieved in fiscal 2006 even without giving effect to its acquisition of After Hours Formalwear, Inc. ("After Hours"), the largest men's formal wear chain in the U.S., which was expected to close in the first quarter.  According to Defendants, although the economic slowdown would result in comparable same-store sales in fiscal 2007 that were flat to a low single digit increase over the prior year, this more modest growth compared to fiscal 2006 would be offset by margin expansion that would result in a 10% to 14% increase in adjusted diluted earnings per share in 2007.

3.      In fact, however, based on the real time sales information available to them, Defendants knew or recklessly disregarded that sales were far below the Company's annual plan and revenue forecast that had been used to determine the external earnings guidance.  In particular, as early as the first quarter when the Company issued its guidance for fiscal 2007, sales at the Company's K&G stores, which had experienced a 6% decline in comparable same-store sales in the fourth quarter of 2006 and targeted more price sensitive customers who were the first to feel the impact of the recession, had continued to deteriorate and were significantly below plan.  Nevertheless, in a March 7, 2007 conference call with analysts, Defendants stated

---

[1] The Company's fiscal year began on February 4, 2007 and ended on February 2, 2008, with quarters ending on May 5, 2007, August 4, 2007, November 3, 2007, and February 2, 2008.

158612

that they were planning for same store sales at K&G that would be flat to 2% *higher* than the prior year.

4.      In addition, although Defendants stated that the accretive effect of the After Hours acquisition would help offset moderating trends in the Company's apparel business by increasing the Company's tuxedo rental revenues, immediately after acquiring After Hours, Defendants dismissed After Hours' founders and key management, discarded the business strategies that were the basis of the company's success, and standardized rental wear in its stores, all of which had a substantial adverse effect on After Hours' business.

5.      By the second quarter of 2007, the significant downward sales trends against plan, which had been clearly evident since the first quarter, was even more pronounced as was the need for a substantial downward revision of the Company's 2007 earnings guidance.  In addition, the integration of After Hours was causing a loss of revenue due to Defendants' dismantling of the sales force and field structure of After Hours that had created demand through close work with David's Bridal in favor of a unified approach across all Men's Wearhouse and After Hours stores.  Rather than reducing guidance, however, in an August 22, 2007 conference call with analysts, Defendants *increased* the Company's full-year GAAP diluted earnings per share guidance to a range of $2.98 to $3.02 per share.  In addition, Defendants falsely stated that they were pleased with how the After Hours integration was proceeding although the adverse effects of their changes in After Hours' business strategy were already evident.

6.      The Company's stock price rose in response to Defendants' materially false and misleading statements from $43.30 on March 7, 2007, the first day of the Class Period, to a Class Period high of $56.24 on July 17, 2007.  Thereafter, the stock continued to trade in the high $40 to low $50 range until mid-October, when Defendants announced modest downward adjustments

- 3 -

to the Company's third quarter earnings guidance on October 10, 2007, and to the annual guidance on November 28, 2007, and the artificial inflation in the Company's stock price caused by Defendants' misrepresentations slowly began to leak out.

7.     Defendants sought to blunt the impact of these announcements by attributing the lower guidance for the fourth quarter of 2007 issued on November 28, 2007, to unusual items including the After Hours acquisition and the relocation of the Company's Houston offices. Although the Company's stock price declined somewhat in response to these disclosures, it nevertheless remained inflated.  In truth, however, the lower guidance, which was still falsely inflated given the information available to Defendants, was attributable to the deteriorating sales trends against plan that had been evident to Defendants throughout 2007 and had been accelerating since the second quarter.  In addition, as Defendants knew but recklessly disregarded, these deteriorating sales trends were exacerbated by the Company's failed integration of After Hours due to Defendants' scrapping of After Hours' successful business model.

8.     It was not until January 9, 2008, that the Defendants finally acknowledged publicly what they had known since the beginning of fiscal 2007 – *i.e.*, that exceeding fiscal 2006 GAAP diluted EPS in fiscal 2007 was impossible given the severe economic downturn, which was adversely impacting the Company's business.  In response, the price of Men's Wearhouse common stock fell $7.60 per share or 30% to close at $17.84, far below its Class Period high of $56.24.  Unlike investors, who suffered substantial losses as a result of Defendants' fraudulent scheme, Defendants took full advantage of the artificial inflation in the Company's stock price throughout the Class Period by selling almost 300,000 shares of Men's Wearhouse common stock that they owned for gross proceeds of over $13.5 million.

- 4 -

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F. R. §240.10b-5].

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

11.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

12.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.    Lead Plaintiff Iron Workers Local 55 Pension Fund, as set forth in the certification filed in support of its motion for appointment as Lead Plaintiff and incorporated herein by reference, purchased the common stock of Men's Wearhouse during the Class Period and has been damaged thereby.

14.    Plaintiff Material Yard Workers Local 1175 Benefit Funds, as set forth in the certification filed with the initial complaint in this action and incorporated herein by reference, purchased the common stock of Men's Wearhouse during the Class Period and has been damaged thereby.

158612

15.     Defendant Men's Wearhouse is incorporated in Texas and maintains its headquarters at 6380 Rogerdale Road, Houston, TX 77072-1624. The Company operates as a specialty retailer of men's suits in the United States and Canada.

16.     (a)     Defendant George Zimmer ("Zimmer") is the Company's co-Founder and was, at all relevant times, the Chairman and Chief Executive Officer of Men's Wearhouse. Notwithstanding Zimmer's knowledge of the adverse facts affecting Men's Wearhouse's business during the Class Period, and the fact that this information was concealed from the public, Defendant Zimmer sold 265,500 shares of his Men's Wearhouse common stock at prices as high as $53.49 for proceeds of $12.9 million, benefiting from the inflation in the Company's stock price caused by Defendants' materially false and misleading statements.

(b)     Defendant Neill P. Davis ("Davis") is, and was at all relevant times, Chief Financial Officer, Executive Vice President and Treasurer of Men's Wearhouse. Notwithstanding Davis' knowledge of the adverse facts affecting Men's Wearhouse's business during the Class Period, and the fact that this information was concealed from the public, Defendant Davis sold 14,002 shares of his Men's Wearhouse common stock at prices as high as $50.60 for proceeds of more than $660,000, benefiting from the inflation in the Company's stock price caused by Defendants' materially false and misleading statements.

(c)     Defendants Zimmer and Davis are referred to herein as the "Individual Defendants."

17.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Men's Wearhouse, were privy to confidential and proprietary information concerning Men's Wearhouse, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public

- 6 -

information concerning Men's Wearhouse, as discussed in detail below. Because of their positions with Men's Wearhouse, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

18.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Men's Wearhouse's business.

