IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MATERIAL YARD WORKERS LOCAL 1175 | § | |
| BENEFIT FUNDS, on behalf of itself and others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. H-09-03265 |
| | § | JUDGE LYNN N. HUGHES |
| v. | § | |
| | § | |
| THE MEN'S WEARHOUSE, INC., GEORGE | § | |
| ZIMMER, AND NEILL P. DAVIS, | § | |
| | | |
| Defendants. | | |

**DEFENDANTS' MOTION TO DISMISS AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ............................................................................. 1

NATURE AND STAGE OF PROCEEDINGS ..................................................... 4

SUMMARY OF FACTUAL ALLEGATIONS ..................................................... 4

    A.    TMW Made Numerous Cautionary Statements and Risk Disclosures ................................................................................ 5

    B.    TMW's Alleged False Statements ....................................................... 7

        1.    March 7, 2007 End-of-Year Press Release And Conference Call ..................................................................... 7

        2.    April 11, 2007 Mid-Quarter Press Release .................................. 9

        3.    May 22, 2007 End-of-Quarter Press Release and Analyst Call ..................................................................... 9

        4.    July 11, 2007 Mid-Quarter Press Release .................................. 10

        5.    August 22, 2007 End-of-Quarter Press Release and Analyst Call .................................................................. 11

        6.    October 10, 2007 Mid-Quarter Press Release ............................ 12

        7.    November 28, 2007 End-of-Quarter Press Release and Analyst Call ................................................................. 13

        8.    January 9, 2008 Mid-Quarter Press Release ............................... 14

    C.    Plaintiffs' Deficient "Confidential Source" Allegations........................ 15

ISSUES TO BE RULED UPON AND STANDARD OF REVIEW ......................... 20

ARGUMENT AND AUTHORITIES ..................................................................... 21

I. PLAINTIFFS HAVE FAILED TO STATE A SECTION 10(B)/RULE 10B-5 CLAIM ........ 21

    A.    Plaintiffs Do Not Allege Particularized Facts Showing A Material False  Statement Or Actionable Omission ............................... 21

    B.    The Allegations Do Not Support A Strong Inference Of Scienter ......... 22

        1.    Plaintiffs Do Not Allege Particularized Facts Demonstrating That Zimmer Or Davis Knew Their Forward-Looking Statements Were False Or Made Any Other Statements With Scienter .................................. 24

        2.    The Stock Sale Allegations Do Not Demonstrate Scienter ........ 26

    C.    Plaintiffs' "Confidential Witness" Allegations Are Grossly Deficient.................................................................................. 28

# TABLE OF CONTENTS

**Page**

D.    Plaintiffs' Claims Are Barred By The Safe Harbor For Forward-Looking Statements ................................................................. 31

    1.    The PSLRA Establishes A Statutory Safe Harbor ...................... 31

    2.    TMW's Statements Were Forward-Looking And Were Accompanied By Meaningful Cautionary Language .................. 32

E.    Plaintiffs Fail To Allege Loss Causation ................................................. 33

II.    PLAINTIFFS' CONTROL PERSON CLAIMS FAIL BECAUSE THERE IS NO PRIMARY CLAIM ................................................................................ 34

CONCLUSION ................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ABC Arbitrage v. Tchuruk,*
    291 F.3d 336 (5th Cir. 2002) ...................................................................28, 31

*Abrams v. Baker Hughes, Inc.,*
    292 F.3d 424 (5th Cir. 2002) .............................................................22, 25, 30

*ACA Fin. Guar. Corp. v. Advest, Inc.,*
    512 F.3d 46 (1st Cir. 2008)...........................................................................24

*In re Alamosa Holdings,*
    382 F. Supp. 2d 832 (N.D. Tex. 2005) ....................................................23, 28

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.,*
    _ F.3d _, 2010 WL 481407 (5th Cir. Feb. 12, 2010) .......................................33

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)..................................................................................21

*In re Azurix Corp. Secs. Litig.,*
    198 F. Supp. 2d 862, *aff'd,* 332 F.3d 854 (5th Cir. 2003) ....................22, 23, 25

*Bell Atl. Corp. v. Twombly,*
    127 S. Ct. 1955 (2007)..................................................................................21

*In re Bisys Secs. Litig.,*
    496 F. Supp. 2d 384 (S.D.N.Y. 2007)............................................................23

*Brodsky v. Yahoo! Inc.,*
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) .........................................................27

*In re Capstead Mortgage Corp. Sec. Litig.,*
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ..........................................................33

*Catogas v. Cyberonics, Inc.,*
    292 Fed. Appx. 311 (5th Cir. 2008)...............................................................32

*Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,*
    497 F.3d 546 (5th Cir. 2007) ..........................................................................1

*In re Cerner Corp. Secs. Litig.,*
    425 F.3d 1079 (8th Cir. 2005) .......................................................................29

*Coates v. Heartland Wireless Communs., Inc.*,
    55 F. Supp. 2d 628 (N.D. Tex. 1999) ................................................................21

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
    504 F. Supp. 2d 151 (N.D. Tex. 2007) ..............................................................31

*Cordova v. Lehman Bros.*,
    526 F. Supp. 2d 1305 (S.D. Fla. 2007) ..............................................................23

*In re Cyberonics Inc. Secs. Litig.*,
    523 F. Supp. 2d 547 (S.D. Tex. 2007) ...............................................................23

*In re Dell Inc.*,
    591 F. Supp. 2d 877 (W.D. Tex. 2008)...............................................................28

*In re Enron Corp. Secs., Deriv. & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) ...............................................................27

*Financial Acquisition Partner v. Blackwell*,
    440 F.3d 278 (5th Cir. 2006) ..............................................................................20

*Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*,
    565 F.3d 200 (5th Cir. 2009) ........................................................................20, 23

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir. 2003) ..............................................................................29

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ..............................................................................24

*Home Solutions of Am. Inv. Grp. v. Fradella*,
    2008 WL 1744588 (N.D. Tex. Mar. 24, 2008)...................................................32

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ................................................................................1

*Kunzweiler v. Zero.net, Inc.*,
    No. 3:00-CV-2553-P, 2002 U.S. Dist. LEXIS 12080 (N.D. Tex. July 3, 2002) ..............20

*In re Michaels Stores, Inc. Secs. Litig.*,
    2004 WL 2851782 (N.D. Tex. Dec. 10, 2004) ..................................................27

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2003) ..............................................................................20

*In re Odyssey Healthcare, Inc. Secs. Litig.*,
    424 F. Supp. 2d 880 (N.D. Tex. 2005) ...............................................................25

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
   No. Civ. A. H-06-3022, 2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ..........................21

*In re Patterson Companies, Inc. Secs., Deriv. & ERISA Litig.*,
   479 F. Supp. 2d 1014 (D. Minn. 2007) ...............................................................................21

*Pollio v. MF Global, Ltd.*,
   608 F. Supp. 2d 564 (S.D.N.Y. 2009) .................................................................................23

*R2 Invs., LDC v. Phillips*,
   401 F.3d 638 (5th Cir. 2005) ...............................................................................................20

*Rodriguez-Ortiz v. Margo Caribe, Inc.*,
   490 F.3d 92 (1st Cir. 2007) ..................................................................................................24

*Schiller v. Physicians Res. Group, Inc.*,
   No. 3:97-CV-3158-L, 2002 U.S. Dist. LEXIS 3240 (N.D. Tex. Feb. 26, 2002),
   *aff'd*, 2003 U.S. App. LEXIS 18021 (5th Cir. Aug. 29, 2003) ...........................................20

*In re Secs. Litig. BMC Software*,
   183 F. Supp. 2d 860 (S.D. Tex. 2001) .................................................................................26

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) .....................................................................................22, 23, 25

*Stark Trading v. Falconbridge Ltd.*,
   No. 05-C-1167, 2008 U.S. Dist. LEXIS 2677 (E.D. Wisc. Jan. 14, 2008).......................24

*Taubenfeld v. Hotels.com*,
   385 F. Supp. 2d 587 (N.D. Tex. 2004) ................................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) ...........................................................................................................1

*Weiss v. Amkor Technology, Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ..................................................................................24

*Winters v. Stemberg*,
   529 F. Supp. 2d 237 (D. Mass. 2008) ..................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...............................................................................................29

## RULES AND STATUTES

15 U.S.C. § 78u-4(b)(1) ......................................................................................................27

15 U.S.C. § 78u-4(b)(1)(B)..................................................................................................20

15 U.S.C. § 78u-4(b)(2) ...................................................................................................20

15 U.S.C. § 78u-4(b)(3) ...................................................................................................20

15 U.S.C. § 78u-5(c)(1)(A) ..............................................................................................31

15 U.S.C. § 78u-5(d) ........................................................................................................31

15 U.S.C. § 78u5-(c)(1)(B) ..............................................................................................22

Fed. R. Civ. P. 8, 9(b), and 12(b)(6) ....................................................................... *passim*

SEC Rule 10b-5 ........................................................................................................ *passim*

SEC Rule 10b5-1 ...............................................................................................................27

## REQUESTED RELIEF

Defendants[1] move to dismiss this case with prejudice because Plaintiffs have not met the threshold requirements of the Private Securities Litigation Reform Act ("PSLRA") and Rules 8 and 9(b) of the Federal Rules of Civil Procedure for pleading a securities fraud claim.