19.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. In fact, the Individual Defendants were the chief spokespersons for the Company in communicating with investors and

- 7 -

securities analysts. Defendant Zimmer was directly quoted in press releases issued during the Class Period, and the Individual Defendants were the only Company officials who spoke during quarterly conference calls with securities analysts during which many of the materially false and misleading statements alleged herein were made. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Men's Wearhouse's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Men's Wearhouse common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

21.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Men's Wearhouse common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Men's Wearhouse's business, operations and management and the intrinsic value of Men's Wearhouse's common stock; (ii) allowed Defendants Zimmer and Davis and other insiders knowledgeable about the Company's true prospects to collectively sell 344,923 shares of their personally-held Men's

- 8 -

Wearhouse common stock for gross proceeds in excess of $16.7 million; and (iii) caused Lead Plaintiff and members of the Class to purchase Men's Wearhouse common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

22.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Men's Wearhouse between March 7, 2007 and January 9, 2008, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Men's Wearhouse common stock was actively traded on the NYSE. While the exact number of Class Members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Men's Wearhouse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

24.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

- 9 -

25.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

26.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Men's Wearhouse;

(c)     whether the price of Men's Wearhouse common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 10 -

## SUBSTANTIVE ALLEGATIONS

### Background

28.    Defendant Men's Wearhouse describes itself as "one of North America's largest specialty retailers of men's apparel with 1,284 stores."

29.    The Company's U.S. retail apparel stores are operated under the brand names of Men's Wearhouse and K&G. Men's Wearhouse's Canadian stores are operated under the brand name of Moores Clothing for Men. Under the Men's Wearhouse and Moores brands, the Company targets middle and upper-middle income men. Under the K&G brand, the Company targets the more price sensitive customer.

30.    On November 16, 2006, Men's Wearhouse entered into a definitive agreement with Federated Department Stores, Inc. and David's Bridal, Inc. to acquire After Hours, the largest men's formal wear chain in the U.S., for an aggregate purchase price of $100.0 million, subject to certain adjustments. Following the acquisition, After Hour's exclusive relationship with David's Bridal, Inc., the nation's largest bridal retailer, was extended to Men's Wearhouse and Moores store brands.

### Defendants' Scheme to Defraud

31.    Defendants' scheme involved reporting significantly inflated earnings guidance for fiscal 2007, which caused the Company's stock price to be artificially inflated, and allowed the Individual Defendants and other insiders with knowledge of the Company's true prospects to unload over 340,000 shares of Men's Wearhouse common stock that they owned for gross proceeds of over $16.7 million. The information contained in the following paragraphs is based on interviews with confidential witnesses, including individuals who held positions at the Company that provided them with access to the real time trend data available to Defendants

throughout the Class Period which revealed, as early as the first quarter of 2007, that the Company's publicly issued earnings guidance was unattainable due to the impact of the economic downturn on the Company's business.   In addition, several of the confidential witnesses held high level positions at After Hours and had personal knowledge of the wholesale changes in business practices implemented by Defendants after the acquisition, which adversely impacted After Hours' results.

### The Materially False and Misleading Earnings Guidance

32.     CW 1 held a high level senior management position with K & G at the time of his departure from the Company.  CW 1 had access to K & G daily sales data, cost data and internal forecasts.  CW 1 directly reported to Doug Ewert, the Company's Chief Operating Officer. CW 1 participated in Company-wide meetings that occurred during the Class Period.   During the meetings, CW 1 discussed with Defendants the Company's internal and external earnings estimates and strategic plans for dealing with expected revenue shortfall.

33.     According to CW 1, the Defendants knew that K & G's customers were very susceptible to economic downturn.   K & G's customer base was largely urban consumers focused on price discounts. The economic downturn that started in late 2006 quickly manifested itself in K & G's sales data in 2007.   The Company had a comprehensive forecasting system showing daily sales per store, region, division and company-wide. The system captured information on an almost real time basis and declining trends were readily apparent in just the first few weeks of the fiscal year.

34.     The Company's management developed its annual plan for fiscal year 2007 in November of 2006.  The annual plan contained a revenue forecast for 2007 that the Company used to determine external earnings guidance.  The annual plan also measured performance of

each division. According to CW 1, the Company's management (including the Defendants) had access to weekly sales data and to weekly forecasts that allowed them to observe how actual performance was trending against plan.

35.     According to CW 1, the Defendants knew that the 2007 guidance issued in March 2007 was inflated because it was evident from the sales data for the first quarter 2007 that K & G would suffer substantial revenue and gross margin shortfalls in 2007.

36.     According to CW 1, it became apparent to Defendants in early to mid second quarter of 2007 that K&G would suffer a 20 percent decrease in revenue for the quarter and fiscal year.  The decrease in revenue was based on weekly forecasting that showed a significant downward trend over the year as compared to plan.  Each of the Company's businesses forecasted separately and then a company-wide forecast was prepared.  The forecasts were created through a "give and take" between the Presidents of each operating business and Defendant Davis.  Each forecast required the blessing of Defendant Davis and/or the Chief Operating Officer, Doug Ewert.

37.     According to CW 1, the significant downward sales trends clearly evident by the Second Quarter dictated a substantial downward revision of the 2007 earnings guidance. However, Zimmer, Davis and Ewert pressured the operating Presidents into forecasting higher revenue than the actual trend data supported.  For example, in late March or early April of 2007, CW 1 told Ewert, Davis and Zimmer that making plan was going to be difficult because the economic downturn was already impacting K & G and that the trend was increasingly negative. In addition, CW 1 also told Ewert, Davis and Zimmer that expanding K & G into ladies apparel would exacerbate the negative revenue trend.  According to CW 1, notwithstanding this ominous report, Defendants wanted the revised second and third quarter 2007 revenue forecasts to reflect

- 13 -

only an 8 to 10 percent decrease against plan.   Because of the economic downturn and the expansion into ladies apparel, CW 1 told Ewert, Davis and Zimmer that a modest loss of 8 to 10 percent against plan was not realistic and that he believed the loss in revenue would be much more severe later into the year.   However, Defendant Davis refused to allow CW 1 to reflect the more severe downturn in his forecast and told CW 1 to stick with the "8 to 10" percent figure for the second and third quarter 2007.

38.     According to CW 1, K & G's CFO Brad Bell changed the initial forecasts for the second and third quarter 2007 to reflect Davis and Ewert's preference for an 8 percent revenue loss against plan.   The initial forecasts prepared by Bell had estimated at least a 12 percent revenue loss against plan for the second quarter and a 20 percent loss against plan for the third quarter.

39.     In addition, according to CW 1, Davis and Ewert wanted K & G's forecast to reflect only a 12 percent loss against plan for the fourth quarter.   However, during a meeting with Davis, Ewert and Zimmer that occurred mid-third quarter, Zimmer decided that the Company would not "anniversary" *i.e.*, repeat, the marketing it had engaged in during the fourth quarter of 2006.   CW 1 told Zimmer and Davis that without a fourth quarter advertising campaign, K & G would suffer a 25 percent reduction in revenue against plan for the quarter as the fourth quarter advertising campaign was very important to K & G's revenues.

40.     According to CW 1, the Company did not pay for a fourth quarter 2007 advertising campaign and did not reduce forecasts to reflect a larger expected revenue loss than previously estimated. The lack of a fourth quarter advertising campaign was inconsistent with Defendants' representations to investors that they would continue to fund advertising and television to help generate business through the economic slowdown.