## SUMMARY OF ARGUMENT

Following years of abusive stock-drop lawsuits, Congress passed the PSLRA in 1995 to require that securities fraud plaintiffs actually allege *fraud*, and not merely that the stock price fell after the company reported disappointing earnings, to survive a motion to dismiss. The PSLRA requires dismissal at the pleading stage unless the complaint sets forth particularized facts: (i) showing that the statements were actually false; (ii) raising a "strong inference" of fraudulent intent ("scienter") that is cogent and at least as compelling as the inference that no fraud occurred; and (iii) demonstrating a causal relationship between the alleged false statements and the plaintiff's alleged loss ("loss causation"). The district court "must consider the complaint in its entirety" to determine whether a strong inference of scienter has been pled and "must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509-10 (2007); *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532 (5th Cir. 2008) ("The PSLRA set high standards for pursuing federal securities fraud suits . . . ."); *Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550-51 (5th Cir. 2007). These are threshold requirements that must be met before discovery can begin.

This lawsuit is the type of groundless case Congress had in mind when it passed the PSLRA. TMW is a well-known Houston-based men's clothing retailer that experienced a

---

[1] The Defendants are The Men's Wearhouse, Inc. ("TMW" or the "Company"), George Zimmer ("Zimmer"), and Neill P. Davis ("Davis").

pronounced drop in year-over-year comparable sales during December 2007 and January 2008. Not coincidentally, December 2007 has been identified as the first month of the so-called "Great Recession," one of the worst economic downturns in 70 years.[2]  The whole point of the PSLRA was to prevent plaintiffs from alchemizing economic misfortune into securities fraud.

This case lacks anything resembling a particularized allegation of fraud.  Plaintiffs' sole allegations are that:  (i) TMW's 2007 earnings forecasts (*i.e.*, its "guidance") were insufficiently pessimistic and did not adequately anticipate the accelerated deterioration in TMW's sales that occurred when the recession began in December 2007 and January 2008; and (ii) TMW made poor business decisions relating to the integration of its acquisition of a tuxedo rental business called After Hours and to its fourth quarter advertising campaign for TMW's K&G brand.

These allegations are patently insufficient under the PSLRA, *Tellabs*, and *Shaw Group*. Numerous cases hold that a mere failure to meet earnings guidance or perform as expected does not demonstrate fraud.  While Plaintiffs attempt to circumvent this problem by including unparticularized allegations from four unnamed confidential witnesses, the Fifth Circuit has rejected these types of allegations as insufficient to survive a motion to dismiss.  In addition, the PSLRA provides a "safe harbor" for forward-looking statements (including earnings guidance) that are either: (i) accompanied by meaningful cautionary language; or (ii) not made with "actual knowledge" of their falsity – a heightened scienter requirement that is subject to the "strong inference" requirement discussed above.

Plaintiffs cannot overcome either prong of the safe harbor and come nowhere close to demonstrating the required "strong inference" of fraud.  TMW provided detailed cautionary statements throughout the alleged class period and repeatedly warned that: (i) its business was

---

[2]  The National Bureau of Economic Research, which is probably the most well-known arbiter for declaring recessions, has declared December 2007 as the starting point for the late 2000s recession.  *See* http://www.nber.org/cycles/dec2008.html.

particularly susceptible to economic downturns because men are first to defer buying during an economic downturn; (ii) the market for its core tailored clothing products had been weakening; and (iii) negative macroeconomic trends impacted the K&G stores in particular.   While Defendants understandably did not anticipate precisely when the recession would occur or how severe the fourth quarter dropoff would be, Defendants warned for months that TMW (and K&G in particular) faced weakening demand and would be vulnerable if the economy worsened.   That is precisely what happened.

The allegations likewise do not support a "cogent" inference that TMW knew from the beginning it could not achieve its financial goals, let alone an inference nearly as compelling as the strong counter-inference that no fraud occurred.   TMW made clear that its guidance numbers were estimates, not guarantees.   Plaintiffs' argument that Defendants must have known from the beginning of 2007 that TMW's projected earnings guidance was false is particularly non-compelling given that TMW *achieved its first quarter earnings guidance, exceeded its second quarter guidance, came within one penny of its original third quarter earnings guidance, achieved its mid-quarter revised guidance for the third quarter, exceeded its mid-quarter revised guidance for the fourth quarter, and missed its original full-year earnings guidance by only approximately 3%*.   Not only is there no cogent inference of fraud, but TMW's candid and fulsome disclosures, including midquarter guidance updates and revisions, support a far stronger nonfraudulent inference that Defendants were making an honest and reasonable effort to inform the market regarding TMW's performance and did not intend to mislead investors.

Similarly, Plaintiffs' criticisms of the way TMW handled the After Hours acquisition and its approach to K&G's advertising in the fourth quarter of 2007 at best reflect a disagreement with the business judgment of TMW's management.   Such allegations fail as a matter of law to

3

demonstrate a false statement, let alone support the required "strong inference" of fraud. Plaintiffs apparently want the Court to draw an inference that Defendants, for some inexplicable purpose, intentionally took actions they knew from the beginning would run After Hours and K&G into the ground – which of course would cause TMW itself to lose money and the individual Defendants' own stock holdings to decline in value. This inference is facially implausible and does not satisfy *Tellabs*.

Plaintiffs likewise have not satisfied the fundamental prerequisite of loss causation, which requires them to identify a "corrective disclosure" where the supposedly fraudulent nature of TMW's past statements was revealed to the market and caused a stock price decline. The alleged "corrective disclosures" identified by Plaintiffs merely reveal that TMW was not performing as well as expected. Numerous cases hold that such revelations are insufficient to plead loss causation and therefore require dismissal.

## NATURE AND STAGE OF PROCEEDINGS

After the Court selected them as Lead Plaintiffs, Plaintiffs filed their Amended Complaint on February 26, 2010, to which this Motion is directed.

## SUMMARY OF FACTUAL ALLEGATIONS

Founded by George Zimmer in 1973, TMW is the largest specialty retailer of men's suits and the largest tuxedo rental retailer in the United States and Canada. *See* Ex. O at 1. The individual Defendants are Zimmer, who serves as TMW's Chairman, and CEO; and Neil P. Davis, who serves as TMW's CFO, Executive Vice President, and Treasurer. *Id.* ¶ 16. At the end of fiscal year 2007, TMW operated 563 stores under the "Men's Wearhouse" brand name in 46 states and the District of Columbia, primarily in middle and upper-middle income regional strip and specialty retail shopping centers. Ex. O at 1. TMW also operated 116 stores in Canada

under the "Moores" brand, which are similar in concept and location to the Men's Wearhouse stores in the United States. *Id.* at 1-2.

In addition to its "Men's Wearhouse" and "Moores" brands, TMW also operated 105 stores under the "K&G" brand as of February 2, 2008. *Id.* K&G primarily targets price sensitive customers through a value-oriented superstore approach. *Id.* While much of Plaintiffs' factual allegations focus on K&G, this brand was only responsible for 19.3% of TMW's net sales for 2007 and approximately 22% of TMW's total revenues during 2005 and 2006. *Id.* at 58.

On April 9, 2007, TMW acquired After Hours Formalwear, Inc. ("After Hours"), a 509-store national tuxedo rental chain, for $100 million. *Id.* at 2. TMW disclosed early in the alleged class period that it planned to "rebrand" After Hours under TMW's existing "MW Tux" concept. *E.g.*, Ex. I at 3, Ex. P (TMW June 14, 2007 Form 10-Q) (disclosing that "[w]e expect to rebrand the After Hours operations and to realize future cost synergies resulting from the consolidation of central functions, division integrations and the adoption of best practices across the combined operations during fiscal 2007"); Ex. Q (same); Ex. R (same). TMW's combined tuxedo rental business (including the new After Hours stores and TMW's pre-existing tuxedo business) ultimately accounted for 15.4% of TMW's total revenues for fiscal year 2007. Ex. O at 20.

## A.   TMW Made Numerous Cautionary Statements and Risk Disclosures[3]

TMW cautioned investors throughout the alleged class period that the Company was particularly susceptible to economic downturns, that demand for TMW's core tailored clothing products was weakening, and that K&G was experiencing considerable weakness. Indeed,

---

[3] A district court may consider documents referenced in the complaint and SEC filings in considering a motion to dismiss. *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 209 (5th Cir. 2009) (court may consider "documents incorporated in the complaint by reference, and matters subject to judicial notice"); *Millcreek Assocs., L.P. v. Bear, Stearns & Co.*, 205 F. Supp. 2d 664, 680 (W.D. Tex. 2002) (court may consider "complete copies" of documents referenced in complaint); *In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*, 830 F. Supp. 361, 367 n. 2 (S.D. Tex. 1993) (court may take judicial notice of SEC filings).

TMW's April 4, 2007 Form 10-K contained more than three pages of detailed risk disclosures, which specifically warned investors that:

- "Our business is particularly sensitive to economic conditions and consumer confidence. . . ."

- "We believe that a decrease in consumer spending in response to a decline in consumer confidence will affect us more than other retailers because *a slowing of men's discretionary spending for items like tailored apparel tends to occur faster than that for other retail purchases*."

- "[W]e cannot assure you that we will continue to experience the same rate of growth as we have historically."

- TMW faced "risks associated with an ability to integrate acquired assets or operations into our existing operations, higher costs or unexpected difficulties or problems with acquired assets or entities, outdated or incompatible technologies, labor difficulties or an inability to realize anticipated synergies and efficiencies, whether within anticipated timeframes or at all."

- "Our business is seasonal," and "our results for any quarter are not necessarily indicative of our annual profitability and any decrease in sales during these peak quarters could have a significant adverse effect on our net earnings."

- TMW faced "*weakening demand for men's tailored clothing*."

- K&G experienced a *1.8% decrease* in comparable store sales during fiscal year 2006.

Ex. A at 6-9, 20 (emphasis added).