- 14 -

158612

41.     The adverse impact of the economic slowdown was not limited to K&G. According to CW 2, a former District Sales Manager, Men's Wearhouse stores were also experiencing declining trends as early as late 2006.   CW 2 explained that the Company established annual sales goals for its stores.   A series of management meetings each February resulted in the individual store sales goals for the Company's fiscal year that begins in March. The individual goals set for the stores are based on the prior year results with an increase of 6%-8%. According to CW 2, a "good" goal was flat performance up to a 5% increase over the prior year. A 6% increase over the previous year was considered an "excellent" goal.

42.     In 2006, however, CW 2's District, and all others he was aware of, had missed their goals and, according to CW 2, it was no better in 2007.   Sales were down beginning in the first quarter, and the downward trend worsened with the economy.   According to CW 2, in his Zone (in 2007 the Districts were reorganized into larger Zones), sales were down an estimated 15-20% from 2006 and he learned, through discussions with other Region and Zone managers, that Men's Wearhouse and After Hours stores were down across the board.   Further, in July 2007, CW 2 was informed by both his immediate Regional Manager and Vice President that the Company was discussing a mid-year adjustment to lower the plan for the year to an attainable goal given that the original plan for the year could not be met.

### The After Hours Acquisition

43.     Men's Wearhouse closed the acquisition of After Hours on April 9, 2007. Immediately prior to the acquisition, Men's Warehouse operated 752 stores. The "After Hours" acquisition added 509 stores.   At the time of the sale, After Hours was the largest men's formalwear chain in the United States.   It operated under the "After Hours Formalwear" and "Mr. Tux" store fronts.   After Hours also had an exclusive relationship with David's Bridal, the

- 15 -

nation's largest bridal retailer with 269 stores and an online offering. The exclusivity remained effective after the acquisition and extended to Men's Warehouse and Moores store brands.

44.     CW 3 was an After Hours executive at the time of the acquisition.  CW 3 had access to information about the acquisition and has personal knowledge of the changes to After Hours' business model implemented immediately after the acquisition. According to CW 3, the Defendants promptly dismissed After Hours founders and key management.  The Defendants also standardized rental wear in the stores which led to a loss of key local business that primarily catered to weddings.  CW 3 recalls that After Hours executives warned the Company's top executives about such changes and their negative impact on sales.

45.     In 2007, CW 1 had discussions with Ewert, Davis and Zimmer about the After Hours acquisition.  According to CW 1, the Defendants decided to change the After Hours business model by imposing the Men's Wearhouse model of standardizing rental wear.  CW 1 confirmed that Defendants discarded the business strategies and plans of After Hours management.

46.     CW 4 was an After Hours manager prior to the acquisition. CW 4 participated in the acquisition meetings.  CW 4 recalls that the Company's executives were told that the After Hours wedding business generated from its relationship with David's Bridal was very important to After Hours' revenue stream.  Even after learning about the local wedding business and how it was generated by the relationship with David's Bridal, the Defendants disassembled the sales force and field structure of After Hours that was in place to create demand through close work with David's Bridal.

47.     As a result of the Company's systemic changes to the After Hours business model, the Company lost significant revenue.  CW 1 recalls that Defendants discussed the lost

158612

revenue resulting from the changes in the business model.  CW 4 also recalls that After Hours suffered a loss of business related to its relationship with David's Bridal immediately after the changes were implemented.

**Materially False And Misleading
Statements During The Class Period**

48.     The Class Period begins on March 7, 2007.  On that date, Men's Wearhouse issued a press release announcing its financial results for the fiscal fourth quarter and year end of 2006, the period ended February 3, 2007.  For the quarter, the Company reported operating income of $73.2 million, net income of $52.3 million and GAAP ("Generally Accepted Accounting Principles") diluted earnings per share ("EPS") of $0.95.  For the year, the Company reported operating income of $223.9 million, net income of $148.6 million, and GAAP diluted earnings per share of $2.71.  Commenting on the announcement, Defendant Zimmer stated, in pertinent part, as follows:

> Fiscal 2006 represented yet another year of outstanding results for all of our stakeholders.  In November 2006, we announced entering into an agreement to acquire After Hours Formalwear, a $250 million tuxedo rental revenue company which is currently expected to close in the first half of fiscal 2007.  Also in November 2006, we elected to redeem and retire our $130 million convertible bond indebtedness thereby strengthening our balance sheet.  In January 2007, we were named once again by FORTUNE(R) magazine as one of the 100 Best Companies to Work for In America.  Lastly, the Board of Directors has approved a 20% increase in the company's quarterly cash dividend from $0.05 per share to $0.06 per share.

With regard to the Company's guidance for 2007, the press release stated, in pertinent part, as follows:

> 2007 GUIDANCE AND HIGHLIGHTS
>
> For the fiscal year ending February 2, 2008, the company expects GAAP diluted earnings per share in a range of $2.80 to $2.91 based on a +1% to +2% same store sales increase in the U.S. and +3% to +4% in Canada, an

- 17 -

effective tax rate of approximately 37.55% and fully diluted shares outstanding of 54.6 million. The 2007 guidance and highlights do not give effect to the After Hours acquisition.

Forecasted operating highlights for the full year include the following:

- New store growth includes up to 15 net new K&G stores and 19 net new Men's Wearhouse stores. Total square footage growth is expected in the mid to high single digit range.

- Total sales for fiscal 2007 on a comparable 52 week basis are expected to increase in a range of 5% to 7% over the prior fiscal year.

- Gross margins are planned to continue to increase and stem largely from the company's ongoing strategy of increasing the penetration of its private label apparel product offerings and growth in tuxedo rentals.

- Selling, general, and administrative expenses, as a percentage of sales, are expected to be flat year over year. Expense leverage is expected in advertising and payroll; however it is being offset by increases in stock based compensation and general corporate overhead expenses.

- Operating income margins, on a comparable 52 week year basis, are anticipated to increase in the range of 50 to 90 basis points over the prior year.

For the first quarter of 2007, the company expects +1% to +2% same store sales growth in the U.S. and +5% to +6% in Canada and GAAP diluted earnings per share to be in the range of $0.63 to $0.67. In 2007, the start of the company's fiscal calendar is later than in the past because of last year's 53rd week. This late start means that the seasonal peak period (fiscal month of May) for the company's tuxedo rentals business will shift one week earlier in the fiscal calendar and therefore is expected to benefit the company's first quarter at the expense of the second quarter.

49.     The same day, after the market close, the Company held a conference call with analysts to discuss its earnings release for the fourth quarter and year ended February 3, 2007. In his prepared remarks, Defendant Davis elaborated on the Company's guidance stating:

On an adjusted basis diluted earnings per share are being planned to increase in a range of 10% to 14%[,] [s]pecifically from $2.63 to a range of $2.89 to $3.00.

Our same-store sales expectation calls for an increase in the range of 1% to 2% for our Men's Wearhouse group of stores. This pace of business

- 18 -

represents a modest slowdown from our results of this past year of 3%. We are planning for continued softness in our retail business and somewhat offset by continued gains in the tuxedo rental business.