Plaintiffs assert that TMW made false statements in various press releases and analyst calls between March 7 and November 29, 2007. *See* Amended Complaint ¶¶ 48-73. Each of these press releases, however, specifically cautioned that the forward-looking statements contained therein "may be significantly impacted by various factors, including unfavorable local, regional and national economic developments . . . and other factors described herein and in the Company's annual report on Form 10-K for the year ended February 3, 2007" and in TMW's quarterly Form 10-Q filings. TMW also warned at the beginning of each analyst call that "we

will be making a number of forward-looking statements and that all such statements are subject to risks and uncertainties that could cause actual results to differ materially from the expectations and assumptions mentioned today due to a variety of factors that affect the Company including the risks specified in the most recently filed Form 10-K and Forms 10-Q." *E.g.*, Ex. C at 1.

In addition to these statements, TMW made numerous additional specific cautionary statements in the text of each specific press release and analyst call as set forth below.

> **B.      TMW's Alleged False Statements**

As demonstrated below, TMW's statements were not remotely false or fraudulent.  TMW expressly disclosed throughout the alleged class period that it was experiencing negative sales trends and was facing economic headwinds, particularly at K&G.  TMW also constantly and candidly updated shareholders regarding the "situation on the ground" in real time.

> **1.      March 7, 2007 End-of-Year Press Release And Conference Call[4]**

Plaintiffs first cite a March 7, 2007 press release and analyst call regarding TMW's year-end 2006 financial results, in which TMW provided earnings guidance for 2007 in a range of $2.80 to $2.91 per diluted share.  *See* Amended Complaint ¶¶ 48-50 and Ex. B and C.  Plaintiffs claim TMW's statements were fraudulent because TMW and one of its business units, K&G, were experiencing a sales slowdown.  *Id.* ¶ 52.

This allegation has no merit whatsoever.  As Plaintiffs admit, TMW expressly disclosed during the March 7, 2007 analyst call that it was experiencing a slowdown:

- TMW's "[c]omparable store sales ***declined*** 1.5% for our United States based stores. . . .  This ***under plan performance*** is a reflection of ***soft traffic levels*** and was most noticeable in our tailored clothing category."

---

[4] TMW's 2007 fiscal year began on February 4, 2007 and ended on February 2, 2008, with quarters ending on May 5, 2007; August 4, 2007; November 3, 2007; and February 2, 2008.  Amended Complaint ¶ 1 n.1.

- TMW expected a "*modest slowdown*" in 2007 "from our results of this past year" and "continued softness in our retail apparel business."

- TMW further expected a "a generally soft tailored clothing market in the US."

- "To summarize, yes, we are experiencing a modest slowdown which began in the fourth quarter of last year and which is reflected in the low single-digit projections. . . ."

- In response to an analyst asking why TMW's guidance was "a little lower than we've been thinking," TMW responded that "it's a *lower same-store growth rate* we're expecting for '07 vs. the 3% we had for '06."

- In response to an analyst question about the expected duration of the slowdown, Zimmer stated that "of course I don't have a crystal ball. . . so I really can only speculate," and that the slowdown could last "another 18 months."

- "What pulled [TMW's fourth quarter 2006 comparable store results] down *was the weakness at K&G.*"

- The integration of After Hours would take "the better part of the first year" (*i.e.*, the entire duration of the alleged class period), with anticipated "up side for the shareholders in the following years."

*See* Ex. C at 1-5, 10-12.  These candid, cautious, and measured statements hardly demonstrate fraud and are flatly inconsistent with Plaintiffs' allegations that TMW intended to inflate the stock price.  There is also no particularized allegation Zimmer or Davis already knew in March 2007 that TMW could not achieve its full-year guidance for fiscal year 2007, which did not end until eleven months later on February 2, 2008, or that TMW could not achieve its first quarter 2007 earnings guidance of $0.63 to $0.67 per diluted share, which in fact it achieved.  While TMW factored the lower same-store growth rate described above into its full-year and first quarter guidance for 2007, TMW was not expecting the strong negative turn that occurred in the

fourth quarter.  TMW ultimately earned $2.73 per diluted share for fiscal 2007, which was just seven cents below the lower range of guidance given eleven months earlier on March 7, 2007.[5]

### 2.    April 11, 2007 Mid-Quarter Press Release

Plaintiffs next cite an April 11, 2007 press release in which TMW provided a "mid-quarter" performance update for the first quarter.  *See* Amended Complaint ¶ 53; Ex. D.  Far from exaggerating TMW's financial performance, the April 11 release warned that TMW expected first quarter 2007 earnings to be "at the lower end of our initial guidance range of $0.63 to $0.67, primarily due to softening U.S. sales."  *Id*.  Once again, TMW expressly disclosed it was experiencing "softening" U.S. demand.

### 3.    May 22, 2007 End-of-Quarter Press Release and Analyst Call

Plaintiffs next assert TMW made false statements in its end-of-first-quarter press release and conference call on May 22, 2007.  *See* Amended Complaint ¶¶ 54-58.  That day, TMW disclosed that it did ***better*** in the first quarter than initially expected and earned $0.75 per diluted share, with $0.08 contributed from its recently completed acquisition of After Hours.  *Id.* Without the After Hours contribution, TMW actual results were at the top of the guidance range originally provided for the first quarter.  Plaintiffs do not dispute the truth of these historical factual statements.  Instead, Plaintiffs claim that the May 22 disclosures again failed to reveal TMW's ongoing sales slowdown.  This argument again ignores TMW's actual May 22 disclosures (attached as Exhibits E and F), which made clear that:

---

[5] TMW did not include the anticipated effect of After Hours in its initial full-year $2.80-$2.91 estimated guidance range on March 7, 2007.  *See* Amended Complaint ¶¶ 48-50 and Ex. B and C.  If the $0.02 per share increase from After Hours in 2007 is omitted, TMW's actual apples-to-apples full-year earnings for fiscal year 2007 was $2.71 per share, which is 3.2% less than the $2.80 per share lower guidance range on March 7, 2007.  TMW provided updated guidance of $2.84 to $2.94 on May 22, 2007, which included the anticipated impact of the After Hours acquisition.  *Compare* Amended Complaint ¶ 76 *with id.* ¶¶ 48, 55 & Ex. E.  TMW's final guidance of $2.73 (including After Hours) was 3.5% lower than the lower end of the May 22 guidance range.  Regardless of which measure is used, the small size of TMW's fiscal 2007 shortfall weighs heavily against any inference of fraud.

- "Comparable store sales declined 1.3% for the company's United States based stores, below the company's guidance of +1% to +2%. The decline in comparable store sales is primarily due to *soft traffic levels* resulting in lower tailored clothing sales at both TMW and K&G."

- K&G experienced "*slower sales trends*."

- TMW's "under planned" U.S. comparable sales performance "is a reflection of soft traffic levels and was most noticeable in our men's tailored clothing categories."

- "We have also experienced regional weakness in California and Florida, which we believe to be related to the poor housing markets in both states." Those states represent "approximately 20% of our retail apparel sales at our traditional Men's Wearhouse stores." TMW later characterized California and Florida as a "*pronounced regional weakness*."

- K&G stores "target a more price sensitive customer whose buying patterns are reflective of a buy today to wear today approach" and have "experienced a tone of business that is *reflective of a customer challenged by rising cost*, particularly energy."

- "As we have communicated for several quarters now, our business trends are moderating . . . . [and] *now appear to be moving below our most recently forecasted trend lines*."

- "Our challenge in forecasting now is one of precision and not direction. That said, we are *trimming our comparable store sales expectations* at our US based stores for the second quarter to a range of flat to an increase of 1%, and for the full year, a range of a decrease of 1% to flat. The implied strength in the second quarter from that guidance is reflective of a seasonal peak in the second quarter from our tuxedo rental business."

- After Hours's expected profitability in the second and third quarters of 2007 "is mostly offset by losses in the first and fourth quarters" due to the seasonality of After Hours's business.

*See* Ex. E at 4; Ex. F at 2-4. Once again, TMW candidly disclosed it was experiencing an

ongoing sales slowdown, "soft" traffic levels, and "pronounced" weakness in certain markets.

### 4.   July 11, 2007 Mid-Quarter Press Release

Plaintiffs next cite TMW's July 11, 2007 "mid-quarter" performance update for the

second quarter of fiscal year 2007, in which TMW announced that it expected to "meet or exceed

the higher end of our initial guidance range of $0.88 to $0.92 earnings per diluted share for the second quarter of 2007.  *See* Amended Complaint ¶ 59; Ex. G.  Given that TMW ultimately beat its second quarter guidance and achieved $1.00 earnings per diluted share for the quarter, one can hardly say the July 11, 2007 updated guidance was fraudulent.  *See* Ex. H at 1.

### 5.    August 22, 2007 End-of-Quarter Press Release and Analyst Call

Plaintiffs next claim TMW made false statements in its end-of-second-quarter press release and conference call on August 22, 2007 and again failed to disclose alleged problems with K&G and After Hours.  *See* Amended Complaint ¶¶ 61-66; Ex. H & I.  TMW disclosed on August 22 that it beat its second quarter guidance and earned $1.00 per diluted share.  *Id.*  Once again, however, TMW expressly disclosed it was facing considerable challenges, including that:

- The company experienced "***traffic weakness at K&G.***"

- "While our traditional stores have improved relative to plan, ***our K&G stores continue to be challenged as its same-store sales results were down 6.9%***, however, consistent with the tone achieved in the first quarter."

- TMW planned to close "22 After Hours stores" and "to dispose of a wholesale tuxedo rental operations historically conducted by After Hours."

- TMW anticipated "a mid-single digit ***decrease*** at our K&G stores."

- "[W]ithout a doubt there are numerous headwinds of a macroeconomic nature that are presenting challenges for the consumer in the United States today."