For K&G we are planning flat to an increase of 2% same-store sales for the year, which represents an improvement over the prior year results of a negative 1.8%. This trend is reflective of our anniversaring versus strong comp gains in fiscal 2005 of 16.4%, as well as generally soft tailored clothing market in the U.S. A stronger tone of business, however is expected for our Canadian-based store, an increase in the range of 3% to 4%, due in large part to the macro economic environment as well as strength in tailored clothing in Canada. . . .

Total sales, then, for fiscal 2007, on a comparable 52-week basis are expected to increase in the range of 5% to 7% over the prior fiscal period.

Gross margins are planned to continue to increase and stem largely from the company's ongoing strategy of increasing the penetration of private label product offerings and growth in tuxedo rental revenues. . . . Operating income margins on a comparable 52-week basis are anticipated to increase in the range of 50 to 90 basis points.

50.     In his remarks, Defendant Zimmer emphasized the Company's continued success

in improving margins, stating:

Clearly, our continuing story is the margin expansion. Both operating margins and merchandise margins. Even including one-time charges, all three divisions were up in merchandise margins and operating margins, as well as top line and bottom line sales and earnings.

If we take a moment and look at our three largest divisions individually, K&G had the largest operating margin increase of the three, primarily caused by a doubling of our direct sourcing penetration. And as Neill mentioned, K&G also had the lowest comp numbers last year, but on a two-year basis, those numbers are actually higher than the other two divisions.

At Moores, our margin is almost up as much as K&G's, and we have the additional benefit of enjoying the highest comp and operating margins in the entire organization. Last year, we did make a change in our marketing strategy, and instead of running 60-second television commercials, we ran 15-second commercials. This increased the gross rating points, increased the traffic, and after experiencing in '05 a traffic decline, the increase in traffic generated fantastic results. In our flagship division, Men's Wearhouse stores, which represent two-thirds approximately, of our total, things continued to strengthen across many financial categories, and

metrics[,] [i]ncluding product margins and operating margins, which both surpassed historical highs.

Recent information from some vendors, competitors, and national research organization indicate that tailored clothing may be struggling down in the low single digits. Therefore, our numbers would suggest that our market share might be up. This is one reason why we want to continue to maintain and enhance our brand [t]hrough our strategy of every day low prices and few, if any, promotions. Regardless of the current economic trends and cycles, we continue to maintain our image.

* * *

To summarize, yes, we are experiencing a modest slowdown which began in the fourth quarter of last year, and which is reflected in the low single-digit projections. However, we are leveraging costs, both product and SG&A at a faster rate. Thus our consolidated operating margins this year are projected to be up again from last year's record, 11.9%.

51.    In response to the Company's positive announcements, the price of Men's Wearhouse stock rose $4.06 per share, or 9% - to close at $47.36 per share on March 8, 2007.

52.    Defendants' statements in the March 7, 2007 press release and conference call including that (i) notwithstanding moderating sales trends fiscal 2007 GAAP diluted EPS of 2.80 - $2.91 per share could be achieved even before giving effect to the After Hours acquisition; (ii) same-store sales for the Men's Wearhouse and K&G stores would be flat to + 2% positive in fiscal 2007; and (iii) margins would continue to improve and help offset weakening sales were materially false and misleading when made. As set forth in ¶¶ 32-42 above, K&G's customers, who were largely urban and relied on price discounts, were very susceptible to economic downtown, and real time trend data available to Defendants no later than the beginning of the first quarter of fiscal 2007 revealed that the deteriorating sales trend that had begun in the fourth quarter of fiscal 2006 with respect to K&G had quickly manifested itself in the first quarter of fiscal 2007 and that K&G would suffer substantial revenue and gross margin short falls in 2007 that would preclude the Company from meeting the earnings guidance issued. In addition, the

158612

declining sales trend was not limited to K&G but also extended to Men's Wearhouse stores, many of which had missed their 2006 goals and were also suffering the same downward trend as the K&G stores in the first quarter of 2007.

53.     On April 11, 2007, Men's Wearhouse issued a press release announcing its mid first quarter update of earnings per share guidance for the quarter ending May 5, 2007. With regard to the Company's guidance, Defendant Davis stated, in pertinent part, as follows:

> After a preliminary review of the first two months' results in our fiscal first quarter, we now expect Q1 2007 GAAP diluted EPS to be at the lower end of our initial guidance range of $0.63 to $0.67, primarily due to softening U.S. sales.

54.     On May 22, 2007, Men's Wearhouse issued a press release announcing its financial results for the fiscal first quarter of 2007, the period ended May 5, 2007. For the quarter, the Company reported operating income of $65.3 million, net income of $40.9 million and GAAP diluted EPS of $0.75 (with the After Hours acquisition contributing $0.08 to the GAAP diluted earnings per share). Commenting on the announcement, Defendant Zimmer stated, in pertinent part, as follows:

> During the quarter we completed the acquisition of After Hours Formalwear (AH) from Federated Department Stores. With the combination of 509 AH stores and MW's existing stores, we are now the leading retailer for the rental of men's formalwear with over 1,100 stores in the United States and Canada. We are sharply focused on capturing the synergistic potential of this acquisition and thereby enhancing shareholder value. Our current priority for the balance of this fiscal year is to complete the operational integration of AH with MW by the end of December 2007 in order to realize maximum synergies in our business model beginning in fiscal 2008. The principal elements of the integration plan involve the formulation of a branding strategy, developing a common inventory assortment, and the assimilation of store support services.

55.     With regard to the Company's guidance for the second quarter and full year of 2007, the press release stated, in pertinent part, as follows:

158612

SECOND QUARTER 2007 GUIDANCE AND UPDATED FISCAL 2007 OUTLOOK

For the second quarter of 2007, the company expects same store sales growth in the U.S. to be in a range of flat to +1% and in Canada to be in a range of +4% to +6%. GAAP diluted earnings per share are expected to be in the range of $0.88 to $0.92.

AH revenues for the second quarter are estimated in a range of $80 million to $85 million. After consideration of acquisition funding costs, AH is expected to be accretive to fiscal second quarter 2007 in a range of $0.15 to $0.17 per diluted share outstanding.

For the fiscal year ending February 2, 2008, the company expects GAAP diluted earnings per share in a range of $2.84 to $2.94. Same store sales changes in the U.S. for fiscal 2007 are expected to be in a range of -1% to flat and in Canada are expected to be in a range of an +3% to +5%. This represents a reduction from previous expectations in the U.S. of an increase of 1% to 2% which is reflective of continued soft tailored clothing sales at both Men's Wearhouse and K&G and principally driven by slower traffic levels.

AH revenues for fiscal 2007 are estimated in a range of $212.0 million to $217.0 million. After consideration of acquisition funding costs, AH is expected to be accretive to fiscal 2007 in a range of $0.03 to $0.05 per diluted share outstanding. It should be noted that the seasonality of AH revenues is heavily concentrated in April, May and June. Second quarter, followed by third quarter, is the highest revenue quarter for AH and first and fourth quarters are considered off season. Therefore, the profitability in the second and third quarters is mostly offset by losses in the first and fourth quarters.

This guidance includes an estimated effective tax rate of approximately 37.6% and fully diluted shares outstanding of 54.5 million.