- "[W]e completed the acquisition of After Hours in April of this year and have laid out internally an integration plan that will enable us to start off the beginning of the rental season in January, 2008, with a unified approach across over 1,000 storefronts under an integrated, multi-unit store management organization on a common reservation system and under a common brand, MW Tux."

- "While many aspects of our business are strong and improving, ***some are less so. K&G, our big box, deep-discount retail concept, continues to be challenged with non-employment-related macroeconomic trends, mainly rising energy and housing costs.***"

11

- "[O]ur internal analysis suggest[s] that we may be experiencing a higher than expected level of cannibalization of sales from existing stores, thereby exerting pressure on our comparable store sale results as we've reported."

- K&G experienced "***negative 6.9%*** comparable store sales results in Q2."

- "[A]s households lose between a thousand and $5,000 of disposable income because of increased energy and housing, quite often that comes out of men's clothing spending. . . . ***At K&G, I don't know that we can really expect to see too significant [a] turnaround until there is some psychological shift foretelling a change in the outcomes of our middle and lower-income people in America***."

- TMW refused to raise its expectations for After Hours' fourth quarter loss outlook, stating that the company had "a lot going on to just ***transition and integrate [After Hours] as opposed to operating***" and that "I think 2008 is the real opportunity that you're going to see as a result of all these efforts."

- When asked by another analyst whether he could say anything to "make me feel comfortable" that K&G's business trends "wouldn't worsen" and whether "there was some execution initiative you could take where you could help the business improve," George Zimmer stated that "***I wish I had an answer, but we don't have an answer other than macro-conditions***."

Ex. H at 2; Ex. I at 2-4, 6, 10-11.  Thus, while TMW increased its projected third quarter earnings guidance to a range of $0.70 to $0.73 per diluted share based on an improvement in its same-store sales during the prior quarter, TMW also warned that it could not give comfort that K&G's business "wouldn't worsen," and that TMW was continuing to integrate After Hours and was unable to improve its loss estimate for After Hours in the fourth quarter.

### 6.      October 10, 2007 Mid-Quarter Press Release

Next, Plaintiffs cite TMW's October 10, 2007 "mid-quarter" performance update for the third quarter of fiscal year 2007, in which TMW reduced its projected third quarter earnings guidance to a range of $0.66 to $0.70 per diluted share.  *See* Amended Complaint ¶¶ 67-68; Ex. J.  TMW issued this updated mid-quarter guidance just 49 days after its initial third quarter guidance on August 22, 2007.  There is no particularized allegation showing that the individual Defendants knew on August 22, 2007, that TMW would need to lower its guidance.

TMW disclosed that the "two principal reasons" for revising its guidance were: (i) "weaker than planned comparable store sales at the company's K&G stores" due to "softening in traffic trends"; and (ii) "a number of operating and systems changes" during "the process of integrating the recently acquired After Hours stores," which "has resulted in lower tuxedo rental unit volume during this adjustment period." *Id.* ¶ 67. While Plaintiffs baldly assert that TMW knew of these problems earlier and failed to disclose them, the Amended Complaint alleges no particularized facts supporting this conclusion. TMW expressly disclosed facts in real time as they were observed and made clear in previous disclosures that K&G was struggling, that the After Hours integration process was still far from complete, and that TMW planned to "rebrand" After Hours under a "common" brand (MW Tux). *E.g.*, Ex. P at 6; Ex. R, Ex. S, Ex. I at 3.

### 7.     November 28, 2007 End-of-Quarter Press Release and Analyst Call

On November 28, 2007, TMW issued its end-of-third-quarter press release and participated in a call with analysts. *See* Amended Complaint ¶¶ 69-73; Ex. K and L. The company reported third quarter earnings of $0.69 per diluted share, which was well within TMW's revised third quarter guidance range of $0.66 to $0.70 as provided on October 10, 2007, and only one penny below TMW's previous guidance of $0.70 to $0.73 per diluted share as provided on August 22, 2007. *See id.* ¶ 70. The allegations thus do not support any inference, let alone a cogent and compelling inference, that TMW must have known on August 22 that it had no basis for its guidance. The November 28 disclosures also expressly stated that:

- TMW expected "same store sales growth in the U.S. to be in the negative low single digit range . . . ."

- After Hours was "expected to be dilutive [*i.e.*, cause a loss] to fiscal fourth quarter 2007 in a range of $0.31 to $0.32 per diluted share outstanding," due to the seasonal nature of its business as previously disclosed.

13

- "Based on our initial sales results for November, **we believe the fourth quarter will be challenging**, and therefore have modified our guidance."

- "We are making modest changes to our promotional activities . . . ."

- "Comparable store sales decreased 2.1% [in the third quarter] for our United States based stores, below our initial expectations of flat to an increase of 1%. This performance versus plan is a reflection of **weaker-than-expected results at our K&G stores** . . . and **continued weakness** in the California and Florida markets."

- "[T]here's **no improvement whatsoever in tailored clothing**."

- "[T]he principal driver to that lower [earnings] number are same-store sales results, the comps and particularly at K&G. We had anticipated mid-single digits before we walked into the fourth quarter and before adjusting and updating our fourth quarter results and you see what K&G's results were for the third quarter. They were down 11%. It's that tenor and tone that is being pushed through for the fourth quarter as a key driver to the lower numbers."

- TMW had experienced "disruptions" with respect to the transfer of customer information from David's Bridal and expected "a lag that will be probably through the entire first quarter before we start to see any benefit."

- TMW expected "**low double digit declines at K&G in comps in the fourth quarter.**"

Ex. K at 2-3; Ex. L at 1-4, 6-7. Once again, Defendants candidly revealed the challenges they were facing. These fulsome disclosures demonstrate an absence of fraud.

### 8.    January 9, 2008 Mid-Quarter Press Release

On January 9, 2008, TMW issued its mid-quarter update for the fourth quarter of 2007 (which, again, ran from November through the end of January). *See* Amended Complaint ¶¶ 74-75; Ex. M. TMW candidly disclosed that it was experiencing "[s]ubstantially lower traffic levels at all of the company's retail stores, in both the United States and Canada" and would reduce its fourth quarter and year-end earnings guidance. *Id.* As Plaintiffs acknowledge, TMW ultimately **exceeded** its reduced fourth quarter guidance and delivered earnings of $0.28 per diluted share that quarter. *See id.* ¶ 76. TMW also earned $2.73 per diluted share for fiscal year 2007, just

14

seven cents (2.5%) below the full-year guidance range of $2.80-$2.91 for 2007 that it predicted one year earlier on March 7, 2007, and just ten cents (3.5%) below the updated range of $2.84 to $2.94 that TMW provided on May 22, 2007, which included the anticipated impact of the After Hours acquisition. *Compare id.* ¶ 76 *with id.* ¶¶ 48, 55 & Ex. E at 2. TMW advised on May 22, 2007, that After Hours was only expected to add $0.03 to $0.05 to TMW's full-year earnings per share because it was a seasonal business that would lose money in the fourth quarter. Ex. E at 2. After Hours ultimately added $0.02 per share, just one penny less than TMW's May 22, 2007 guidance. Ex. N, TMW March 12, 2008 Press Release, at 2.

### C. Plaintiffs' Deficient "Confidential Source" Allegations

Despite the Fifth Circuit's recent holding that "courts must discount allegations from confidential sources" and that "[s]uch sources afford no basis for drawing the plausible competing inferences [of scienter] required by *Tellabs*,"[6] Plaintiffs nonetheless rest virtually their entire case on the allegations of four anonymous "confidential witnesses."

The first confidential witness ("**CW1**") is described as having held "a high level senior management position with K&G at the time of his departure from the Company." Amended Complaint ¶ 32. In violation of Fifth Circuit precedent,[7] the Amended Complaint provides no information regarding his specific title, responsibilities, or the dates of his employment. Plaintiffs claim CW1 told them that: (i) TMW had a "comprehensive forecasting system" that "captured information on an almost real time basis"; (ii) TMW's "management developed its annual plan for fiscal year 2007 in November of 2006," which "contained a revenue forecast for 2007 that the Company used to determine external earnings guidance"; (iii) "it was evident from

---

[6] *Shaw Group*, 537 F.3d at 535-36.

[7] *Central Laborers*, 497 F.3d at 552 (no inference of scienter from confidential witness allegations that lacked "specific details, such as particular job descriptions, individual responsibilities, and specific employment dates").

the sales data for the first quarter 2007 that K&G would suffer substantial revenue and gross margin shortfalls in 2007"; (iv) "it became apparent to Defendants in early to mid second quarter of 2007 that K&G would suffer a 20 percent decrease in revenue for the quarter and fiscal year" based on "weekly forecasting that showed a significant downward trend over the year as compared to plan"; (v) "forecasts were created through a 'give and take' between the Presidents of each operating business and Defendant Davis"; (vi) "the significant downward sales trends clearly evident by the Second Quarter dictated a substantial downward revision of the 2007 earnings guidance"; (vii) CW1 supposedly told Defendants that "making plan was going to be difficult because the economic downturn was already impacting K&G . . ., that the trend was increasingly negative," "that expanding K&G into ladies apparel would exacerbate the negative revenue trend," and that CW1 "believed the loss in revenue would be much more severe later in the year"; (viii) K&G's CFO originally estimated "at least a 12 percent revenue loss against plan for the second quarter [of 2007] and a 20 percent loss for the third quarter" for K&G, but later changed his forecast to reflect "an 8 percent revenue loss against plan"; and (ix) CW1 supposedly told Defendants he expected a "25 percent reduction in revenue against plan for the [fourth] quarter" due to TMW's alleged decision not to "repeat the marketing it had engaged in during the fourth quarter of 2006."  Amended Complaint ¶¶ 32-40.