56.     The same day, after the market close, the Company held a conference call with analysts to discuss its earnings release for the first quarter ended May 5, 2007. Defendant Davis began the call by stating that the Company was "pleased to be in a position . . . to report yet another quarterly increase in earnings per share." According to Davis, the increase in EPS in the first quarter had been "achieved in spite of a negative 1.3% same store sales result for [the Company's] U.S. based retail stores and was sharply better than [the Company's] mid-quarter

updated guidance."   According to Davis, the results were attributable to (i) "better than anticipated results at [the Company's] traditional Men's Wearhouse stores;" (ii) "lower payroll costs ... in response to slower sales trends;" and (iii) "stronger merchandise margins in Canada coupled with a much stronger than anticipated Canadian dollar."   In addition, while acknowledging moderating business trends, Defendant Davis stated that:

> We do not see nor anticipate an impending sharp decline, rather a continued moderation.   Our challenge in forecasting now is one of precision and not direction.   That said, we are trimming our comparable store sales expectations at our US based stores for the second quarter to a range of flat to an increase of 1% and for the full year, a range of a decrease of 1% to flat.   The implied strength in the second quarter from that guidance is reflective of the seasonal peak in the second quarter from tuxedo rental business.   While we are modestly challenged from a top line perspective, gross margins on the other hand are planned to continue to increase[,] [a]nd as we have said over a year now, result from our ongoing strategy of increasing the penetration of private label apparel across all of our retail businesses, as well as the growing mix of our sales being derived from tuxedo rentals.   This is offsetting from lower comparable store sales expectations. . . .   Sales for the second quarter and fiscal year from the inclusion of the After Hours operations are expected in a range of 80 million to 85 million and for the fiscal year 212 million to 217 million. Our second quarter diluted earnings per share guidance excluding the After Hours acquisition is being set at a range of 73 cents to 75 cents, [c]ompared to the prior year comparable quarter diluted earnings per share of 65 cents and current consensus estimates of 70 cents. The impact of the After Hours acquisition including estimated integrated cost current year synergies and acquisition funding costs is expected to be accretive to the diluted earnings per share in a range of 15 cents to 17 cents bringing the quarter and including After hours to a range of 88 cents to 92 cents.   Our fiscal 2007 diluted earnings per share guidance excluding the After Hours acquisition is being set at a range of $2.81 to $2.89 compared to our previous guidance range of $2.80-$2.91 and to comparable prior year adjusted diluted earnings per share of $2.55.   The impact of the After Hours acquisition including integration costs, current synergies, and acquisition funding costs is expected to be accretive to diluted [earnings] per share in a range of 3 cents to 5 cents bringing the full year, including After Hours to a range of $2.84 to $2.94.

57.   In response to the Company's earnings announcement which represented, among other things, that the Company had exceeded its earnings guidance issued on April 11, 2007,

shares of the price of Men's Wearhouse stock rose $4.44 per share, or 10% – to close at $49.98 per share on May 23, 2007.

58.     Defendants' statements in the May 22, 2007 press release and conference call that the Company was on track to achieve diluted EPS of $2.81 to $2.89 in fiscal 2007 and that same store sales in the U.S. would be in the range of -1% to flat were materially false and misleading for the reasons stated in ¶ 52, above.

59.     On July 11, 2007, Men's Wearhouse issued a press release announcing its mid second quarter update of earnings per share guidance for the quarter ending August 4, 2007. With regard to the Company's guidance, Defendant Davis stated, in pertinent part, as follows:

> After a preliminary review of the first two months' results in our fiscal second quarter, we now expect Q2 2007 GAAP diluted EPS to meet or exceed the higher end of our initial guidance range of $0.88 to $0.92, primarily due to stronger retail apparel sales at the company's traditional Men's Wearhouse stores.

60.     In response to the Company's increased guidance, shares of the Company's stock rose $3.23 per share, or 6% – to close at $54.33 per share on July 12, 2007.

61.     On August 22, 2007, Men's Wearhouse issued a press release announcing its financial results for the fiscal second quarter of 2007, the period ended August 4, 2007. For the quarter, the Company reported operating income of $82.7 million, net income of $54.2 million and GAAP diluted EPS of $1.00 (with the After Hours acquisition contributing $0.24 to the GAAP diluted earnings per share). With regard to the Company's guidance for the third quarter and full year of 2007, the press release stated, in pertinent part, as follows:

> THIRD QUARTER 2007 GUIDANCE AND UPDATED FISCAL 2007 OUTLOOK
>
> For the third quarter of 2007, the Company expects same store sales growth in the U.S. to be in a range of flat to +1% and in Canada to be in a

- 24 -

range of +2% to +4%.  GAAP diluted earnings per share are expected to be in the range of $0.70 to $0.73.

After Hours revenues for the third quarter are estimated in a range of $64 million to $66 million.  After consideration of acquisition funding costs, AH is expected to be accretive to fiscal third quarter 2007 in a range of $0.06 to $0.07 per diluted share outstanding.

For the fiscal year ending February 2, 2008, the Company expects GAAP diluted earnings per share in a range of $2.98 to $3.02.  Same store sales changes in the U.S. for fiscal 2007 are expected to be flat to +1% and in Canada are expected to be in a range of +4% to +5%.

After Hours revenues for fiscal 2007 are estimated in a range of $208 million to $212 million.  After consideration of acquisition funding costs, AH is expected to be accretive to fiscal 2007 in a range of $0.10 to $0.12 per diluted share outstanding.  It should be noted that the seasonality of AH revenues is heavily concentrated in April, May and June.  Second quarter, followed by third quarter, is the highest revenue quarter for AH and first and fourth quarters are considered off season.  As a result, AH typically has income in the second and third quarters and losses in the first and fourth quarters.

For the third quarter, the guidance includes an estimated effective tax rate of approximately 37.4% and fully diluted shares outstanding of 53.9 million.  For the full year, the estimated effective tax rate is 36.6% and the fully diluted shares outstanding are estimated to be 54.2 million.

62.    The same day, after the market close, the Company held a conference call with analysts to discuss its earnings release for the second quarter ended August 4, 2007. Commenting on the Company's increased earnings guidance for the year, Defendant Davis stated:

> For the upcoming third quarter, we are looking for a low, single-digit increase and comparable store sales for our Men's Wearhouse stores, which is expected to be offset by a mid, single digit decrease at our K&G stores, thereby resulting in a flat to increase of 1% range for our U.S.-based store group.  In Canada, we are projecting a plus 2% to plus 4% increase.  The contribution to revenues for the third quarter from the operations of After Hours [sic] and in the range of $64 million to $66 million.  This update for the third quarter will result in full-year comparable store sales increases in the U.S. of flat to up 1% and a plus 4 to plus 5 increase in Canada.  Full-year revenues for After Hours are expected in a range of $208 million to $212 million. . . .  We are

- 25 -

increasing our full-year diluted earnings per share guidance to a range of $2.98 to $3.02. This is up from previous guidance of $2.84 to $2.94 and . . . After Hours is expected to be accretive in a range now to $0.10 to $0.12.