These allegations do not satisfy the PSLRA or support a strong inference of fraud.  Just because one official at one subsidiary of TMW (K&G) supposedly had a different opinion than senior TMW management regarding estimated revenue forecasts for K&G – which represented less than 20% of TMW's total revenue for the year, and which TMW repeatedly and candidly disclosed was experiencing considerable "weakness" throughout the alleged class period and would suffer a "double digit" fourth quarter decline – does not demonstrate TMW's company-

wide guidance was false, let alone that it was knowingly fraudulent.   Plaintiffs make no allegation that CW1 has any insight regarding the other 80% of TMW's business outside of K&G or had any involvement whatsoever with the development of company-wide guidance for TMW.   The fact that TMW achieved its earnings guidance for the first quarter, exceeded its guidance for the second quarter, was only a penny off its initial guidance for the third quarter, achieved its mid-quarter guidance for the third quarter, and exceeded its mid-quarter guidance for the fourth quarter likewise severely undermines any inference of fraud from CW1's alleged opinions that TMW should have lowered its guidance – which is all they are: opinions, not facts, from someone who had no involvement in the calculation of company-wide guidance for TMW. CW1 also acknowledged that K&G's CFO accepted the alleged "8 percent revenue loss against plan" forecast for the second and third quarter.   Amended Complaint ¶ 38.   Given CW1's admission that the forecasting process is a "give and take" where different people have different opinions, the fact that not everyone shared his alleged opinions about what the "plan" for K&G should be is not fraud.

Plaintiffs also offer no insight regarding the relationship between the alleged "plan" described by CW1 and TMW's actual quarterly guidance, whether the "plan" played any role in guidance or, if so, how the "plan" was supposedly used in calculating guidance, a process in which CW1 admittedly had no involvement.   TMW did not break out specific quarterly guidance for K&G and merely provided guidance regarding TMW's total U.S. and Canadian same-store sales and total company-wide earnings.   Notably, while CW1 allegedly "believed" K&G would suffer a decline of "at least 12 percent" for the second quarter, 20 percent for the third quarter, and 25 percent in the fourth quarter, K&G in fact experienced only a 6.9% comparable sales

shortfall during the second quarter of 2007, an 11.3% decline in the third quarter, and a 17.2% decline in the fourth quarter.  Ex. H at 1, Ex. K at 1, Ex. N at 1.

Plaintiffs further overlook that not only is K&G only a small fraction of TMW's overall revenue stream, but there are numerous other factors that affect net earnings besides the amount of sales, including margins and operating costs.  Just because K&G experienced lower sales did not necessarily mean its income or earnings-per-share contribution to TMW would also decline.  Indeed, during the second quarter, K&G earned more income than it did during 2006 despite a 6.9% decline in comparable store sales, a result it achieved by controlling markdowns and improving markups.  Ex. I at 4.

Finally, CW1's apparent disagreement with TMW management's view regarding K&G's advertising strategy for the fourth quarter of 2007 likewise fails to demonstrate that Defendants made a false or fraudulent statement.  Plaintiffs wholly fail to identify any affirmative statement regarding K&G's advertising that is rendered false by this allegation.  CW1 also does not and cannot dispute that TMW *increased* its advertising expenses from $67.3 million in 2006 to $73.8 million in 2007.  Ex. O at 6.  CW1 likewise does not state the scope or impact of the change in advertising strategy compared to the prior year or provide any detail whatsoever regarding the specific campaign that was allegedly discontinued or changed.  Given that K&G had been underperforming for over a year, it is perfectly understandable TMW senior management opted not to repeat the same advertising campaigns for K&G that were used in previous quarters.  TMW also expressly disclosed on November 28, 2007, that it was making changes to its promotional activities at K&G.  Ex. L at 11.

Plaintiffs' next alleged confidential witness, CW2, is described as merely a former "District Sales Manager," with no information as to dates of employment or where he worked.

18

Amended Complaint ¶¶ 41-42.  CW2 claimed that Men's Wearhouse stores were "experiencing declining trends as early as late 2006," a fact that TMW expressly disclosed.  *Id.* ¶ 41.  CW2 also described a multi-tiered system of "annual sales goals" for Men's Wearhouse stores, which allegedly included a "good" level that was 5% higher than the previous year's sales and an "excellent" level that was 6-8% higher than the prior year.  *Id.*  While CW2 alleges that the stores in his "district" (the location of which is not identified) had difficulty meeting these goals, CW2 fails to identify which goals were missed, which stores missed these goals or how these goals have any relevance to the guidance that was provided.  CW2 says nothing that is remotely inconsistent with TMW's actual financial results and professes no knowledge or insight regarding the calculation of companywide guidance or any other issue in this litigation.

The next alleged confidential witness, **CW3**, is described only as "an After Hours executive at the time of the acquisition," with no further description of his title, dates of employment, or responsibilities.  Amended Complaint ¶¶ 44-45. The only allegation attributed to CW3 is that TMW dismissed After Hours management after the acquisition and standardized rental wear in the stores, which allegedly led to a loss of local business, and that unnamed After Hours executives allegedly warned unnamed TMW "top executives" that TMW's changes to After Hours management and business strategies would harm sales.  *Id.*  CW1, an alleged K&G executive who does not claim to have any personal involvement whatsoever with After Hours, also allegedly confirmed that TMW "discarded the business strategies and plans of After Hours management."  *Id.*  TMW, however, expressly disclosed early in the alleged class period that it intended to "rebrand" After Hours and integrate it into TMW's existing MW Tux business.  *See, e.g.,* Ex. P at 6; Ex. Q; Ex. R; Ex. I at 3.  Not only are these allegations completely devoid of

particularity, but they simply reflect a disagreement over how to run the After Hours business and do not demonstrate that TMW made false or misleading statements.

Plaintiffs' final alleged confidential witness, **CW4,** is described only as "an After Hours manager prior to the acquisition, again with no further detail.  Amended Complaint ¶ 46.  CW4 allegedly stated that certain of TMW's strategic decisions regarding After Hours negatively affected After Hours' business relationship with David's Bridal, which was a source for After Hours' referrals.  *Id.* ¶¶ 46-47.  CW1 also claimed that TMW ultimately lost revenue as a result of these changes.  *Id.* ¶ 47.  Again, these unparticularized allegations at best reflect a criticism of TMW's business strategy, which is not securities fraud.

## ISSUES TO BE RULED UPON AND STANDARD OF REVIEW

The issue is whether Plaintiffs have shown with particularity: (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused the plaintiff's injury.  *Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009); *R2 Invs., LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).  Plaintiffs must also "plead ***specific*** facts establishing a ***strong*** inference of scienter." *Financial Acquisition Partner v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (emphasis added); 15 U.S.C. § 78u-4(b)(2).  "[P]ursuant to the PSLRA, failure to adequately plead scienter requires dismissal of the complaint."  440 F.3d at 287; 15 U.S.C. § 78u-4(b)(3).

**ARGUMENT AND AUTHORITIES**

I.    **Plaintiffs Have Failed To State A Section 10(b)/Rule 10b-5 Claim**

   A.    **Plaintiffs Do Not Allege Particularized Facts Showing A Material False Statement Or Actionable Omission**

Plaintiffs fail to plead specific facts showing a material false statement or omission, which is the most basic element of a securities fraud claim.[8]  Even under Rule 8(b), a complaint must contain sufficient factual detail supporting each element of the claim and demonstrating a plausible right to relief.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–52 (2009).  Plaintiffs must plead facts that actually "show" Defendants made material misstatements and omissions.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965–66 & n.3 (2007) (complaint must "show" that pleader is entitled to relief).  Because this is a securities fraud case, such facts must be particularized under Rule 9(b) and the PSLRA.  As this Court aptly noted, a securities fraud plaintiff must provide "a clear, precise description of ***dishonestly manipulative acts*** affecting the stock market" to survive dismissal.  Ex. S, Order in *Goldfarb v. El Paso Corporation*, Dkt. #80 in Civil Action H-02-2717 (S.D. Tex. Dec. 4, 2002) (Hughes, J.) (emphasis added).

Plaintiffs have failed to plead facts showing that ***any*** of TMW's press releases or public statements contained material misstatements or actionable omissions.[9]  As set forth above, all of TMW's public statements were accurate, and there are no particularized allegations to the contrary.  TMW was candid regarding the challenges and risks it faced and did not "promise" it

---

[8] *See* 15 U.S.C. § 78u-4(b)(1)(B) (plaintiffs must specify "the reason or reasons why [a] statement is misleading"); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412-13 (5th Cir. 2003) (plaintiffs must "explain why the statements were fraudulent"); *Kunzweiler v. Zero.net, Inc.*, No. 3:00-CV-2553-P, 2002 U.S. Dist. LEXIS 12080, at *15 (N.D. Tex. July 3, 2002)  ("Plaintiff has failed to specify *how* the stated investment values are untrue; in other words, he has failed to provide specific facts explaining why the values, as represented, were false"); *Schiller v. Physicians Res. Group, Inc.*, No. 3:97-CV-3158-L, 2002 U.S. Dist. LEXIS 3240, at *17 n.3 (N.D. Tex. Feb. 26, 2002), *aff'd*, 2003 U.S. App. LEXIS 18021 (5th Cir. Aug. 29, 2003) (complaint did not "identify a false statement or omission and match it with specific facts explaining how the statement is misleading").

[9] Plaintiffs also cannot demonstrate a material omission unless "what [the Defendants] said" – *i.e.*, their affirmative statements – are rendered misleading by the omission.  *See Shaw Group*, 537 F.3d at 541.  Plaintiffs have failed to demonstrate any affirmative statement rendered materially misleading by any alleged omission.