63.     In his prepared remarks, Defendant Zimmer emphasized the positive impact of the

After Hours acquisition on the Company's business stating:

> [T]he tuxedo rental business is counter[-]seasonal to our retail apparel businesses. The seasonal peaks in tuxedo rental occur in the second and third fiscal quarters while the seasonal peaks in the apparel business occur in the fourth and first fiscal quarters. Five years ago, in fiscal 2002, which was the bottom of the last economic downturn, tuxedo rental revenues comprised only 2.5% of our consolidated revenues. Next year fiscal 2008, we are estimating that tuxedo rentals wills represent approximately 17% of consolidated sales. This growth drives earnings more than sales. So what has been developing over the years, within our portfolio of businesses, is a balancing of both short-term seasonality and long-term cycles in a way we believe that lessens the business risks inherent in our group of businesses. . . . We are already feeling the affects of the upside from the combination of the After Hours organization with that of Men's Wearhouse, as you heard Neill earlier report. We are running ahead of our financial targets through the second quarter. Based on that experience we have increased our outlook for the year and that is reflected in the guidance that Neil provided.

64.     Defendant Zimmer also addressed the reported decline in comparable K&G store

sales as follows:

> While many aspects of our business are strong and improving, some are less so. K&G, our big box deep discount retail concept continues to be challenged with nonemployment-related macro economic trends, mainly rising energy and housing costs. In addition, we have increased the store base of K&G over the last 12 months by 18%, with most of that growth in existing markets, our internal analysis suggests that we may be experiencing a higher than expected level of cannibalization of sales from existing stores, thereby exerting pressure on our comparable store sales results as we've reported. I will say that our management team at K&G is doing a great job of mitigating weaker sales results by improving markups, primarily cost-driven, as Neill said, controlling markdowns, and controlling operating costs. The result, operating income at K&G is estimated to be approximately the same this year as compared to last year, even under the weight of a negative 6.9% comparable store sales result in the second quarter. At the same time, we do remain focused on building

- 26 -

the K&G brand through initiatives such as increasing our boys merchandise assortments that customers seem to be responding well to, the development of a frequent shopper program, expected to come online within the next 12 months, as well as continuing to spend our advertising dollars on television, not promotional print.... In summary we are pleased with our consolidated results, happy with the pace and results of the After Hours integration, satisfied with our margin growth and we remain cautiously optimistic about the balance of the year.

65.     In response to Defendants' remarks, analyst Janet Kloppenburg of JJK Research asked whether management had considered the fact that business trends could worsen with respect to K&G, stating, "I would like you to make me feel comfortable that it wouldn't worsen." Defendant Zimmer responded:

> Here's what I can tell you, Janet.  You've noticed that our board's approved a $100 million stock repurchase....And we did that because we wanted to send the message that even if things were to weaken, and God help us, it could, we would still be financially strong enough to make a $100 million stock repurchase.  So without giving you the details on individual divisions, we still feel pretty good about things, even in kind of the worst case.

Defendant Davis added:

> Janet, Janet, let me just add.  We're continuing to fund the advertising and television that George mentioned that's in support of the brand, and they are -- the operating team there is working on some new merchandise programs, an expansion of existing ones to help through this process.  At some point in time, the macrotrends, you can't deal with it.  And the last thing, the profitability, even with the challenges we have for this year.

> Imagine with almost a 7% negative comp, we're making the same money. I think that's kind of the reassurance that I feel.

66.     Defendants' statements in the August 22, 2007 press release and conference call referenced above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts set forth in ¶¶ 32-47 above, which were known to Defendants or recklessly disregarded by them, including:

(a)     that the Company's earnings guidance and its statements about K&G were predicated on forecasts that were far less negative than K&G's management had prepared. Indeed, Defendant Davis had refused to allow K&G management to reflect their initial projections of a 20% loss in revenue against plan for the third quarter in their forecasts;

(b)     that the Company had altered the After Hours business model following the acquisition and as a resulted the Company lost significant revenue that prior to the acquisition had been attributed to the strategic relationship between After Hours and David's Bridal;

(c)     that the Company was experiencing significant difficulties integrating the After Hours acquisition because key personnel had been terminated and business strategies significantly altered which was causing a severe disruption in that division's business and reducing sales volumes below budgeted levels;

(d)     that, given the deteriorating demand for the Company's products, the Company was forced to significantly discount beyond customary discounts which would further erode earnings; and

(e)     that as a result of the foregoing, Defendants' positive statements concerning the Company's guidance and prospects were lacking in a reasonable basis at all relevant times.

67.     On October 10, 2007, Men's Wearhouse issued a press release announcing its mid third quarter update of earnings per share guidance for the quarter ending November 3, 2007, which lowered the Company's previously issued guidance. Defendant Davis, commenting on the Company's lowered guidance, stated, in pertinent part, as follows:

> After a preliminary review of the first two months' results in our fiscal
> third quarter, we are updating our Q3 2007 GAAP diluted EPS estimate to

- 28 -

be in the range of $0.66 to $0.70, up approximately 14% to 21% over last year's third quarter GAAP results of $0.58 per diluted share. This new estimate updates our prior guidance of $0.70 to $0.73, provided on August 22, 2007.

There are two principal reasons for the refinement of our third quarter estimate range. First, continued softening in traffic trends is driving weaker than planned comparable store sales at the company's K&G stores. Second, the process of integrating the recently acquired After Hours stores has required a number of operating and systems changes which has resulted in lower tuxedo rental unit volume during this adjustment period. Our integration process of After Hours continues and we remain excited about the potential return on this investment and its impact on our continued long-term earnings growth.

68.    In response to the Company's announcement of lowered third quarter guidance due to weak sales at its K&G stores and integration problems with the After Hours acquisition, which had been known to the Company but concealed from investors, the price of Men's Wearhouse common stock fell $4.32 per share, or approximately 9%, to close at $44.16 per share, on October 10, 2007, on heavy trading volume. Defendants, however, continued to conceal the true scope of the problems at the Company.

69.    On November 28, 2007, Men's Wearhouse issued a press release announcing its financial results for the third quarter of fiscal 2007, the period ended November 3, 2007. For the quarter, the Company reported operating income of $59.2 million, net income of $37.1 million and GAAP diluted earnings per share of $0.69 (with the After Hours acquisition contributing $0.05 to the GAAP diluted earnings per share). With regard to the Company's guidance for the fiscal fourth quarter and full year of 2007, the press release stated, in pertinent part, as follows:

FOURTH QUARTER 2007 GUIDANCE AND UPDATED FISCAL 2007 OUTLOOK

For the fourth quarter of 2007, the Company expects same store sales growth in the U.S. to be in the negative low single digit range and in Canada to be in a range of flat to +2%. GAAP diluted earnings per share are expected to be in the range of $0.43 to $0.48.

- 29 -

After Hours revenues for the fourth quarter are estimated in a range of $24 million to $26 million. After consideration of acquisition funding costs, After Hours is expected to be dilutive to fiscal fourth quarter 2007 in a range of $0.31 to $0.32 per diluted share outstanding. It should be noted that the seasonality of After Hours revenues is heavily concentrated in April, May and June. Second quarter, followed by third quarter, is the highest revenue quarter for After Hours and first and fourth quarters are considered off season. As a result, After Hours typically has income in the second and third quarters and losses in the first and fourth quarters.