21

would be able to achieve guidance.  Merely alleging that TMW fell short of guidance does not "show" a false statement or omission.[10]  Plaintiffs likewise cannot state a claim based on "soft opinions" and statements of "hope" and optimism.[11]  The Amended Complaint wholly fails to identify anything resembling a "dishonestly manipulative act" by Defendants.

### B.        The Allegations Do Not Support A Strong Inference Of Scienter

Plaintiffs likewise fail to plead specific facts supporting a strong inference of scienter. Under the PSLRA, the Amended Complaint must "'with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" which requires intentionally fraudulent or severely reckless conduct.  *R2 Invs.*, 401 F.3d at 641.  "Severe recklessness is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care.'"  *Id*. at 643 (citation omitted).

Importantly, for guidance and other forward-looking statements, Plaintiffs must allege particularized facts demonstrating that the defendant who made the statement had actual knowledge that it was false ***even if the cautionary language is deemed inadequate***.  "[T]here is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was

---

[10] *See, e.g., Azurix*, 198 F. Supp. 2d 882 ("The mere fact that a business did not live up to expectations is insufficient to create an inference of fraud"); *see also In re Patterson Companies, Inc. Secs., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1031-32 (D. Minn. 2007) ("[P]laintiffs' attempt to contort missed earnings into actionable securities fraud with the benefit of hindsight based on motivational sales talks and the company's maintenance of previously issued growth and earnings projections fails to state with particularity an actionable claim for securities fraud under the Exchange Act"); *Coates v. Heartland Wireless Communs., Inc.*, 55 F. Supp. 2d 628, 635-36 (N.D. Tex. 1999) ("It is also impermissible to allege fraud by hindsight, that is, to seize upon disclosures in later reports and allege that they should have been made in earlier ones"); *see also Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002) ("mismanagement" does not amount to securities fraud).

[11] *See, e.g., Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, No. Civ. A. H-06-3022, 2007 WL 2720074, at *3 (S.D. Tex. Sept. 18, 2007) (statements regarding company's "hopes and expectations" do not support Rule 10b-5 liability); *In re Azurix Corp. Secs. Litig.*, 198 F. Supp. 2d 862, 882, *aff'd*, 332 F.3d 854 (5th Cir. 2003) ("A company's expressions of confidence in its management or business are not actionable, especially where, as here, all historical information appears to be factually correct").  *See also Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("soft opinions" that "contain no concrete factual or material misrepresentation" are not actionable); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2003) ("generalized positive statements about a company's progress are not a basis for liability").

made with **actual knowledge that the statement was false or misleading**, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with **actual knowledge by that officer that the statement was false or misleading**." *Southland*, 365 F.3d at 371-72; 15 U.S.C. § 78u5-(c)(1)(B) (emphasis added).  Plaintiffs thus cannot rely on severe recklessness – which is an onerous standard in its own right – to support a securities fraud claim based on TMW's failure to achieve its guidance or perform as expected.[12]

Under the Supreme Court's recent decision in *Tellabs*, an inference of scienter not only must be "powerful" or "cogent," but it must also be at least as compelling as any non-fraudulent inference to survive a motion to dismiss.  *Flaherty & Crumrine*, 565 F.3d at 207-08 (citing *Tellabs*, 127 S. Ct. at 2509-10).  The Court must conduct a rigorous analysis of the Amended Complaint at the pleading stage to determine whether the fraudulent inference is as strong as the non-fraudulent inference.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Id.*

*Tellabs* has left securities fraud plaintiffs facing a difficult legal landscape.  The Fifth Circuit has found securities fraud complaints deficient under *Tellabs* involving far more serious allegations than those asserted here.[13]  Courts routinely grant or affirm dismissals despite far

---

[12] *Southland*, 365 F.3d at 371-72; 15 U.S.C. § 78u5-(c)(1)(B); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[s]imply alleging that predictive statements . . . did not have a reasonable basis – that is, that [they were] negligently made – would hardly suffice to state a claim under Rule 10b-5'") (internal citation omitted); *In re Alamosa Holdings*, 382 F. Supp. 2d 832, 847 (N.D. Tex. 2005) (plaintiff failed to plead specific facts showing defendants had actual knowledge guidance was inaccurate when made).

[13] In *Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546 (5th Cir. 2007), the Fifth Circuit affirmed dismissal of a Rule 10b-5 suit despite allegations of GAAP violations that led to the restatement of more than two years of financial reports, false Sarbanes-Oxley certificates, insider trades, and allegations from a confidential witness that one of the individual defendants "did not want to know the details of a revenue issue so that he would not be liable"—a far cry from the allegations here.  *Id.* at 549-556.  In *Shaw Group*, 537 F.3d at 539,  the Fifth Circuit reversed a district court's denial of a motion to dismiss and held that the complaint did not adequately allege scienter under *Tellabs* despite allegations from a confidential witness that the company's executives knew of

stronger allegations of wrongdoing, including options backdating, accounting violations, significant restatements, internal investigations, false certifications, insider trading, and even in situations where the allegations involved "suspect" timing, "raise[d] the Court's eyebrows," or demonstrated "inexcusable negligence."[14]

> ### 1. Plaintiffs Do Not Allege Particularized Facts Demonstrating That Zimmer Or Davis Knew Their Forward-Looking Statements Were False Or Made Any Other Statements With Scienter

To allege a claim against TMW, Plaintiffs must individually satisfy the scienter requirement as to the person who actually made the alleged misrepresentation and cannot rely on the alleged collective knowledge of TMW as a whole (*i.e.*, there is no "collectivized" corporate scienter or "group pleading"). *Southland*, 365 F.3d at 366. Plaintiffs must therefore establish scienter as to Zimmer and Davis individually and may not impute scienter to them based on their positions with the company. *Blackwell*, 440 F.3d at 287.

The Amended Complaint wholly fails to establish a "cogent and compelling" inference of scienter that is at least as compelling as the inference that Zimmer's and Davis's conduct was not

---

deficiencies in the company's project tracking software. *See also Flaherty & Crumrine*, 565 F.3d 200, 210 (5th Cir. 2009) (affirming dismissal with prejudice despite "suspect" timing of dividend announcement).

[14] *See, e.g., ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 63–68 (1st Cir. 2008) (affirming dismissal with prejudice despite plaintiffs' argument that defendants possessed internal budget that contradicted their public statements); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007) (affirming dismissal with prejudice and discounting allegations from anonymous confidential sources); *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 97–98 (1st Cir. 2007) (affirming dismissal with prejudice under *Tellabs*); *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, (S.D.N.Y. 2009) (dismissing complaint with prejudice despite 28-day period between last alleged false statement and adverse news); *Stark Trading v. Falconbridge Ltd.*, No. 05-C-1167, 2008 U.S. Dist. LEXIS 2677, at *20–32 (E.D. Wisc. Jan. 14, 2008) (granting dismissal in tender offer case where defendants allegedly provided inaccurate information to investors); *Winters v. Stemberg*, 529 F. Supp. 2d 237, 250–52 (D. Mass. 2008) (granting dismissal despite allegations of options backdating that "raise the Court's eyebrows"); *Cordova v. Lehman Bros.*, 526 F. Supp. 2d 1305, 1319 (S.D. Fla. 2007) (granting dismissal even though evidence supported "a showing of negligence or even inexcusable negligence on the part of Defendants"); *In re Cyberonics Inc. Secs. Litig.*, 523 F. Supp. 2d 547, 553–55 (S.D. Tex. 2007) (granting dismissal despite allegations of options backdating, accounting violations, false certifications, and insider trades); *Weiss v. Amkor Technology, Inc.*, 527 F. Supp. 2d 938, 948–56 (D. Ariz. 2007) (granting dismissal in backdating case even though company's own internal review identified wrongdoing and accounting violations); *In re Bisys Secs. Litig.*, 496 F. Supp. 2d 384, 386 & n.1 (S.D.N.Y. 2007) (denying motion to reinstate claims and holding that "[i]f anything, *the law [since Tellabs] is now more favorable to [the defendant]* than it was [when the claims were initially dismissed]").

fraudulent and that the guidance was not knowingly false.  Simply alleging that TMW fell short

of guidance does not satisfy the PSLRA.[15]  *See, e.g., Azurix*, 198 F. Supp. 2d 882 ("The mere

fact that a business did not live up to expectations is insufficient to create an inference of fraud").

Plaintiffs fail to identify any specific communications or reports to Zimmer or Davis that

directly contradicted their public statements or identify who provided the information, what

information was furnished and when.  The Fifth Circuit requires this type of information to

survive dismissal.[16]  Nor do Plaintiffs dispute that TMW repeatedly and consistently disclosed

throughout the alleged class period that demand for its core men's tailored clothing items was

declining, that K&G was underperforming, and that TMW would be vulnerable if economic

trends worsened.  At best, all Plaintiffs allege is that TMW management did not sufficiently

anticipate the onset and eventual scope of the recession and could have made better business

decisions regarding the integration of After Hours.  These claims do not demonstrate scienter.[17]

The allegations also support an overwhelming competing inference under *Tellabs* that

Zimmer and Davis did ***not*** act fraudulently, including the fact that:

---

[15] *E.g., In re Patterson Companies, Inc. Secs., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1031-32 (D. Minn. 2007) ("[P]laintiffs' attempt to contort missed earnings into actionable securities fraud with the benefit of hindsight based on motivational sales talks and the company's maintenance of previously issued growth and earnings projections fails to state with particularity an actionable claim for securities fraud under the Exchange Act"); *Coates v. Heartland Wireless Communs., Inc.*, 55 F. Supp. 2d 628, 635-36 (N.D. Tex. 1999) ("It is also impermissible to allege fraud by hindsight, that is, to seize upon disclosures in later reports and allege that they should have been made in earlier ones"); *see also Abrams.*, 292 F.3d at 433-34 ("mismanagement" does not amount to securities fraud).