For the fiscal year ending February 2, 2008, the Company expects GAAP diluted earnings per share in a range of $2.87 to $2.92. Same store sales changes in the U.S. for fiscal 2007 are expected to be a decrease of 1% to flat and in Canada are expected to be in a range of +2% to +4%.

After Hours revenues for fiscal 2007 are estimated in a range of $201 million to $203 million. After consideration of acquisition funding costs, After Hours is expected to be accretive to fiscal 2007 in a range of $0.05 to $0.06 per diluted share outstanding.

For the fourth quarter, the guidance includes an estimated effective tax rate of approximately 37.3% and fully diluted shares outstanding of 53.3 million. For the full year, the estimated effective tax rate is 36.6% and the fully diluted shares outstanding are estimated to be 54.0 million.

70.      The same day, after the market close, the Company held a conference call with analysts to discuss its earnings release for the third quarter ended, November 3, 2007. Commenting on the Company's third quarter results and the Company's guidance for the fourth quarter and year end 2007, Defendant Davis stated:

Third quarter earnings per share of $0.69 which represents year over year growth of 19% was slightly below our original guidance of $0.70 to $0.73. However, it was at the high end of our revised guidance range of $0.66 to $0.70, provided at our mid-quarter update in early October. The third quarter 2007 results included $0.05 of accretion from our acquisition of After Hours formal wear earlier in the year and a strong Canadian dollar provided $0.01 of upside. I would also point out that our effective tax rate was higher this year over last year, which had the effect of increasing last year's earnings per share by $0.02. Our operating income margin increased 21 basis points to 11.55%, as gross margin expansion more than offset increases in SG&A expenses.

Based on our initial sales results for November, we believe the fourth quarter will be challenging. And, therefore, have modified our guidance.

- 30 -

We are making modest changes to our promotional activities and we have reviewed our inventory positions, in consideration of the range of guidance we are providing. Overall, we feel comfortable with our mix and levels of inventory, and do not foresee issues which would cause us to modify our historical markdown cadence. That said, we are establishing our fourth quarter '07 earnings per share in the range of $0.43 to $0.48 and for the full year, a range of $2.87 to $2.92. . . .

71.    Seeking to blunt the impact of the downward adjustment to the Company's guidance he had just announced, Defendant Davis continued:

Comparability of this year's fourth quarter to that of the prior year is being significantly influenced by a number of items and events, some of which occurred in last year's quarter and some of which in this year's quarter. We will offer detail and hopefully that will allow for a clearer interpretation and assessment of our earnings per share performance. Let me review last year's items and events.

First, the fourth quarter of last year included 14 weeks of operations, based on the 53 week retail calendar. That additional week of operation added $0.08 to diluted earnings per share. Second, our effective tax rate of 28.7% was significantly lower than this year's rate of 37.4%. . . . The impact of that lower effective tax rate increased diluted earnings per share $0.11. The net effect of these items increased the prior year's diluted earnings per share by an aggregate of $0.19.

Concerning this year's fourth quarter, with the acquisition of the 509 store chain After Hours, tuxedo rentals will not approximate 6.3% of consolidated sales for the fourth quarter, as compared to the prior quarter mix of 2.7%. The fourth quarter represents the seasonal low point for our tuxedo rental revenues or approximately 11% of our total annual rental revenues. This seasonal profile results in operating losses in the fourth quarter as the growth [sic] profit from rental revenues are insufficient to cover fixed infrastructure cost. Based on that seasonal profile and after consideration of funding costs, After Hours is expected to be dilutive to the fourth quarter fiscal 2007 in the range of $0.31 to $0.32.

The fourth quarter of this year includes costs associated with the relocation of the Company's corporate offices in Houston as well as the effect of our current year adoption of the emerging issues task force bulletin 0607 . . . . The impact of these items to dilutive earnings per share is approximately $0.02. The net effect then of these items is expected to decrease the current year's fourth quarter diluted earnings per share by $0.33 to $0.34. *Applying these adjustments to this year's fourth quarter and last year's fourth quarter, diluted earnings per share are then*

- 31 -

*expected in a range of $0.77 to $0.81 for the current year and would compare to the prior year of $0.76.*

This adjusted year-over-year increase in diluted earnings per share for the fourth quarter is based on a flat to 1% increase in comparable store sales for our Men's Wearhouse stores, a low double-digit decrease in our K&G stores, resulting in a low single digit decrease for our U.S. based group of stores. In Canada, we are projecting a flat to 2% increase. Our full year diluted earnings per share guidance then is in a range of $2.87 to $2.92 as I said earlier. After Hours is expected to be accretive to the full year in a range of $0.05 to $0.06 in diluted earnings per share. [Emphasis added.]

72.    In response to the Company's earnings announcement and reduced guidance for fiscal 2007, the price of Men's Wearhouse common stock fell $6.72 per share, or 16%, to close at $34.33 per share, on November 29, 2007 on heavy trading volume.

73.    Defendants' statements in the November 28, 2007 press release and conference call referenced above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts set forth in ¶ 66 above. In addition, Defendants' statements were materially false and misleading because they failed to disclose that the Company had decided in the third quarter not to fund a fourth quarter advertising campaign, which would have a substantial, adverse impact on K&G's already weak sales. Although CW 1 informed Defendants that the failure to advertise would result in a 25% reduction in revenue against plan, Defendants nevertheless insisted that K&G reflect only a 12% loss against plan in K&G's forecast for the fourth quarter.

74.    Then, on January 9, 2008, Men's Wearhouse shocked the market when it issued a press release announcing its mid fourth quarter update of earnings per share guidance for the quarter ending February 2, 2008. With regard to the Company's lowered guidance, Defendant Davis stated, in pertinent part, as follows:

After a preliminary review of the first two months' results in our fiscal fourth quarter, we are updating our Q4 2007 GAAP diluted EPS estimate

- 32 -

to be in the range of $0.16 to $0.18, and Fiscal Year 2007 GAAP diluted EPS to be in a range of $2.60 to $2.62. This new estimate updates our prior guidance of $0.43 to $0.48 for the fourth quarter and $2.87 to $2.92 for the fiscal year, provided on November 28, 2007.

Substantially lower traffic levels at all of the company's retail stores, in both the United States and Canada, for the month of December drove weaker than planned comparable store sales results. The company anticipates continued weak traffic trends for January. Excluding occupancy costs, gross profit as a percentage of total sales is estimated to be in line with initial plans for the quarter. Deleverage of occupancy, selling, general and administrative expenses resulted from the weaker than anticipated comparable store sales.

75.     In response to the Company's reduced guidance for fiscal 2007, the price of Men's Wearhouse common stock fell $7.60 per share, or 30%, to close at $17.84 per share, on January 10, 2008, on extremely heavy trading volume.