[16] *See Abrams*, 292 F.3d at 432 (dismissing complaint where plaintiffs "point[ed] to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); *Rosenzweig*, 332 F.3d at 868 (5th Cir. 2003) (dismissing complaint where report "fail[ed] to identify exactly who supplied the information [that contradicted company's public disclosures] or when [management] knew the information"); *In re Odyssey Healthcare, Inc. Secs. Litig.*, 424 F. Supp. 2d 880, 890 (N.D. Tex. 2005) ("The Complaint does not allege the existence of any specific reports that would have disclosed such irregularities that were provided to the Individual Defendants").

[17] *E.g., Abrams*, 292 F.3d at 433 ("mismanagement" does not demonstrate fraud); *In re Secs. Litig. BMC Software*, 183 F. Supp. 2d 860, 907, 916-17 (S.D. Tex. 2001) (rejecting fraud allegations based on alleged failure to integrate acquired companies).

- TMW achieved its earnings per share guidance during the first quarter, exceeded its guidance for the second quarter, only missed its original third quarter guidance by one cent, achieved its mid-quarter guidance for the third quarter, exceeded its mid-quarter guidance for the fourth quarter, and came within approximately 3% of achieving its initial full-year 2007 earnings per share guidance as provided on March 7, 2007.  One cannot reasonably infer Zimmer and Davis knew from the beginning TMW could not achieve guidance given how close TMW came to achieving it.

- TMW made candid disclosures throughout the alleged class period regarding the ongoing weakness of the K&G business, the decline in demand for TMW's core tailored clothing products, and the Company's vulnerability to broader economic trends.

- TMW made some of its starkest warnings in the August 22, 2007 conference call that preceded the stock price decline on October 10, 2007.  When asked by another analyst whether he could say anything to "make me feel comfortable" that K&G's business trends "wouldn't worsen" and whether "there was some execution initiative you could take where you could help the business improve," George Zimmer stated that "*I wish I had an answer, but we don't have an answer other than macro-conditions*."  Zimmer further candidly stated that "*[a]t K&G, I don't know that we can really expect to see too significant [a] turnaround until there is some psychological shift foretelling a change in the outcomes of our middle and lower-income people in America*."

- The 2007-09 "Great Recession" began in December 2007, which is the month when TMW began experiencing a significant decline in sales.  *See supra* n. 2.

- TMW went out of its way to update its guidance and even provided "mid-quarter" guidance, which it was not required to do.

### 2.     The Stock Sale Allegations Do Not Demonstrate Scienter

Plaintiffs' other scienter allegations are likewise insufficient.  For example, Plaintiffs assert that Zimmer and Davis sold a minority of their stock holdings in TMW during the alleged class period.  *See* Amended Complaint ¶ 81.  Stock sales, however, cannot **create** an inference of scienter; they can only **enhance** an inference that already exists from Plaintiffs' other well-pled factual allegations (of which there are none).  "[A]llegations of insider trading are essentially a form of motive and opportunity allegations," and the Fifth Circuit "requires more than allegations of motive and opportunity to withstand dismissal."  *Southland, Inc.*, 365 F.3d at 368;

*see also Nathenson*, 267 F. 3d at 412 (stock sales can only enhance existing inference of scienter).   Even then, such trades only enhance an inference of scienter when they occur "at times calculated to maximize the personal benefit from undisclosed inside information," as there is nothing inherently improper about an executive selling stock.   *Southland*, 365 F.3d at 368.

Plaintiffs' stock sale allegations do nothing to support an inference that Zimmer and Davis knew their statements were false when made.[18]   Plaintiffs allege that Zimmer sold 265,000 of his total TMW holdings during the alleged class period (out of more than 3.8 million shares, meaning that he collectively sold less than seven percent of his total holdings) at regular monthly intervals of 37,500 shares.   These sales were made pursuant to a pre-arranged Rule 10b5-1 trading plan, in which the amounts to be sold each month were decided in advance.[19]   Davis sold just 14,002 shares, all but 2,000 of which were sold in March 2007.   There are no allegations regarding Defendants' prior trading patterns.   There is simply nothing suspicious about the timing or amount of these sales that would support any inference, let alone a cogent and compelling inference, that Zimmer or Davis knew that TMW's public statements were false.   Courts have consistently held similar allegations insufficient.[20]

---

[18] Plaintiffs apparently want to draw an inference, based on their stock sales, that Davis must have known when he sold stock in March or June 2007 that TMW would need to revise guidance downward in October.   The Fifth Circuit recently rejected a far more compelling "timing" inference in *Flaherty & Crumrine*, 565 F.3d at 210 (no strong inference of fraud where company substantially raised dividend just eight days after completing tender offer).

[19] *See* Ex. T.   A 10b5-1 plan can raise an additional inference "'that the sales were pre-scheduled and not suspicious'" if the plan was put in place before the alleged class period, as is the case here.   *Central Laborers*, 497 F.3d at 554 n.4 (quoting *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003)).

[20] *E.g., Shaw Group*, 537 F.3d at 544 (sale of 57% of executive's stock immediately after positive earnings announcement did not support strong inference of scienter); *Central Laborers*, 553-54 (executive's stock sale profit of $1.44 million did not support strong inference of fraud); *Dell*, 591 F. Supp. 2d at 897 (allegations that defendants sold 29.61% and 49.33% insufficient); *Zucco Partners*, 552 F.3d at 1005-06 (executive sale of 48% insufficient); *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1118-19 (N.D. Cal. 2009) (executive sales of 35%-68% of total holdings insufficient); *In re Michaels Stores, Inc. Secs. Litig.*, 2004 WL 2851782, at *13 (N.D. Tex. Dec. 10, 2004) (sale of 18.93% of holdings insufficient); *In re Enron Corp. Secs., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 634-39 (S.D. Tex. 2003) (rejecting insider trading allegations against outside directors who sold "between 20-100% of their Enron holdings during the Class Period for a total of over $1 billion").

Moreover, the alleged stock sales by Douglas Ewert and James Zimmer are irrelevant, as those individuals are not accused of making false statements.  *See, e.g., Alamosa Holdings*, 382 F. Supp. 2d at 860 (recognizing that stock sales of non-speaking defendants are irrelevant to scienter); *BMC Software*, 183 F. Supp. 2d at 902 (disregarding stock sales by non-speakers because "the state of mind of [non-speaking defendants] is irrelevant").  There is also nothing remotely suspicious regarding the timing and amounts of those sales.

### C.     Plaintiffs' "Confidential Witness" Allegations Are Grossly Deficient

Plaintiffs' confidential witness allegations likewise violate the PSLRA and fail to support any inference of falsity or fraud, let alone a cogent and compelling one.  The PSLRA requires securities fraud plaintiffs to provide specific details regarding the sources of so-called "information and belief" allegations.[21]  Following *Tellabs*, the Fifth Circuit has held that confidential sources "***afford no basis for drawing the plausible competing inferences [of scienter] required by Tellabs***."  *Shaw Group*, 537 F.3d at 535-36 (emphasis added).  The fact that Plaintiffs' allegations "derive from confidential sources further detracts from their weight in the scienter analysis."  *Id.* at 535 ("Following *Tellabs*, courts ***must discount*** allegations from confidential sources") (emphasis added).

To the extent these types of allegations are allowable at all after *Tellabs*, the sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded."  *Id.* at 536 (citing *ABC Arbitrage*, 291 F.3d 336, 353 (5th Cir. 2002)).  "[P]laintiffs must allege with particularity ***when*** a comment was made to a confidential source, or, if the source alleges a conversation took place,

---

[21] "[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity ***all facts on which that belief is formed***."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  While courts have previously allowed confidential source allegations under limited circumstances involving allegations far more serious and specific than those here, Defendants note that the very concept of allowing anonymous allegations appears to contradict the plain meaning of the phrase "all facts on which that belief is formed."

when and where the conversation occurred." *In re Dell Inc.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) (citing *Indiana Elec.*, 537 F.3d at 538). "The complaint should give details such as the person's job description, individual responsibilities, and specific employment dates." 591 F. Supp. 2d at 895 (citing *Central Laborers*, 497 F.3d at 552). A statement that is "susceptible to many interpretations, including innocent ones," cannot "contribute to a strong inference of scienter." *Shaw Group*, 537 F.3d at 538 (internal quotation marks omitted). Scienter also cannot be inferred just because those with alleged knowledge of alleged improper practices reported to the individual Defendants. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003). Plaintiffs also cannot demonstrate scienter through "vague hearsay" allegedly overheard by confidential sources and must plead particularized facts showing that the sources are "reliable." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996-97 (9th Cir. 2009).

Plaintiffs' confidential source allegations are weaker than the allegations held insufficient in *Shaw Group*, *Central Laborers*, and other Fifth Circuit cases. None of the alleged sources claims any personal knowledge regarding the process used by Zimmer and Davis to forecast TMW's company-wide guidance, which depends on far more than the level of sales at K&G (which comprises less than 20% of TMW's total revenue, and which is all CW1 allegedly had knowledge of or discussed) or the performance of Men's Wearhouse stores within the single "district" allegedly overseen by CW2. *See supra* at 16-21. The Amended Complaint does not identify the alleged witnesses' dates of employment, provides vague and insufficient descriptions of their job titles and responsibilities, and fails to identify any instance where Zimmer or Davis were provided any factual information that contradicted their public statements. An opinion by other lower-level employees that a company's guidance is unattainable – which none of the witnesses even specifically alleges – "sheds no light on the relevant issue of whether the

Individual Defendants shared this view, or indeed of whether the forecasts were necessarily unattainable." *In re Cerner Corp. Secs. Litig.*, 425 F.3d 1079, 1086 (8th Cir. 2005).