76.     On March 12, 2008, Men's Wearhouse issued a press release announcing its financial results for the fourth quarter and year end of fiscal 2007, the period ended February 2, 2008. For the quarter, the Company reported operating income of $21.5 million, net income of $14.8 million and diluted EPS of $0.28 (with After Hours decreasing the diluted earnings per share by $0.37). Although EPS was higher than the Company's most recent guidance, it was still far below the Company's initial guidance for the quarter of $0.43 to $0.48. For the year, the Company reported GAAP diluted EPS of just $2.73, including After Hours, far below the Company's initial guidance of $2.80 - $2.91, without After Hours.

77.     The market for Men's Wearhouse common stock was open, well developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Men's Wearhouse common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired Men's Wearhouse common stock relying upon the integrity of the market price of Men's

158612

Wearhouse common stock and market information relating to Men's Wearhouse, and have been damaged thereby.

78.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Men's Wearhouse common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations as alleged herein.

79.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Men's Wearhouse's business, prospects and operations.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Men's Wearhouse and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

80.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

- 34 -

158612

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Men's Wearhouse, their control over, and/or receipt and/or modification of Men's Wearhouse's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Men's Wearhouse, participated in the fraudulent scheme alleged herein.

81.     Defendants were further motivated to engage in this course of conduct in order to allow Defendants Zimmer and Davis and other Company insiders knowledgeable about the Company's prospects to collectively sell 344,923 shares of their personally held Men's Wearhouse common stock for gross proceeds in excess of $16.7 million.   The insider shares sold during the Class Period are set forth more fully in the following chart:

| Insider | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Neill Davis | 3/12/2007 | 7,500 | $46.59 | $349,425 |
| | 3/12/2007 | 3,752 | $46.59 | $174,806 |
| | 3/12/2007 | 750 | $46.59 | $34,943 |
| | 6/13/2007 | 2,000 | $50.60 | $101,200 |
| | | 14,002 | | $660,373 |
| | | | | |
| Douglas Ewert | 3/12/2007 | 4,500 | $47.40 | $213,300 |
| | 3/12/2007 | 3,000 | $47.40 | $142,200 |
| | 3/12/2007 | 1,500 | $47.40 | $71,100 |
| | 5/29/2007 | 6,421 | $50.29 | $322,912 |
| | | 15,421 | | $749,512 |
| | | | | |
| George Zimmer | 3/21/2007 | 37,500 | $47.37 | $1,776375 |
| | 4/23/2007 | 37,500 | $43.65 | $1,636,875 |
| | 5/21/2007 | 37,500 | $46.36 | $1,738,500 |
| | 6/21/2007 | 37,500 | $51.23 | $1,921,125 |
| | 7/23/2007 | 37,500 | $53.49 | $2,005,875 |
| | 8/21/2007 | 37,500 | $50.28 | $1,885,500 |
| | 9/2412007 | 37,500 | $49.48 | $1,855,500 |
| | 10/19/2007 | 3,000 | $39.94 | $119,820 |
| | | 265,500 | | $12,939,570 |
| | | | | |
| James Zimmer | 4/212007 | 50,000 | $47.34 | $2,367,000 |
| | | | | |
| **Grand Total:** | | **344,923** | | **$16,716,455** |

**Loss Causation/Economic Loss**

82.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Men's Wearhouse common stock and operated as a fraud or deceit on Class Period purchasers of Men's Wearhouse common stock by failing to disclose to investors that the Company was experiencing sales far below plan, including weak sales at its K&G stores, and integration problems with the After Hours acquisition.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Men's Wearhouse common stock fell precipitously as the prior artificial inflation came out.   As a result of their purchases of Men's Wearhouse common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

83.     By failing to disclose to investors that the Company was experiencing sales far below plan and integration problems with the After Hours acquisition, among other things, Defendants presented a misleading picture of Men's Wearhouse's business and prospects. Defendants' false and misleading statements had the intended effect and caused Men's Wearhouse common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $56.24 per share on July 17, 2007.

84.     As a direct result of information disclosed on October 10, 2007, November 28, 2007 and January 9, 2007, the price of Men's Wearhouse common stock fell precipitously, falling from $48.48 per share on October 10, 2007 to $17.84 per share on January 10, 2008 – a decline of 63%.  These drops removed the inflation from the price of Men's Wearhouse common stock, causing real economic loss to investors who had purchased Men's Wearhouse common stock during the Class Period.

158612

85.    The 63% decline in the price of Men's Wearhouse common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Men's Wearhouse common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Men's Wearhouse common stock and the subsequent significant decline in the value of Men's Wearhouse common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

86.    At all relevant times, the market for Men's Wearhouse common stock was an efficient market for the following reasons, among others.

(a)    Men's Wearhouse common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Men's Wearhouse filed periodic public reports with the SEC and the NYSE;

(c)    Men's Wearhouse regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

158612

(d)     Men's Wearhouse was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

87.     As a result of the foregoing, the market for Men's Wearhouse common stock promptly digested current information regarding Men's Wearhouse from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Men's Wearhouse common stock during the Class Period suffered similar injury through their purchase of Men's Wearhouse common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

88.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Men's Wearhouse who knew that those statements were false when made.

158612

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

89.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and ( c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

92.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Men's Wearhouse common stock. Lead Plaintiff and the Class would not have purchased Men's Wearhouse common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

93.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Men's Wearhouse common stock during the Class Period.

158612

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

94.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     The Individual Defendants acted as controlling persons of Men's Wearhouse within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Men's Wearhouse, and their ownership of Men's Wearhouse stock, the Individual Defendants had the power and authority to cause Men'sWearhouse to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as counsel for the Class;

B.     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

158612

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED:   February 26, 2010                    SCHWARTZ, JUNELL, GREENBERG &
                                                                      OATHOUT, LLP


                                                                      */s/ Roger B. Greenberg*
                                                                      ROGER B. GREENBERG

                                                                      Roger B. Greenberg
                                                                      Federal I.D. No. 3239
                                                                      Texas State Bar No. 08390000
                                                                      Thane Tyler Sponsel III
                                                                      Federal LD. No. 690068
                                                                      Texas State Bar No. 24056361
                                                                      Two Houston Center
                                                                      909 Fannin Street, Suite 2700
                                                                      Houston, Texas 77010
                                                                      Telephone: (713) 752-0017
                                                                      Facsimile: (713) 752-0327
                                                                      *Liaison Counsel*

                                                                      WHATLEY DRAKE & KALLAS, LLC
                                                                      Joe R. Whatley, Jr.
                                                                      Deborah Clark-Weintraub
                                                                      Richard P. Rouco
                                                                      1540 Broadway, 37th Floor
                                                                      New York, New York  10036
                                                                      Telephone:  (212) 447-7070
                                                                      Facsimile: (212) 447-7077

                                                                      *Lead Counsel*

158612

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of February, 2010, true and correct copies of the foregoing *Amended Class Action Complaint for Violations of Federal Securities Laws* have been served by U.S. Certified Mail, Return Receipt Requested, upon the following:

Mr. Gerard G. Pecht                    CM/RRR# 7009 1680 0001 1928 2608
Fulbright & Jaworski
1301 McKinney, Suite 5100
Houston, Texas 77010
*Counsel for Defendants*


                              /s/ Roger B. Greenberg
                              Roger B. Greenberg

158612