Perhaps most fundamentally, none of the confidential witness allegations is inconsistent with TMW's public disclosures.  For example, while CW1 claimed that K&G was already weakening in late 2006 and early 2007, TMW expressly disclosed this trend to investors before and throughout the alleged class period.  CW2's allegations regarding the difficulty meeting "good" and "excellent" sales goals in his or her "district" likewise are not remotely inconsistent with TMW's public statements, which made clear TMW did not expect significant comparable store sales growth and was experiencing a significant decline for its core tailored clothing items. It is quite telling that neither of these witnesses actually accuses TMW of making any specific false public statement or falsifying any specific public earnings projection, an allegation Plaintiffs surely would make if one of their alleged witnesses had made such a statement.

Moreover, the mere fact CW1 (an alleged former K&G employee with no apparent involvement or knowledge regarding After Hours or any other aspect of TMW's business outside K&G), CW3 and CW4 apparently question the wisdom of TMW's business decisions regarding the post-merger integration of After Hours, and that CW1 criticizes the approach to K&G's advertising in the fourth quarter, does not demonstrate a fraudulent statement or omission. *E.g.*, *Abrams*, 292 F.3d at 433 (allegations of "mismanagement" do not "rise to the standard necessary to support a securities fraud action").  Plaintiffs identify no false public statements regarding either of these issues.  These allegations also fail to withstand the *Tellabs* comparative inference test.  Which inference is more plausible:  (i) the inference that TMW made decisions regarding After Hours and K&G with the reasonable belief and intent that their decisions would improve their prospects and make more money for TMW, or (ii) the inference that TMW intentionally ran

After Hours into the ground and sabotaged K&G's advertising so that it would not make any sales during the fourth quarter, which is apparently the inference Plaintiffs believe should be drawn. The answer is clear. This case simply cannot withstand *Tellabs*.

### D.   Plaintiffs' Claims Are Barred By The Safe Harbor For Forward-Looking Statements

Plaintiffs' claims should also be dismissed under the common law and statutory protections for forward-looking statements. The gravamen of Plaintiffs' Amended Complaint is that TMW's earnings guidance was insufficiently pessimistic and that the stock price fell after TMW reduced or failed to meet its guidance.[22] "'[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.'" *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 358 (5th Cir. 2002).[23] TMW did not "guarantee" anything and consistently warned that actual results could differ from guidance. *See supra* at 6-8.

### 1.   The PSLRA Establishes A Statutory Safe Harbor

In addition to the longstanding common law prohibition on liability for forward-looking projections, the PSLRA contains a safe harbor. The safe harbor "has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind." *Southland*, 365 F.3d at 371. If either prong is satisfied, the claim fails. *See Home Solutions of Am. Inv. Grp. v. Fradella*, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 161 (N.D. Tex. 2007).

---

[22] Plaintiffs' claims regarding the After Hours merger and K&G's fourth advertising strategy are similarly barred to the extent they are asserting that Defendants failed to anticipate alleged future problems or overstated the future impact of these actions.

[23] *See, e.g., ABC Arbitrage*, 291 F.3d at 360 (company's projections of "continued double-digit growth both in sales and orders for the full year" and "the potential for sales growth of 10 to 20 percent per year" were inactionable projections); *In re Alamosa*, 382 F. Supp. 2d at 858 ("The setting of aggressive targets by management does not constitute securities fraud"); *see also In re Sec. Litig. BMC Software*, 183 F. Supp. 2d 860, 887 n.36 (S.D. Tex. 2001) ("'Projections of future performance not worded as guarantees' are not actionable").

The first prong creates a safe harbor for forward-looking statements that are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *See* 15 U.S.C. § 78u-5(c)(1)(A).  The second prong (the "actual knowledge" requirement, which applies regardless of whether the cautionary language is deemed sufficient) is discussed in the scienter section above and is equally fatal to Plaintiffs' claims.  *See supra* at 23.  The PSLRA further provides that "nothing in this section shall impose upon any person a duty to update a forward-looking statement."  15 U.S.C. § 78u-5(d).

### 2.    TMW's Statements Were Forward-Looking And Were Accompanied By Meaningful Cautionary Language

Plaintiffs' allegations regarding earnings guidance and expected future performance clearly involve forward-looking statements.  Each of the press releases and conference call transcripts contains a cautionary disclosure stating that the company was making forward-looking statements and containing express cautionary language, including references to the detailed cautionary disclosures in TMW's 10-K filings with the SEC.  Risk disclosures in prior SEC filings may be "incorporated by reference into a forward-looking statement," as TMW did here.[24]   In addition, TMW made specific cautionary disclosures during the analyst calls themselves regarding the declining demand for its core tailored men's clothing items, the K&G sales slowdown, the Company's susceptibility to macroeconomic trends, and numerous other

---

[24] *See Home Solutions*, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *In re Odyssey Healthcare, Inc. Secs. Litig.*, 424 F. Supp. 2d 880, 886-87 (N.D. Tex. 2005) (dismissing guidance-related claims); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591-592 (N.D. Tex. 2004) (same); *In re Michaels Stores, Inc. Sec. Litig.*, No. 3:03-cv-0246, 2004 WL 2851782, at *15 (N.D. Tex. Dec. 10, 2004) (dismissing claims where SEC filing referenced in press release contained five pages of cautionary statements).

specific issues.  *See supra* at 6-16.  Texas federal courts have routinely held that these types of disclosures are sufficient to bar liability at the Rule 12(b)(6) dismissal stage.[25]

### E.   Plaintiffs Fail To Allege Loss Causation

Plaintiffs have also not pled loss causation – *i.e.*, "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [TMW's] previous representations. . . ."[26] The "truth" revealed in a corrective disclosure must "'make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true).'"[27]

Plaintiffs identify only three sets of alleged "corrective disclosures": the October 10, 2007 mid-quarter press release when TMW lowered its projected third quarter guidance, the November 28, 2007 press release and conference call when TMW achieved its revised guidance, and the January 9, 2008 mid-quarter press release when TMW lowered its fourth quarter guidance.  *See* Amended Complaint ¶ 84.  These disclosures fail to reveal any facts that "make the existence of the [alleged] fraud more probable than it would be without the alleged fact" taken as true.  All they reveal is that TMW did not perform as expected, which is insufficient to plead loss causation.  The "'[m]ere failure to meet earnings guidance is insufficient to establish loss causation.'"  *Dell*, 591 F. Supp. 2d at 909 (quoting *In re AOL Time Warner, Inc. Secs. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007)).  "[D]isclosure of financial losses generally – even if those financial losses are a result of the specific concealed fact – is not sufficient' to establish –

---

[25] *See, e.g., Home Solutions*, 2008 WL 1744588, at *6; *Blockbuster*, 504 F. Supp. 2d at 161; *In re Odyssey*, 424 F. Supp. 2d at 887; *In re Alamosa*, 382 F. Supp. 2d at 844-45 (dismissing claims under "cautionary language" safe harbor); *Taubenfeld*, 385 F. Supp. 2d at 591-592 (same); *In re Michaels Stores,* 2004 WL 2851782, at *15 (same).

[26] *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314-15 (5th Cir. 2008) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

[27] *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, _ F.3d _, 2010 WL 481407, at *3 (5th Cir. Feb. 12, 2010) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 256 n.20 (5th Cir. 2009)).

or allege – loss causation.'" *Dell*, 591 F. Supp. 2d at 901 (quoting *In re Rhodia S.A. Secs. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007)).[28]  Plaintiffs thus have not pled loss causation.

## II.    Plaintiffs' Control Person Claims Fail Because There Is No Primary Claim

"Where a primary violation by the 'controlled person' has not been adequately pleaded, the court should also dismiss a section 20(a) claim."  *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 548 (N.D. Tex. 2003).  Because Plaintiffs have not adequately pled a primary violation, the control person claims also fail.

## CONCLUSION

Defendants pray that the Court dismiss this action with prejudice and award all further relief to which they are justly entitled.

---

[28] *See also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 231-32 (5th Cir. 2009) (a "loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation"); *National Junior Baseball League v. Pharmanet Development Group Inc.*, No. 08-5723, 2010 WL 1379735, at *35 (D.N.J. Mar. 30, 2010) ("PharmaNet's announcement in September 2008 of a downward revision to guidance did not reveal any of the alleged fraud . . . ."); *In re Retek Inc. Secs. Litig.*, 621 F. Supp. 2d 690, 702 (D. Minn. 2009) ("It is clear that the mere disclosure of disappointing earnings or reduced future guidance is not sufficient to reveal that prior financial statements contained misrepresentations").

Respectfully submitted,


FULBRIGHT & JAWORSKI L.L.P.


s/ Gerard G. Pecht
Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Ave., Suite 2400
Austin, Texas 78701-2978
Telephone:  (512) 536-5287
Telecopier:  (512) 536-4598
ATTORNEYS FOR DEFENDANTS

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.

s/ Gerard G. Pecht
Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, Texas  77010-3095
Tel.:  (713) 651-5151
Fax:  (713) 651-5246

Peter A. Stokes
State Bar No. 24028017
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Ave., Suite 2400
Austin, Texas 78701-2978
Tel.:  (512) 536-5287
Fax:  (512) 536-4598

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on April 12, 2010, which caused an electronic copy of this document to be served on all counsel of record in this matter.

s/ Gerard G. Pecht
Gerard G. Pecht

36