# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

————————————————————x
|  |  |
|---|---|
| | : Civil Action No. 4:09-cv-03265 |
| MATERIAL YARD WORKERS LOCAL 1175 | : |
| BENEFIT FUNDS, Individually and on Behalf of | : |
| All Others Similarly Situated, | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| MEN'S WEARHOUSE INC., GEORGE | : |
| ZIMMER and NEILL P. DAVIS, | : |
| | |
| Defendants. | |

————————————————————x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

SCHWARTZ, JUNELL, GREENBERG &
OATHOUT, LLP
Roger B. Greenberg
Thane Tyler Sponsel III
Two Houston Center
909 Fannin Street, Suite 2700
Houston, Texas 77010
Telephone: (713) 752-0017
Facsimile: (713) 752-0327

*Liaison Counsel*

WHATLEY DRAKE & KALLAS, LLC
Joe R. Whatley, Jr.
Deborah Clark-Weintraub
Richard P. Rouco
1540 Broadway, 37th Floor
New York, New York  10036
Telephone:  (212) 447-7070
Facsimile: (212) 447-7077

*Lead Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ........................................................................... 6

  A.  Background ................................................................................. 6

  B.  Defendants' Materially False and Misleading Statements...................... 7

    1.  The Initial 2007 GAAP Diluted EPS Guidance................................. 7
    2.  Defendants Raise 2007 Guidance ................................................. 9
    3.  Defendants' Inadequate Adjustments to the Company's Guidance .............. 11
    4.  The Truth is Revealed ............................................................. 14

ARGUMENT ........................................................................................... 14

  A.  Standard of Review..................................................................... 14

  B.  The Amended Complaint Alleges False Statements and Actionable Omissions in Violation of Section 10(b)/Rule 10b-5 Consistent with Fed. R. Civ. P. 9(b) and the PSLRA's Pleading Standards......................................................... 15

  C.  The Allegations of the Amended Complaint Raise A Strong Inference of Scienter .................................................................................... 19

    1.  Plaintiffs' Adequately Describe Their Confidential Sources.......................... 23

    2.  Defendants' Reaping of Tangible Benefits Adds to the Overall Strong Inference of Scienter ................................................................ 26

  D.  Defendants' Statements Are Not Protected by Any Safe Harbor ........................ 28

    1.  The Complaint contains statements that were not exclusively forward-looking ................................................................................... 28

    2.  The cautionary guidance offered on the few forward-looking statements was inadequate ........................................................................... 30

      a.  Defendants' forward-looking statements were not accompanied by meaningful cautionary language .............................................. 30

      b.  The safe harbor is inapplicable because defendants actually knew their statements were misleading at the time they were made ......................... 33

  E.  Plaintiffs Have Adequately Alleged Loss Causation............................................. 34

F.    The Control Person Liability Claims Should Not Be Dismissed..........................39

CONCLUSION.............................................................................................................39

# TABLE OF AUTHORITIES

## Federal Cases

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ................................................................................. 23

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
   597 F. 3d 330 (5th Cir. 2010) ............................................................................... 34

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ........................................................................................... 15

*Beach v. Healthways, Inc.*,
   No. 08-745894, 2009 WL 605408 (M.D. Tenn. Mar. 9, 2009) ................................... 22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 15

*Bourjaily v. United States*,
   483 U.S. 171 (1987) ............................................................................................... 20

*Broad v. Rockwell, Int'l Corp.*,
   642 F.2d 929 (5th Cir. 1981) ................................................................................. 19

*City of Hialeah Employees' Retirement Sys. v. Toll Brothers, Inc.*,
   No. 07-1513, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ........................................ 22

*Darquea v. Jarden Corp.*,
   No. 06 CV 0722, 2007 WL 1610146 (S.D.N.Y. May 31, 2007) ................................. 21

*ECA & LOCAL 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187, 204 (2d Cir. 2009) .............................................................................14

*Fener v. Operating Engineers Const. Industry and Misc. Pension Fund*,
   579 F. 3d 401 (5th Cir. 2009) ............................................................................... 35

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ....................................................................... passim

*Foman v. Davis*,
   372 U.S. 178 (1962) ............................................................................................... 39

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) ................................................................................. 15

iv

*Griffin v. GK Intelligent Systems, Inc.*,
   87 F. Supp. 2d 684 (S.D. Tex. 1999) ........................................................ 28

*Higginbotham v. Baxter Int'l Inc*.,
   495 F.3d 753 (7th Cir. 2007) ..................................................................... 23

*In re Apple Computer, Inc., Secs. Litig*.,
   243 F. Supp. 2d 1012 (N.D. Cal. 2002) .................................................... 32

*In re Cadence Design Sys., Inc. Secs. Litig*., No. 08-4966, ___ F. Supp. 2d. ___, 2010 WL
   726515 (N.D. Cal. Mar. 2, 2010) .............................................................. 24

*In re Check PointSoftware Techs., Inc. Secs. Litig*.,
   No. 03-CV-6594, 2006 WL 1116699 (S.D.N.Y. Apr. 26, 2006) ............... 22

*In re Copper Mountain Secs. Litig*.,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) ...................................................... 32

*In re Dell Inc. Secs. Litig*.,
   591 F. Supp. 2d 877 (W.D. Tex 2008) ...................................................... 38

*In Re Enron Corp. Secs. Derivative & ERISA Litig*.,
   No. MDL 1446, 2005 WL 3504860 (S.D. Tex. Dec. 22, 2005) ................ 35

*In re Indep. Energy Holdings PLC*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001) ...................................................... 29

*In re Initial Public Offering Secs. Litig*.,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...................................................... 29

*In re Initial Public Offering Secs. Litig*.,
   399 F. Supp. 2d 298 (S.D.N.Y. 2005) ........................................... 35, 36, 37

*In re Lucent Tech., Inc. Secs. Litig*.,
   217 F. Supp. 2d 529 (D.N.J. 2002) ........................................................... 29

*In re Rosenbaum Capital, LLC v. McNulty*,
   549 F. Supp. 2d 1185 (N.D. Cal. 2008) .................................................... 22

*In re Secs. Litig. BMC Software, Inc*.,
   183 F. Supp. 2d 860 (S.D. Tex. 2001) ...................................................... 33

*In re TETRA Techs., Inc. Secs. Litig*.,
   No. 4:08-cv-0965, 2009 WL 6325540 (S.D. Tex. 2009) ...................... 32, 33

*In re U.S. Interactive Sec. Litig.*,
    2002 WL 1971252 ......................................................................................... 29

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ......................................................... 18

*In Re Williams Sec. Litig.*,
    496 F. Supp. 2d 1195 (N.D. Okla. 2007) ..................................................... 35

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ................................................................. 25, 26

*Lormand v. US UnWired, Inc.*,
    565 F. 3d 228 (5th Cir. 2009) ....................................................................... 34

*Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*,
    513 F.3d 702 (7th Cir. 2008) ....................................................................... 23

*Nathenson v. Zonagen, Inc.*,
    267 F.3d 400 (5th Cir. 2001) ....................................................................... 26

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ....................................................................... 19

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690, 699 (5th Cir. 2005) ............................................................... 28

*Selbst v. McDonald's Corp.*,
    Nos. 04-C-2422 et al., 2005 WL 2319936 (N.D. Ill. Sept. 21, 2005 ............... 18, 22, 25

*Silverman v. Motorola, Inc.*,
    No. 07-C-4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008 ...................... 29

*Steinberg v. BPO Management Services Inc.*,
    No. 3:09-cv-02291-0K, 2010 WL 1330971 (N.D. Tex. 2010 ...................... 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)....................................................................... passim

## Rules and Statutes

15 U.S.C. §78u- 4(b)(1) ........................................................................... 15, 17

15 U.S.C. §78u-4(b)(2) ................................................................................ 20

15 U.S.C. § 78u-5(c)(1)(A)-(B) ) .................................................................. 33

15 U.S.C. § 78u-5-(c)(1)(B)(1) ............................................................. 5, 19, 28

15 U.S.C. § 78u-5(c)(1)(A)(i) ............................................................. 28

Fed. R. Civ. P. 8 ............................................................. 34

Fed. R. Civ. P. 9(b) ............................................................. 15

Fed. R. Civ. P. 15(a) ............................................................. 39

.

Lead Plaintiff Iron Workers Local 53 Pension Fund respectfully submits this memorandum of law in opposition to the motion to dismiss filed by Defendants Men's Wearhouse Inc. ("TMW" or the "Company"), George Zimmer, and Neill P. Davis.

## PRELIMINARY STATEMENT

This is a federal securities class action on behalf of purchasers of the common stock of TMW between March 7, 2007 and January 9, 2008, inclusive (the "Class Period"), against TMW and its chairman and chief executive officer, George Zimmer ("Zimmer"), and its chief financial officer, Neill P. Davis ("Davis"), for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") arising out of the defendants' false and misleading statements concerning the Company's business and earnings and revenues projections for fiscal 2007.[1]

Throughout the Class Period, defendants issued materially false and misleading statements representing that notwithstanding the weakening economy, the Company was on track to exceed the GAAP diluted earnings per share of $2.71 achieved in fiscal 2006 even without giving effect to its acquisition of the largest men's formal wear chain in the U.S., After Hours Formalwear, Inc. ("After Hours"), which was expected to close in the first quarter.  According to defendants, although the economic slowdown would result in comparable same-store sales in fiscal 2007 that were flat to a low single digit increase over the prior year, this more modest growth compared to fiscal 2006 would be offset by margin expansion that would result in a 10% to 14% increase in adjusted diluted earnings per share in 2007.

---

[1] The Company's fiscal year began on February 4, 2007 and ended on February 2, 2008, with quarters ending on May 5, 2007, August 4, 2007, November 3, 2007, and February 2, 2008.

In fact, however, based on the real time sales information available to them, defendants knew or recklessly disregarded that sales were far below the Company's annual plan and revenue forecast that had been used to determine the external earnings guidance issued to investors.   In particular, as early as the first quarter when the Company issued its guidance for fiscal 2007, sales at the Company's K&G stores, which had experienced a 6% decline in comparable same-store sales in the fourth quarter of 2006 and targeted more price sensitive customers who were the first to feel the impact of the recession, had continued to deteriorate and were significantly below plan. Nevertheless, in a March 7, 2007 conference call with analysts, defendants stated that they were planning for same store sales at K&G that would be flat to 2% *higher* than the prior year.

In addition, although defendants stated that the accretive effect of the After Hours acquisition would help offset moderating trends in the Company's apparel business by increasing the Company's tuxedo rental revenues, immediately after acquiring After Hours, defendants dismissed the founders and key management of After Hours, discarded the business strategies that were the basis of the company's success, and standardized rental wear in its stores, all of which had a substantial adverse effect on After Hours' business.

By the second quarter of 2007, the significant downward sales trend against plan, which had been evident since the first quarter, was even more pronounced–as was the need for a substantial downward revision of the Company's 2007 earnings guidance.  In addition, the integration of After Hours was causing a loss of revenue due to defendants' dismantling of the sales force and field structure of After Hours that had created demand

2

through close work with David's Bridal in favor of a unified approach across all TMW and After Hours stores.  Rather than reducing guidance, however, in an August 22, 2007 conference call with analysts, defendants ***increased*** the Company's full-year GAAP diluted earnings per share guidance to a range of $2.98 to $3.02 per share.  In addition, defendants falsely stated that they were pleased with how the After Hours integration was proceeding although the adverse effects of their changes in After Hours' business strategy were already evident.

The Company's stock price rose in response to defendants' materially false and misleading statements from $43.30 on March 7, 2007, the first day of the Class Period, to a Class Period high of $56.24 on July 17, 2007.  Thereafter, the stock continued to trade in the high $40 to low $50 range until mid-October, when defendants announced modest downward adjustments to the Company's third quarter earnings guidance on October 10, 2007, and to the annual guidance on November 28, 2007, and the artificial inflation in the Company's stock price caused by defendants' misrepresentations slowly began to leak out.

Defendants sought to blunt the impact of these announcements by attributing the lower guidance for the fourth quarter of 2007 issued on November 28, 2007, to unusual items including the After Hours acquisition and the relocation of the Company's Houston offices.  Although the Company's stock price declined somewhat in response to these disclosures, it nevertheless remained inflated.  In truth, however, the lower guidance–which still exceeded the guidance originally announced in March 2007 and was still falsely inflated given the information available to defendants–was attributable to the deteriorating sales trends against plan that had been evident to defendants throughout

3

2007 and had been accelerating since the second quarter.  In addition, as defendants knew but recklessly disregarded, these deteriorating sales trends were exacerbated by the Company's failed integration of After Hours due to defendants' scrapping of After Hours' successful business model.

It was not until January 9, 2008, that the defendants finally acknowledged publicly what they had known since the beginning of fiscal 2007 – *i.e.*, that exceeding fiscal 2006 GAAP diluted EPS in fiscal 2007 was impossible given the severe economic downturn, which was adversely impacting the Company's business.  In response, the price of TMW common stock fell $7.60 per share or 30% to close at $17.84, far below its Class Period high of $56.24.  Unlike investors, who suffered substantial losses as a result of defendants' fraudulent scheme, defendants and other knowledgeable insiders took full advantage of the artificial inflation in the Company's stock price throughout the Class Period by selling almost 300,000 shares of TMW common stock for gross proceeds of more than $13.5 million.

To avoid liability for their misconduct, defendants attempt to paint themselves as unwitting victims of the economic recession and accuse plaintiffs of "alchemizing economic misfortune into securities fraud."  *See* Dkt. # 26 at 2.  However, this argument ignores the factual allegations of the amended complaint which, among other things, show that defendants were well aware that the Company's publicly issued  guidance was unattainable due to deteriorating sales, especially in the Company's K&G stores, *a downward trend that commenced a full year before the "Great Recession" purportedly began*.  Indeed, the amended complaint alleges that defendants directed K&G management to change their forecasts for the division, which allowed defendants to

maintain the false and misleading impression that the Company was successfully managing through the economic downturn, and that its 2007 GAAP diluted earnings per share guidance could be met.

It is well settled that "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001). The fact that defendants acknowledged certain weakening trends during the Class Period does not absolve them from liability as they continued to publish 2007 guidance that they knew was unattainable based on the information available to them at the time. It is black letter law that the PSLRA safe harbor does not protect forward-looking statements made with actual knowledge of their falsity. 15 U.S.C. § 78u-5-(c)(1)(B)(1).

Defendants also twist plaintiffs' allegations regarding the integration of the After Hours acquisition arguing that "[p]laintiffs apparently want the Court to draw an inference that Defendants, for some inexplicable purpose, intentionally took actions they knew from the beginning would run After Hours and K&G into the ground." *See* Dkt. # 26 at 4. Of course, as defendants well know, the inference this Court must draw from the After Hours allegations is far more obvious and compelling – *i.e.*, that defendants were aware that the process of integrating After Hours, including the dismantling of the sales force and field structure of After Hours that had created demand through close work with David's Bridal, had negatively impacted After Hours business and this knowledge, coupled with defendants' knowledge of deteriorating sales trends in the Company's retail

sales business, gives rise to a strong inference that the guidance they issued to investors was misleading and neither made in good faith nor with a reasonable basis.

In view of the foregoing, defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.     Background

Defendant TMW describes itself as "one of North America's largest specialty retailers of men's apparel with 1,284 stores." (Compl. ¶ 28.)  The Company's U.S. retail apparel stores are operated under the brand names of TMW and K&G. (*Id*. ¶ 29.)   Under the TMW brand, the Company targets middle and upper-middle income men. (*Id*.)  Under the K&G brand, the Company targets the more price sensitive customer. (*Id.*)

On November 16, 2006, TMW entered into a definitive agreement with Federated Department Stores, Inc. and David's Bridal, Inc. to acquire After Hours, the largest men's formal wear chain in the U.S., for an aggregate purchase price of $100 million, subject to certain adjustments. (Compl. ¶ 30.)  Following the acquisition, After Hour's exclusive relationship with David's Bridal, Inc., the nation's largest bridal retailer, was extended to the TMW store brand. (*Id.*)

The tuxedo rental business of After Hours is counter-cyclical to the Company's retail sales business.  While the first and fourth quarters of the year are peak for the Company's retail sales business, the high season for the tuxedo rental business is the second and third quarters. (Compl. ¶ 63.)   In acquiring After Hours, defendants emphasized that the growth in revenues from After Hours' tuxedo business would help smooth the peaks and valleys in the Company's retail sales business. (*Id.*)

**B.     Defendants' Materially False and Misleading Statements**

**1.     The Initial 2007 GAAP Diluted EPS Guidance**

The Class Period begins on March 7, 2007, when defendants issued earnings guidance for fiscal 2007 in conjunction with the Company's results for the fourth quarter and year ended February 3, 2007.  In a press release issued that day and a subsequent conference call with securities analysts, defendants announced that notwithstanding softening same-store sales in the U.S. (down 1.5%) and the Company's K&G division (down 6.5%) in the fourth quarter of 2006, defendants nevertheless expected TMW to post *increased* GAAP diluted earnings per share in fiscal 2007 in a range of $2.80 to $2.91 per share even without taking account of the Company's acquisition of After Hours, which was expected to close in the first quarter. (Compl. ¶ 48.)  According to defendants, this expected increase in 2007 GAAP diluted earnings per share was based on projected modest growth in same store sales of 1-2% in the U.S., including a 0-2% increase in K&G same store sales (as opposed to 2006's 1.8% decline), and increases in gross margins. (Compl. ¶ 49.)  In his remarks to securities analysts the same day, defendant Zimmer emphasized that "our continuing story is the margin expansion." (*Id.* ¶ 50.)  Although he acknowledged that the Company was "experiencing a modest slowdown which began in the fourth quarter of [2006]" (not December 2007 as defendants now claim),[2] Zimmer emphasized that this had been factored into the Company's guidance and was offset by the fact that the Company was "leveraging costs, both product and SG&A at a faster rate" resulting in projected operating margins that were nearly 12% higher than 2006.  (*Id.*)  The market's response to defendants'

---

[2] *See* Dkt. # 26 at 2.

statements on March 7, 2007 was predictably positive and the price of TMW common stock rose $4.06 per share to close at $47.36 per share on March 8, 2007.

On May 22, 2007, the Company issued a press release and conducted a conference call with securities analysts to announce its results for the first quarter of 2007 and issue updated guidance for 2007 in order to take account of the After Hours acquisition, which had closed in the first quarter. (Compl. ¶¶ 54-56.)  Although After Hours was expected to contribute just $0.03 to $0.05, the Company ***raised*** its guidance for 2007 GAAP diluted earnings per share to $2.84-$2.94 per share even though it was now projecting same store sales in the U.S. to be flat or modestly lower (down 1%) than the prior year. (*Id.* ¶ 55.)  During the Company's conference call with securities analysts, defendant Davis stated that he was "pleased to be in a position . . . to report yet another quarterly increase in earnings per share," which he reported had been achieved in spite of a negative 1.3% same store sales result for [the Company's] U.S. based retail stores." (Compl. ¶ 56.)  Notwithstanding the continued downward trend in same store sales, defendant Davis stated that the Company "did not see or anticipate an impending sharp decline, rather a continued moderation." (*Id.*)  In addition, he emphasized that although the Company was "modestly challenged from a top line perspective, gross margins on the other hand [were] planned to continue to increase," which was "offsetting" the "lower comparable store sales expectation." (*Id.*)  In response to defendants' statements in the May 22, 2007 press release and conference call, including that TMW was on track to achieve its 2007 GAAP diluted earnings guidance notwithstanding negative same store sales trends, the price of the Company's stock rose $4.44 per share (10%) to close at $49.98 per share on May 23, 2007. (*Id.* ¶ 57.)

As defendants knew or recklessly disregarded, however, there was no cause for investors to be optimistic.  To the contrary, real time trend data available to defendants no later than the beginning of the first quarter of fiscal 2007 revealed that the deteriorating sales trend that had begun in the fourth quarter of fiscal 2006 with respect to K&G had quickly manifested itself in the first quarter of fiscal 2007. (*Id.* ¶ 33.)  K&G's customers, who were largely urban and relied on price discounts, were very susceptible to economic downtown. (*Id.*)  As a result, the information available to defendants revealed that K&G would suffer substantial revenue and gross margin short falls in 2007 that would preclude the Company from meeting the earnings guidance it issued on March 7 and May 22, 2007. (*Id.* ¶ 35.)  In addition, the declining sales trend was not limited to K&G but also extended to TMW stores, many of which had missed their 2006 goals and were also suffering the same downward trend as the K&G stores in the first quarter of 2007. (*Id.* ¶¶ 41-42.)

## 2.  Defendants Raise 2007 Guidance

On August 22, 2007, although it was still experiencing significant weakness in comparable store sales at its K&G division and was projecting that same store sales would be essentially flat for the year, the Company once again ***raised*** its 2007 GAAP diluted earnings per share guidance to a range of $2.98 to $3.02. (Compl. ¶ 61.)  In his remarks to securities analysts that day, defendant Zimmer emphasized the positive impact of the After Hours acquisition in "lessen[ing] the business risks inherent in [the Company's] group of businesses." (*Id.* ¶ 63.)  In this regard, defendant Zimmer pointed out that as a percentage of the Company's business, tuxedo rentals had grown tremendously since "the bottom of the last economic downturn" and stated that "[t]his

growth drives earnings more than sales." (*Id.*)  Zimmer stated that the Company was "running ahead of [its] financial targets through the second quarter" and "based on that experience," the Company had "increased its outlook for the year." (*Id.*)  Although he acknowledged that K&G "continue[d] to be challenged," Zimmer emphasized that the Company was "controlling markdowns, and controlling operating costs," and that as a result of these efforts, "operating income at K&G [was] estimated to be approximately the same [in 2007] as compared to [2006], even under the weight of a negative 6.9% comparable same store sales result in the second quarter." (*Id.* ¶ 64.)  In addition, Zimmer represented that the Company was continuing to advertise in an effort to build K&G's sales. (*Id.*)  Zimmer concluded his prepared remarks on the conference call by stating that he was "pleased with our consolidated results, happy with the pace and results of the After Hours integration, [and] satisfied with our margin growth," and that he "remain[ed] cautiously optimistic about the balance of the year." (*Id.*)

Reflecting the importance of K&G's results to the Company's fortunes, an analyst asked whether management had considered that business trends could worsen with respect to K&G.  Zimmer responded that although the economy could continue to weaken, the board had approved a $100 million stock repurchase "***because we wanted to send the message that even if things were to weaken . . . we would still be financially strong enough to make a $100 million stock repurchase.  So . . .  we still feel pretty good about things, even in kind of the worst case.***" (Compl. ¶ 65.) (emphasis added.) Defendant Davis added that the Company was "continuing to fund the advertising" for K&G and stated that he took reassurance from the fact that "with almost a 7% negative comp" K&G was "making the same money."  (*Id.*)

10

In fact, however, as defendants knew or recklessly disregarded, the Company's earnings guidance and its statements about K&G on August 4, 2007, were predicated on forecasts that were far less negative than K&G's management had prepared. (Compl. ¶¶ 37-38.)  Indeed, defendant Davis had refused to allow K&G management to reflect their initial projections of a 20% loss in revenue against plan for the third quarter in their forecasts (*Id.*)  Further, the Company had altered the After Hours business model following the acquisition which resulted in a significant loss of revenue that prior to the acquisition had been attributed to the strategic relationship between After Hours and David's Bridal (*Id.* ¶¶ 44-47.)  Further, the Company was experiencing significant difficulties integrating the After Hours acquisition because key personnel had been terminated and business strategies significantly altered which was causing a severe disruption in that division's business and reducing sales volumes below budgeted levels (*Id.*)  Moreover, margins, which were supposedly offsetting declines in the Company's comparable store sales, were deteriorating as declining demand for the Company's products was forcing the Company to significantly discount beyond customary discounts which was further eroding earnings.

### 3.    Defendants' Inadequate Adjustments to the Company's Guidance

On October 10, 2007, defendants provided a mid-quarter update of the Company's third quarter 2007 earnings guidance and reduced the guidance to the range of $0.66 to $0.70 from $0.70 to $0.73. (Compl. ¶ 67.)  According to the release, the reduction was due to "weaker than planned comparable store sales at the company's K&G stores" and "operating and systems changes which had resulted in lower tuxedo rental unit volume" during the peak third quarter rental season. (*Id.*)  Nevertheless, the

release emphasized that the Company "remained excited about the potential return on this investment and its impact on [the Company's continued long-term earnings growth." (*Id.*) Shocked by this announcement, given the Company's previous positive statements concerning the integration of After Hours and the Company's ability to maintain the same profitability level by managing margins in the face of declining sales, the price of Men' Wearhouse common stock fell $4.32 per share or approximately 9% to close at $44.16 per share on October 10, 2007, on heavy trading volume. (*Id.* ¶ 68.)  Defendants, however, continued to conceal the true scope of the Company's problems.[3]

Although defendants finally lowered their 2007 GAAP diluted earnings guidance to $2.87 to $2.92 on November 28, 2007, based on "a flat to 1% increase in comparable store sales for [the Company's] TMW stores, [and] a low double-digit decrease in [its] K&G stores, resulting in a low single digit decrease for [the Company's] U.S. based group of stores," (Compl. ¶¶ 69, 71), this still exceeded the original guidance announced in March 2007, notwithstanding the clearly worsening business trends and problems with the integration of After Hours. (*Id.* ¶¶ 48, 69.)   Indeed, although defendant Davis stated that the fourth quarter would be "challenging," he also stated that the Company had made "modest changes to [its] promotional activities" and had "reviewed its inventory positions, in consideration of the range of guidance [being] provided," and did not "foresee any issues which would cause [the Company] to modify [its] historical

---

[3] Defendants' assertion (Dkt. # 26 at 13)  that the amended complaint alleges no particularized facts supporting the allegation that defendants were aware of weaker than planned comparable store sales at K&G or issues integrating After Hours that resulted in lower tuxedo unit rental volume prior to October 2007, simply ignores the allegations of the amended complaint.   Indeed, the amended complaint alleges that K&G management presented defendants' with  lower forecasts for the second and third quarters of 2007, but were instructed by defendants to change their forecasts to reflect a less substantial drop off in sales. (Compl. ¶¶ 32-40).  In addition, the amended complaint alleges that After Hours' founders and key management were dismissed promptly after the acquisition closed in the first quarter of 2007 and that defendants' discarded the existing business strategies, including the close relationship with David's Bridal, which quickly led to a substantial fall off in demand. (*Id.* ¶¶ 43-47).

markdown cadence." (*Id.* ¶ 68.)   The Company provided fourth quarter 2007 GAAP diluted earnings per share guidance of $0.43 to $0.48. (*Id.*)

Seeking to blunt the adverse impact of any comparisons of 2007 fourth quarter earnings guidance to the prior year's fourth quarter results (GAAP diluted EPS of $0.95), defendant Davis pointed out that the fourth quarter of 2006 included an additional week of operations and that the Company had a lower effective tax rate in 2006 than 2007. (Compl. ¶ 71.)   He also emphasized several one time items that were expected to be dilutive to fourth quarter earnings including After Hours, given that the fourth quarter was the seasonal low point of the tuxedo rental business, and the relocation of the Company's corporate offices in Houston. (*Id.*)   According to Davis, if the foregoing "adjustments" were applied to diluted earnings per share for the fourth quarters of 2006 and 2007, diluted earnings per share was actually expected to be ***higher*** in the fourth quarter of 2007, in an expected in a range of $0.77 to $0.81. (*Id.*)   In response to these statements, the price of TMW common stock fell $6.72 per share (16%) to close at $34.33 per share on November 29, 2007, on heavy trading volume. (*Id.* ¶ 72.)

Nevertheless, the stock price remained inflated because defendants had not yet revealed the true extent of the Company's difficulties.   In this regard, in addition to the other facts set forth above, defendants' failed to disclose that contrary to their prior statements otherwise, the Company had decided in the third quarter not to fund a fourth quarter advertising campaign, which would have a substantial, adverse impact on K&G's already weak sales. (Compl. ¶¶ 39-40.)   Indeed, a member of K&G's senior management had informed defendants that the failure to advertise would result in a 25% reduction in

revenue against plan. (*Id.*)   Nevertheless, defendants insisted that K&G reflect only a 12% loss against plan in K&G's forecast for the fourth quarter (*Id.*)

### 4.     The Truth is Revealed

It was not until January 9, 2008, that defendants disclosed that the downturn in the Company's business, which had been evident since the fourth quarter of 2006, was such that 2007 GAAP diluted earnings per share would not exceed 2006 results but would in fact be significantly less due to the economic slowdown and could not be offset by increasing margins. (Compl. ¶ 74.)  In response to this news, the price of TMW common stock plummeted by $7.60 per share (30 %) to close at $17.84. (*Id.* ¶ 75.)  When the final results were announced on March 12, 2008, 2007 GAAP diluted earnings per share were just $2.71 *including After Hours*, far below the Company initial guidance of $2.80 to $2.91. (*Id.* ¶ 76.)[4]

## <u>ARGUMENT</u>

### A.     Standard of Review

On a motion to dismiss, Plaintiffs' allegations are accepted as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).  In addition, the Complaint must be considered in its entirety.  As the Supreme Court has instructed, the inquiry "is whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original); *Id.* at 2511 ("the court's job is not to

---

[4] Defendants' effort to minimize the importance of the Company's earnings miss is unavailing and telling. While defendants perform calculations using the Company's March 7, 2007 and May 22, 2007 guidance, they totally ignore the fact that the Company issued increased guidance of $2.98 to $3.02 per share on August 22, 2007. (Compl. ¶ 63).  The Company missed the low end of this guidance by $0.25 or 8%.  The threshold for materiality is 5%.  *See ECA & LOCAL 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009).

scrutinize each allegation in isolation but to assess the allegations holistically"); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 247 (5th Cir. 2003) ("[W]e must consider any evidence of scienter pleaded by the plaintiffs cumulatively.").

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement. . . .'" *Id.* at 194. Indeed, the Supreme Court has cautioned that "a well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

**B.      The Amended Complaint Alleges False Statements and Actionable Omissions in Violation of Section 10(b)/Rule 10b-5 Consistent with Fed. R. Civ. P. 9(b) and the PSLRA's Pleading Standards**

Contrary to defendants' contention (Def. Mem. at 21), the amended complaint alleges false statements and actionable omissions in violation of the Section 10(b) and Rule 10b-5. The Private Securities Litigation Reform Act ("PSLRA") provides that in an action alleging a violation of Section 10(b)/Rule 10b-5, the complaint must "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading." 15 U.S.C. §78u- 4(b)(1). Here, defendants' false statements are pleaded with particularity. The amended complaint sets forth "the who, what, where, and when" with respect to each of Defendants' allegedly false and misleading statements. (Compl. ¶¶ 48-50, 53-56, 58-59, 61-67, 69-71, 73.) The cited paragraphs specifically identify the speaker(s), and each misrepresentation's content, date, and where it appeared.

Defendants' assertion (Def. Mem. at 21) that the amended complaint fails to allege any false statements because "all of TMW's public statements were accurate" is specious.   As an initial matter, the merits of plaintiffs' claims are not before the court on this motion.   As the Supreme Court instructed in *Tellabs*, this Court must accept plaintiffs' allegations as true and give plaintiffs the benefit of every inference unless a more compelling inference can be drawn from the facts alleged.  127 S. Ct. at 2510.   In any event, contrary to defendants' contention, the amended complaint pleads numerous false and misleading statements by defendants including the following:

- Defendants' issuance on Match 7, 2007, May 22, 2007, August 22, 2007, and November 28, 2007, of 2007 GAAP diluted earnings per share guidance in excess of 2006 results. (Compl. ¶¶ 48, 55, 61, 69.)[5]

- Defendants' statements on March 7, 2007 and May 22, 2007 that the deteriorating sales trends the Company was experiencing could be offset by margin expansion to a sufficient degree to achieve 2007 GAAP diluted earnings guidance. (Compl. ¶¶ 49-50, 56.)

- Defendant Zimmer's statement on August 22, 2007, that TMW was "running ahead of [its] financial targets through the second quarter." (*Id.* ¶ 63.)

- Defendants' statement on August 22, 2007, that K&G's profitability was approximately the same in the second quarter of 2007 as in 2006 notwithstanding a decline in comparable store sales for the unit of almost 7%. (*Id.* ¶¶ 64-65.)

- Defendants' statement on August 22, 2007, that TMW was "already feeling the affects of the upside from the combination of the After Hours organization with that of Men's Wearhouse" and that management was "happy with the pace and results of the After Hours integration." (*Id.* ¶¶ 63-64.)

- Defendants' statements on October 10, 2007, that K&G comparable store sales were weaker than planned. (*Id.* ¶ 67.)

---

[5]Contrary to defendants' contention (*see* Dkt. # 26 at 22 & n. 11), none of the foregoing statements can be characterized as a "soft opinion" or a mere expression of "hope" and optimism.  As the Fifth Circuit instructed in *Rubenstein v. Collins*, "predictive statements are deemed to contain false statements of 'fact' under Rule 10b-5 when the predictions embodied in those statements do not have a reasonable basis."  20 F.3d 160, 168 (5th Cir. 1994).

- Defendants' statement on November 28, 2007, that after "adjustments" to exclude extraordinary items, the Company's GAAP diluted earnings for the fourth quarter were on track to exceed fourth quarter 2006 results. (*Id.* ¶ 71.)

- Defendants' failure to disclose on October 10, 2007 or November 28, 2007 their decision not to fund K&G's advertising campaign in the fourth quarter of 2007 notwithstanding their prior statement on August 22, 2007 that defendants "remain[ed] focused on building the K&G brand through initiatives" including spending on advertising. (*Id.* ¶ 64.)[6]

In addition, the Complaint satisfies both Rule 9(b) and the PSLRA because it "specif[ies] the reason or reasons why the statement is misleading, and, if ... made on information and belief, ... all facts on which that belief is formed" 15 U.S.C. §78u-4(b)(1.) (Compl. ¶¶ 37-40, 42, 44-47.)  Specifically, the amended complaint contains the following particularized facts demonstrating why the foregoing statements were false and misleading including:

- That the Company's earnings guidance issued to investors by defendants was predicated on forecasts that were far less negative than management on the ground had prepared. (Compl. ¶¶ 37-39.)  Specifically, as set forth in the amended complaint, based on real time data available to them as early as the first quarter of fiscal 2007, management of K&G, including its CFO Brad Bell, consistently prepared forecasts, which were shared with TMW management, including defendants Zimmer and Davis, as well as COO Doug Ewert, projecting that K&G would suffer a decrease in revenues of approximately 20% due to deteriorating economic conditions which were adversely impacting K&G's budget-minded clientele. (*Id.* ¶¶ 37-38.)  However, rather than reflecting this in the guidance being issued to investors, Ewert, Davis and Zimmer refused to allow K&G management to reflect a loss in their second and third quarter forecasts of more than 8-10% or a loss of more than 12% in the division's fourth quarter forecast (*Id.* ¶¶ 37-39.)

---

[6] Defendants' assertion (see Dkt. # 26 at 18) that TMW increased its advertising expenses by $6.5 million in 2007 does not disprove CW1's assertion that the fourth quarter advertising campaign was not implemented.  Indeed, defendants concede as much a few sentences later when they assert that "[g]iven that K&G had been underperforming for over a year, it is perfectly understandable TMW senior management opted not to repeat the same advertising campaigns for K&G that were used in previous quarters."  *Id.* Further, the implication that defendants' disclosed in November 2007 that the advertising was not being conducted is specious.  All that was said on the November 3 conference call was the Company was making "modest changes to [its] promotional activities." (Compl. ¶ 70.)  Even if this statement could be interpreted as foreshadowing a *decrease* in advertising expense, which is far from obvious, it certainly cannot be interpreted as a clear and unambiguous disclosure that advertising would not be conducted during the critical fourth quarter.

- That the Company was discussing the need to reduce 2007 guidance in July 2007, a month before it increased guidance on August 22, 2007. (*Id.* ¶ 42.)

- That defendants decided in the middle of the third quarter (October 2007) not to repeat in the fourth quarter the advertising campaign for K&G that the Company had run the prior year notwithstanding their strong statements in August 2007 that the Company was committed to continuing advertising in order to build K&G's sales. (*Id.* ¶¶ 39-40.)

- That the Company's alterations to the After Hours business model following the acquisition had resulted in a significant loss of revenue that prior to the acquisition had been attributed to the strategic relationship between After Hours and David's Bridal. (*Id.* ¶¶ 44-47.)   Further, the Company was experiencing significant difficulties integrating the After Hours business because key personnel had been terminated and business strategies significantly altered which was causing a severe disruption in that division's business and reducing sales volumes below budgeted levels (*Id.*)

Courts repeatedly have found allegations such as those above sufficient to plead falsity under the PSLRA and Rule 9(b).  *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 (N.D. Cal. 2009) (allegations of declining demand and operational difficulties at time financial guidance was issued were sufficient to allege that there was no reasonable basis for company's financial guidance); *Selbst v. McDonald's Corp.*, Nos. 04-C-2422 *et al.,* 2005 WL 2319936, at *10 (N.D. Ill. Sept. 21, 2005) (allegation that defendants ignored facts that seriously undermined the accuracy of projections were sufficient to support plaintiffs' claim that the projections were misleading and neither made in good faith nor with a reasonable basis).[7]  Defendants' assertion that plaintiffs

---

[7] Defendants' authorities are not to the contrary.  In each, the plaintiffs failed to allege why the defendants' statements were misleading.  In  *Kunzweiler v. Zero.net, Inc.*, No. 3:00-CV-2552-P, 2002 U.S. Dist. LEXIS 3240, at *15 (N.D. Tex. Jul. 3, 2002), Plaintiff "relie[d] on conclusory assertions, without any factual support, that the investment amount was overvalued and the amount of Zero.Net's investment portfolio was overstated."  Here, the amended complaint's detailed allegations concerning defendants' instructions to K&G management that the division's guidance be changed to be less pessimistic are far from conclusory. In *Schiller v. Physicians Res. Group, Inc.*, No. 3:97-CV-3158-L, 2002 U.S. Dist. LEXIS 3240, at *18 (N.D. Tex. Feb 26, 2002), *aff'd*, 2003 U.S. App. LEXIS 18021 (5th Cr. Aug. 29, 2003), plaintiffs had relied on the group pleading doctrine and failed to distinguish each defendant's role in the alleged fraud.  In this

have done nothing more than allege "fraud by hindsight" (*see* Dkt. # 26 at 22 & n.10), is simply incorrect.

## C.     The Allegations of the Amended Complaint Raise a Strong Inference of Scienter

The foregoing allegations also raise a strong inference of scienter.  *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 932 (9th Cir. 2003) (whether falsity and scienter have been adequately pleaded ordinarily can be collapsed into a single inquiry, because their analyses frequently involve the same set of facts).  To state a claim under Section 10(b)/Rule 10b-5, plaintiffs must plead with particularity facts raising a "strong inference" of the defendants' state of mind, or scienter. 15 U.S.C. §78u-4(b)(2).  In the context of securities fraud, the Fifth Circuit has defined scienter as an "intent to deceive, manipulate, or defraud" or the type of "severe recklessness" which poses a "danger of misleading buyers or sellers . . . [and] is either known to the defendant or so obvious that the defendant must have been aware of it."  *Broad v. Rockwell, Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).  With respect to forward-looking statement accompanied by meaningful cautionary language, actual knowledge must be alleged to avoid application of the PSLRA's safe harbor.  15 U.S.C. § 78u-5-(c)(1)(B)(1).

Importantly, the factual allegations of the amended complaint must be considered in combination.  *Tellabs*, 127 S. Ct. at 2509; *id.* at 2511 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").  Indeed, even if each fact by itself is not enough to create a strong inference of scienter, that does not mean that the same facts in combination do not suffice. *Id.*; *accord*

---

case, the speaker is identified with respect to each allegedly false and misleading statement.  Defendants do not contend otherwise.

*Cabletron*, 311 F.3d at 40 ("Each individual fact about scienter may provide only a brushstroke, but the resulting portrait satisfies the requirement for a strong inference of scienter under the PSLRA."); *Green Tree*, 270 F.3d at 660 (reasonable inferences may "collectively" add up to strong inference); *see also Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987) ("individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it").   "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 127 S. Ct. at 2510 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)).   In determining whether plaintiff has alleged facts raising a strong inference of scienter, plaintiff's allegations need only be "at least as compelling as any opposing inference one could draw from the facts alleged." *Telllabs, Inc.*, 127 S. Ct. at 2510; *id.* at 2511 ("would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"). In other words, if all inferences are deemed equivalent, the inference in plaintiff's favor prevails.

Defendants argue that the allegations of the amended complaint are insufficient because the inference of scienter from the facts alleged is no more compelling than the inference that defendants' conduct was not fraudulent and that the guidance was not knowingly false.  *See* Dkt. # 26 at 24-25.  This argument fails for two reasons.  First, as noted above, under *Tellabs*, if all inferences are deemed equivalent, the inference in plaintiff's favor prevails.  *Id.* at 2511 ("[W]ould a reasonable person deem the inference of scienter at least as strong as any opposing inference?").   Second, even assuming *arguendo* that plaintiffs' burden is to show that the inference of scienter from the facts

20

alleged is more compelling than the inference that defendants' conduct was not fraudulent, it is in this case.

As noted above, "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Green Tree*, 270 F.3d at 665.   In this regard, the amended complaint alleges that defendants Zimmer and Davis pressured the operating presidents of the Company's divisions into forecasting higher revenue than the actual trend data supported. (Compl. ¶ 37.)   For example, although Brad Bell, K&G's CFO had prepared forecasts for his division that reflected at least a 12% loss against plan for the second quarter of 2007 and a 20% loss against plan for the third quarter, Zimmer, Davis, and the Company's COO, Doug Ewert, refused to allow K&G to reflect a loss against plan of more than 8-10%. (*Id.* ¶¶ 37-38.)[8] In addition, Davis and Ewert directed that only a 12% loss against plan be reflected for the fourth quarter even though K&G management indicated that the defendants' decision, contrary to their prior public statements, to suspend the division's annual fourth quarter advertising campaign would result in a 25% loss of revenue. (*Id.* ¶ 39.)[9]

---

[8] Defendants seek to minimize these allegations by stating that the forecasting process involves "give and take" and that "different people have different opinions."  *See* Dkt. # 26 at 17.  However, as one court has stated, "[w]hile defendants were permitted to remain optimistic about the future and to maintain a hopeful outlook, their public statements of optimism should have been subject to what the current data indicated." *Darquea v. Jarden Corp.*, No. 06 CV 0722, 2007 WL 1610146, at *8 (S.D.N.Y. May 31, 2007).  In this case, none of the facts before the Court support the contrary inference that defendants seek to draw – *i.e.*, that they had good reason to be *more* optimistic than K&G management.

[9] Defendants compare apples to oranges when they point out that TMW reported a decline in K&G comparable store sales of 6.9% in the second quarter and 11.3% in the third quarter and compare these percentages to CW1's assertion that K&G management believed K&G would suffer a revenue loss *against plan* of 12% in the second quarter and 20% in the third quarter.  *See* Dkt. # 26 at 18.  The Company's fiscal 2007 earnings guidance was purportedly predicated on K&G comparable store sales that were flat to 2% *higher* than in fiscal 2006 (¶ 49).

In addition, defendants' knowledge of deteriorating business conditions also extended to After Hours. (Compl. ¶¶ 42-47.)  Taken together, the foregoing allegations are plainly sufficient to give rise to a sufficient inference that defendants had actual knowledge that the 2007 earnings guidance had no reasonable basis.  Countless courts have held that allegations such as these give rise to a strong inference of scienter.  *See Beach v. Healthways, Inc.*, No. 08-745894, 2009 WL 605408, at *5 (M.D. Tenn. Mar. 9, 2009) (allegations that company could not achieve earnings guidance due to loss of contracts known to defendants "render[ed] an inference of scienter at least as likely as plausible opposing inference"); *City of Hialeah Employees' Retirement Sys. v. Toll Brothers, Inc.*, No. 07-1513, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) (allegations that several material adverse facts existed at the time future projections were made suggested that projections were unreasonable when made); *In re Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1193 (N.D. Cal. 2008) (allegations that revenue and earnings projections were based on statements regarding success of integration which defendants knew to be false gave rise to "a cogent and compelling inference of scienter"); *In re Check PointSoftware Techs., Inc. Secs. Litig.*, No. 03-CV-6594, 2006 WL 1116699, at *3 (S.D.N.Y. Apr. 26, 2006) (allegations that defendants had access to specific information of sales results and sales projections gave rise to a strong inference that they knew of material differences between their public statements and Check Point's financial performance); *Selbst*, 2005 WL 2319936, at *23 (allegation that company's CEO and CFO were aware that internal forecasts projected declining system wide sales growth in 2002 when compared to 2001 sufficient to allege scienter).[10]

---

[10] Defendants seek to undermine the import of these allegations by pointing out that K&G accounted for "only" 22% of TMW's total revenues during 2005 and 2006.  *See* Dkt. # 25 at 5.  However, as defendants

### 1.      Plaintiffs' Adequately Describe Their Confidential Sources

Defendants' contention that plaintiffs have not adequately alleged falsity or scienter is inextricably linked to their assertion that the factual allegations of the amended complaint based upon information supplied by confidential witnesses must be disregarded.  However, the Fifth Circuit has held that confidential source allegations are a permissible basis from which an inference of scienter may be made.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).[11]  While defendants complain that the amended complaint fails to allege CW1's "specific title, responsibilities, or the dates of his employment" (*See* Dkt. # 26 at 15), the Fifth Circuit has rejected such a "standard as a threshold in every case."  291 F.3d at 355; *id.* at 353 ("[W]e adopt today, a plaintiff must 'plead with particularity sufficient facts to support' their allegations of false or misleading statements made on information and belief.").  In the case of confidential sources, all that is required is that the allegations contain "sufficient particularity to support the probability that a person in such a position would possess the information pleaded."  *Id.* at 357.  Thus, in *Tchuruk*, the Fifth Circuit held that a completely unsourced allegation concerning a conversation between "a high ranking Alcatel SEL official" who was "a top executive of Alcatel SEL" and Alcatel Executive Vice President, Jacques Dunoge, was pleaded with sufficient particularity

concede, TMW's tuxedo rental business following the After Hours acquisition accounted for 15.4% of TMW's total revenues for fiscal 2007.  *Id.*  Thus, together, K&G and the Company's tuxedo rental business accounted for nearly 40% of TMW's revenue.  Defendants' knowledge of negative sales trends in such a significant portion of the Company's business gives rise to a strong inference that the 2007 guidance defendants' issued to investors was misleading and neither made in good faith nor with a reasonable basis.

[11] Defendants cite *Shaw Group*, 537 F.3d at 535-36, as holding that it is no longer permissible to infer scienter from confidential source allegations.  *See* Dkt. # 26 at 28.  However, *Shaw Group*, relying on the Seventh Circuit's decision in *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007), merely holds that the fact that a source is confidential allows the court to discount the weight given to confidential source allegations.  537 F.3d at 535-36.  Indeed, since *Higginbotham* was decided, the Seventh Circuit has held that "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions."  *Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 712 (7th Cir. 2008).

because the executive and his conversation with Dunoge were described with sufficient particularity to support the probability that a person in such a position would possess the information pleaded. *Id.*[12]

Similarly, in this case, CW1's position and his interactions with defendants are described with sufficient particularity to support the probability that CW1 was in a position to possess the information pleaded. Plaintiffs allege that CW1 (i) held a high level senior management position with K&G;" (ii) had access to K&G daily sales data, cost data and internal forecasts; (iii) directly reported to TMW COO Doug Ewert; (iv) and participated in Company-wide meetings with defendants in which the Company's internal and external earnings estimates and strategic plans for dealing with expected revenue shortfalls were discussed (Compl. ¶ 32.) In addition, the amended complaint describes specific meetings that CW1 had with defendants Zimmer and Davis as well as COO Doug Ewert in which K&G's forecasts were discussed and defendants directed that the forecasts be changed (*Id.* ¶¶ 36-40.)[13] These allegations are plainly sufficient under *Tchuruk*. *See also In re Cadence Design Sys., Inc. Secs. Litig.*, No. 08-4966, ___ F. Supp. 2d. ___, 2010 WL 726515, at * 6 (N.D. Cal. Mar. 2, 2010) (confidential witness'

---

[12] Unlike in this case, in *Central Laborers' Pension Fund v. Integrated Electrical Services, Inc.*, the allegations failed to support the probability that a person in such a position would possess the information pleaded. 497 F.3d 546, 552 (5th Cir. 2007). There were only two allegations in the complaint suggesting that the defendants' ignored the alleged accounting issues. One source was a former network technician who claimed to have overheard comments at headquarters about the company's accounting practices and internal controls. *Id.* The other was a former senior vice president who stated that one of the individual defendants had said that he did not want to know the details of a revenue issue so that he would not be liable. *Id.*. In contrast, here, CW1 personally engaged in periodic meetings and conversations with defendants Zimmer and Davis to discuss K&G's guidance and stated that Davis directed that K&G's guidance be changed.

[13] Defendants' assertion (see Dkt. # 26 at 17) that K&G's CFO "accepted" defendants' direction to change the forecast is disingenuous. The amended complaint clearly alleges that defendants "pressured the operating Presidents into forecasting higher revenue than the actual trend data supported" and defendant Davis "refused to allow CW1 to reflect the more severe downturn in his forecast" (¶ 37).

account of individual defendant's personal involvement in suspect transaction "free[d] Plaintiffs from the burden of establishing that the key details of these transactions had to percolate up to the executive officers through less direct or reliable channels of communication" and, therefore, strengthened inference of scienter); *Selbst*, 2005 WL 2319936, at *7 (crediting allegations based on confidential witness who "regularly interacted" with individual defendants).

They also stand in stark contrast to the allegations the Fifth Circuit found deficient in *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 537-38 (5th Cir. 2008).  In that case, the only allegation supporting the plaintiffs' allegation that defendants had pressured employees to inflate certain numbers was the statement by one of the individual defendants at a dinner that, "We have got to show more progress" on construction projects which were accounted for using percentage of completion accounting.  *Id.* at 537.  Here, plaintiffs have alleged that defendants demanded that K&G management change its forecasts so that they would be less negative.[14]

The same is true with respect to plaintiffs' other confidential sources.  CW2, a District Sales Manager for TMW stores, stated that sales were down beginning in the first quarter and that in July 2007, he was informed by both his immediate Regional Manager

---

[14] Recognizing the significance of the allegations concerning CW1's interactions with defendants, defendants seek to minimize the import of these allegations by stating that K&G represented less than 20% of TMW's total revenue for the year.  *See* Dkt. # 2 at 16.  However, the court need look no further than the exchange between analyst Janet Kloppenburg of JJK Research and defendants Zimmer and Davis during the August 22, 2007 conference call to appreciate the materiality to investors of what was going on at K&G (Compl. ¶ 65).  Moreover, although it is true that TMW announced negative comparable store sales at K&G throughout the Class Period, defendants ignore their consistent efforts to minimize the impact this deteriorating trend would have on the Company's bottom line.  Defendant Davis' statement to Ms. Kloppenburg  on the August 22, 2007, is illustrative:  "Imagine with almost a 7% negative comp, we're making the same money.  I think that's the kind of reassurance [that trends wouldn't worsen] that  feel." *Id.*

and Vice President that the Company was discussing a mid-year adjustment to lower the plan for the year to an attainable goal given that the original plan for the year could not be met. (Compl. ¶ 42.)[15]  CW3 and CW4 were After Hours executives at the time of the acquisition who watched defendants dismantle After Hours' successful business model, most notably its relationship with David's Bridal, which had an immediate negative impact on After Hours' business. (*Id.* ¶¶ 44-47.)[16]  As was the case with CW1, based on the allegations in the amended complaint, these confidential witnesses are also described with sufficient particularity to support the probability that they were in a position to possess the information pleaded.[17]

## 2. Defendants' Reaping of Tangible Benefits Adds to the Overall Strong Inference of Scienter

The Supreme Court recently reaffirmed that a defendant's "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 127 S. Ct. at 2511.  The Fifth Circuit has similarly held that allegations of motive and opportunity may meaningfully strengthen the inference of scienter.  *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 412 (5th Cir. 2001); *see also Green Tree*, 270 F.3d at 660 ("[I]n insider trading cases, the timing of trades shows motive and opportunity, but it may also provide additional circumstantial evidence that the defendant knew of an advantage.").  As set forth below, the Complaint pleads precisely these facts.

---

[15] Although CW2 stated that discussions regarding the need to lower guidance were occurring in July 2007, as discussed above, on August 22, 2007, defendants issued ***increased*** the Company's guidance.

[16] In this regard, it is noteworthy that CW4 participated in acquisition meetings with TMW executives.

[17] Defendants point out that they disclosed that TMW was going to "re-brand" After Hours stores after the acquisition.  *See* Dkt. # 26 at 19.  This misses the point.  What defendants failed to disclose was the immediate and substantial adverse impact the "re-branding" strategy had on the business.  Instead, defendants stated on August 22, 2007, that the Company was "already feeling the effects of the upside from the combination of the After Hours organization with that of Men's Wearhouse" and that they were "happy with the pace and results of the After Hours acquisition." (Compl. ¶¶ 63-64).

Indeed, defendants Zimmer and Davis and other insiders knowledgeable about the Company's prospects reaped significant tangible benefits from the fraud that inflated the Company's stock price. Specifically, these individuals sold nearly 350,000 shares of TMW common stock at inflated prices for gross proceeds of more than $16.7 million. Significantly, defendant Zimmer's pattern of trading changed significantly in October 2007, allowing him to avoid selling shares at the significantly depressed prices that TMW traded at following the reductions in guidance announced on November 29, 2007 and January 9, 2008. Although Zimmer sold 37,500 shares per month in 2005 and 2006 pursuant to 10b5-1 plans dated July 15, 2005 and May 23, 2006, respectively, contrary to defendants' contention that defendant Zimmer's 10b5-1 plan was put in place prior to the Class Period (*see* Dkt. # 26 at 27 n.19), Zimmer entered into a new 10b5-1 plan dated June 4, 2007, pursuant to which his monthly sales of 37,500 shares ceased in September 2007, before the stock drops resulting from the disclosures on October 10 and November 29, 2007, and January 9, 2008. (Dkt. # 26, Exh. T.)[18] This mid-Class Period change in Zimmer's 10b5-1 plan is an additional fact supporting a strong inference of scienter in this case.[19]

---

[18] As a recent *Business Week* article recounted, a recent study found that executives selling pursuant to 10b5-1 plans sell shares in advance of negative news twice as frequently as they sell ahead of good news. *See* "Not As Random As It Looks? Some Executives Seem to be Making Big Gains in Automatic Trading Plans," *Business Week* (Nov. 6, 2006) (available at http://www.businessweek.com/magazine/content/ 06_45/b4008051.htm).

[19] Defendants' contention that Doug Ewert and James Zimmer's sales are irrelevant (*see* Dkt. # 26 at 28) is simply incorrect. The Fifth Circuit has held that the actions of other knowledgeable insiders are relevant in determining whether stock sales by insiders contribute to an inference of scienter. While sales by a non-defendant insider do not contribute to an inference of scienter on the part of a defendant, sales by other knowledgeable insiders in advance of a stock drop do contribute to an inference of scienter when defendants sell as well. Here, Ewert is alleged to have been a party to discussions between CW1 and defendants Zimmer and Davis regarding changing K&G's projections.

**D.      Defendants' Statements Are Not Protected by Any Safe Harbor.**

In their brief, defendants contend that their statements are protected by both a common-law and statutory safe harbor, and that all of the statements in the amended complaint were—as is required under the PSLRA—"accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i) (for written statements); *see also id*. § 78u-5(c)(2) (verbal statements). Their arguments fail for at least two reasons, each of which is addressed in turn.

**1.      The Complaint contains statements that were not exclusively forward-looking**

For any statement to be protected by a safe harbor it must, by definition, be a "forward-looking statement."  15 U.S.C.A. § 78u-5(c)(1).  Caselaw in the Fifth Circuit and this District is clear that statements of fact regarding events that already have occurred, business strategies, and statements of present circumstances are not forward-looking and entitled to a safe harbor.  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 699 (5th Cir. 2005) ("facts concerning the contracts are not forward-looking predictions"); *Griffin v. GK Intelligent Systems, Inc.*, 87 F. Supp. 2d 684, 689 (S.D. Tex. 1999) ("Cautionary language cannot insulate from liability false statements of present fact.").  Here, just as was the case in *Griffin*, "several of the allegedly misleading statements referred to then-present factual conditions, or implied background factual assumptions a reasonable investor would regard the speaker as believing to be true" and, as such are not protected as forward-looking.  87 F. Supp. 2d at 689 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1123 (10th Cir. 1997)).  This view is supported all across the country, and encompasses even statements that are statements of existing conditions that include some

28

forward-looking information. *In re Lucent Tech., Inc. Secs. Litig.*, 217 F. Supp. 2d 529, 557 (D.N.J. 2002); *see also Silverman v. Motorola, Inc.*, No. 07-C-4507, 2008 WL 4360648, at *11 (N.D. Ill. Sept. 23, 2008); *In re Indep. Energy Holdings PLC*, 154 F. Supp. 2d 741, 757 (S.D.N.Y. 2001), *abrogated on other grounds in In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352, 392 (S.D.N.Y. 2003). "Defendants cannot convert a larger statement containing a series of misstatements about current factual conditions into one forward-looking statement simply by including one statement that is clearly forward-looking." *In re U.S. Interactive Sec. Litig.*, 2002 WL 1971252, at *18 n.11.

Applying the foregoing legal authorities in this case leads to the conclusion that the following statements by defendants were not forward-looking and, therefore, are not protected by the safe harbor:

- Defendant Zimmer's statements regarding the After Hours acquisition and integration. (Compl. ¶¶ 63-64.)

- Defendants' statements regarding revenue from margin expansion. (Compl. ¶¶ 50-56.)

- Defendants' statements on October 10, 2007 regarding K&G's comparable store sales. (Compl. ¶ 67.)

- Defendants' statements regarding K&G's continued profitability on August 22, 2007. (Compl. ¶ 65.)

- Defendant Davis's statement on November 28, 2007, that the Company's GAAP diluted earnings for the fourth quarter of 2007 were on track to exceed fourth quarter 2006 results. (Compl. ¶ 71.)

2.     **The cautionary guidance offered on the few forward-looking statements was inadequate**

Even as to those statements that are forward-looking, there are two reasons why the Defendants' arguments fail with regard to the safe harbor provision.  First, any warnings that were made were inadequate because they were not accompanied by meaningful cautionary language.  Second, the safe harbor does not protect forward-looking statements that defendants knew were false when they were made.

a.     **Defendants' forward-looking statements were not accompanied by meaningful cautionary language.**

"'Meaningful cautionary language' cannot be boilerplate and must include substantive, company-specific warnings based on realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp.*, 365 F.3d at 372.  Nevertheless, boilerplate was all that Defendants provided to their investors.  The cautionary statement included in the March 7, 2007, news release read as follows:

> This press release contains forward-looking information.  The forward-looking statements are made pursuant to the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements may be significantly impacted by various factors, including unfavorable local, regional and national economic developments, disruption in retail buying trends due to homeland security concerns, severe weather conditions, aggressive advertising or marketing activities of competitors, governmental actions and other factors described herein and in the company's annual report on Form 10-K for the year ended January 28, 2006 and subsequent Forms 10-Q.

Every relevant news release TMW published during 2007 bore materially the same boilerplate cautionary statement, and none elaborated on the risk factors contained therein.

The cautionary statement made at the outset of the March 7, 2007, was similarly boilerplate:

> Let me also remind you that we will be making a number forward-looking statements and that all such statements are subject to risks and uncertainties that could cause actual results to differ materially from the expectations and assumptions mentioned today due to a variety of factors that affect the company including the risks specified in the most recently filed Form 10-K and Forms 10-Q.

The May 22, 2007, call had a cautionary statement that was even less descriptive than the one before, and was similarly meaningless boilerplate:

> As you know, we will be making a number of forward-looking statements, and all such statements are subject to risks and uncertainties that could cause actual results to differ materially from the expectations and assumptions mentioned today due to a variety of factors that affect the company including the risks specified in the most recently filed Form 10-K.

Neither of those statements is sufficiently descriptive. No other cautionary statements made during the relevant earnings calls were more descriptive. The Fifth Circuit has found disclosures substantially the same as these inadequate to afford a defendant the protection of the safe harbor. *See Loramand*, 565 F.3d at 244-45.

Defendants contend that their list of cautionary factors in SEC filings is absolutely a shield against liability for their forward-looking statements. That is not the case. Courts in this District are required to take a comprehensive approach to evaluation of cautionary statements. Any relevant cautionary language must be sufficiently related in time and substance to the misstatements made, and courts in this District have acknowledged that cautionary language that does not appear in the same document as the forward-looking statement is less effective than an accurate risk assessment included in the same document as the misrepresented fact. *In re TETRA Techs., Inc. Secs. Litig.*, No.

4:08-cv-0965, 2009 WL 6325540, at *12 (S.D. Tex. 2009) (citing *Kurtzman v. Compaq Computer Corp.*, No. Civ. A H-99-779 et al., 2002 WL 32442832, at *23 (S.D. Tex. Mar 30, 2002), *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997)).   "The cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *In re Copper Mountain Secs. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004).[20]   More importantly, in close cases, cautionary statements, like those defendants made in this case, ***should not allow them a safe harbor***: "If reasonable minds could disagree as to whether the mix of information in the allegedly actionable document is misleading, ***the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law***." *In re TETRA*, 2009 WL 6325540, at *12 (emphasis added) (quoting *Lormand*, 565 F.3d at 248 (internal quotation marks omitted)).

Here, the cautionary statements from TMW's Form 10-K which are cited by defendants are no less boilerplate than those contained in the press releases issued during the Class Period.  Indeed, the Fifth Circuit has rejected similar language as inadequate to satisfy the PSLRA safe harbor.  *Compare* Dkt. # 26 at 6 ("[W]e cannot assure you that we will continue to experience the same rate of growth as we have historically."), *with Loramand*, 565 F.3d at 244 (disclaimer that company's statements were "not guarantees of future performance" was boilerplate and did not qualify as meaningful cautionary language).  Moreover, as in *Loramand*, in this case, even more specific warnings (*e.g.*, the potential effect on TMW of lower consumer spending or the inability to integrate

---

[20]   It is an accepted view that, under the plain language of the PSLRA, statements of caution may not be incorporated by reference. *In re Apple Computer, Inc., Secs. Litig.*, 243 F. Supp. 2d 1012, 1024-25 (N.D. Cal. 2002).  "The making of a cautionary statement on one occasion does not provide a shield to liability for all statements subsequently made.  In order for the safe harbor or bespeaks caution doctrine to apply, a cautionary statement must 'accompan[y]' or be 'contained' in the statement that is the basis for a plaintiff's claim."  Defendants' wholehearted reliance on risk factors incorporated by reference should give this Court pause, because it indicates Defendants' knowledge that their statements in *actual compliance* with the statute were inadequate.

acquired assets) "were glossed over as a future risk" when, in fact, those "dangers . . . had already begun to materialize." *Id.* at 247. Significantly, defendants make no effort to undertake the required statement-by-statement analysis of each of the allegedly false and misleading forward-looking statements alleged and demonstrate how each "is specifically and meaningfully protected by the safe harbor." *Id.* at 245.

> **b.    The safe harbor is inapplicable because defendants actually knew their statements were misleading at the time they were made.**

Even if defendants' forward-looking statements had been accompanied by meaningful cautionary language–and, to be sure, they were not–the safe harbor still would be inapplicable because, as demonstrated above, plaintiffs adequately allege that the defendants actually knew that their statements were misleading at the time they were made. *See* 15 U.S.C. § 78u-5(c)(1)(A)-(B) (noting that the "safe harbor" would apply only if "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading."); *Loramand*, 565 F.3d at 244; *In re TETRA Techs.*, 2009 WL 6325540 at *20; *In re Secs. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 881 n.28 (S.D. Tex. 2001) ("The safe harbor provision does not apply where the defendants knew at the time that they were issuing statements that the statements contained false and misleading information and thus lacked any reasonable basis for making them.").[21]   As such, the Defendants cannot seek protection under the safe harbor provision.

---

[21] Contrary to defendants' contention (*see* Dkt. # 26 at 31), a knowingly false forward-looking statement cannot be protected by the safe harbor no matter how much cautionary language accompanies it. *See Loramand*, 565 F.3d at 244. To hold otherwise would provide corporate defendants with a license to lie.

**E.      Plaintiffs Have Adequately Alleged Loss Causation**

Defendants' argument that plaintiffs have not pleaded loss causation applies the wrong standard and mischaracterizes the allegations in the Amended Complaint.   As *Dura Pharmaceutical, Inc. v. Broudo* acknowledged, the pleading of loss causation need only comply with Rule 8, which simply requires a "short and plain statement of the claim showing that the pleader is entitled to relief."   544 U.S. 336, 347 (2005); Fed. R. Civ. P. 8.   The *Dura* Court further noted that "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide defendant with some indication of the loss and the causal connection the plaintiff has in mind."   *Id*. at 347.

A complaint that pleads a facially plausible causal relationship between the fraudulent statements or omissions and plaintiff's economic loss satisfies the notice pleading requirement of Rule 8.   *Lormand v. US UnWired, Inc.*, 565 F. 3d 228, 258 (5th Cir. 2009).   Asking for plausible grounds to infer loss causation (an element of a 10b-5 claim) "does not impose a probability requirement at the pleading stage."   *Id.* at 257; *see also*, *Steinberg v. BPO Management Services Inc.,* No. 3:09-cv-02291-0K, 2010 WL 1330971 * 9 (N.D. Tex. 2010) ("The loss causation pleadings requirement adhere to the less stringent Rule 8 and require only a short plain statement that provides the defendant with fair notice of  what the plaintiff's claim is and the grounds upon which it rests."). Thus, contrary to defendants' argument, to plead loss causation under Rule 8 the plaintiff does not have to allege that the truth revealed in a corrective disclosure makes the actionable fraud more probable than it would be without the alleged fact.   (*See* Dkt.# 26 33.)[22]   Indeed, the "probability standard" was specifically rejected in *Dura*.

---

[22] The Defendant relies on *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F. 3d 330, 338 (5th Cir. 2010), for the proposition that Plaintiff must plead facts that make it "more probable than

A complaint can satisfy the loss causation pleading requirement two different ways. First it can allege a material misrepresentation or omission followed by a leaking out of relevant or related truth about the fraud (i.e. a corrective disclosure) that causes a significant part of the depreciation of the stock. *Lormand*, 565 F.3d at 258. Second, a plaintiff can allege that the defendant fraudulently concealed a risk from investors, the risk materialized other than in the form of a disclosure and caused a drop in the stock price. *See In Re Enron Corp. Secs. Derivative & ERISA Litig*, No. MDL 1446, 2005 WL 3504860, * 18 (S.D. Tex. Dec. 22, 2005); *In Re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1265 (N.D. Okla. 2007); *In Re Initial Public Offering Secs. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005).

Plaintiffs' complaint satisfies either method of pleading "loss causation." The amended complaint alleges, among other things, the following misrepresentations and/or fraudulent concealment:

- March 7, 2007, May 22, 2007, August 22, 2007 and November 28, 2007 and full year 2007 GAPP diluted earnings per share guidance in excess of 2006 results. (Compl. ¶¶ 48, 55, 61, 69);

- March 7, 2007 and May 22, 2007 statements that the deteriorating sales trends the Company was experiencing could be offset by margin expanding to a sufficient degree to achieve 2007 GAAP diluted earnings guidance. (*Id.* ¶¶ 49-50, 56);

- Defendant Zimmer's statement on August 22, 2007 that TMW was "running ahead of [its] financial targets though the second quarter.

- Defendants' statements on August 22, 2007 that profitability was approximately the same in the second quarter of 2007 as in 2006 notwithstanding a decline in comparable store sales for the unit of almost 7 percent. (*Id.* ¶¶ 64-65);

not" that a corrective disclosure resulted in a stock drop. *Halliburton*, however, involved the standard of proof for establishing loss causation at class certification and not at the motion to dismiss stage. In *Fener v. Operating Engineers Const. Industry and Misc. Pension Fund*, 579 F. 3d 401, 407 (5th Cir. 2009), the court cautioned against conflating the requirements for loss causation at the pleading stage with the requirements for establishing loss causation at the certification stage.

• Defendants' statement on August 22, 2007 that TMW was "already feeling the affects of the upside from the combination of the After Hours organization with that of Men's Wearhouse" and that management was "happy with the pace and results of the After Hours integration. (*Id.* ¶ 63-64);

• Defendants' statement on November 28, 2007, that after "adjustments" to exclude extraordinary items, the Company's GAAP diluted earnings for the fourth quarter were on track to exceed fourth quarter 2006 results. (*Id.* ¶ 71);

• Defendants' failure to disclose on October 10, 2007 or November 28, 2007 their decision not to fund K&G's advertising campaign in the fourth quarter of 2007 notwithstanding their prior statement on August 22, 2007 that defendants "remain[ed] focused on building the K&G brand through initiatives" including spending on advertising. (*Id.* ¶ 64.)

Plaintiffs contend that the above statements providing and/or related to the Company's quarterly and annual earnings guidance were material misrepresentations and/or omissions because defendants knew or recklessly disregarded facts that contradicted such guidance.  For example, the earning guidance ignored real time negative sales trend data that Company executives had in their possession. (Compl. ¶¶ 37-39.)  As earlier as the first quarter 2007, K&G management was projecting significantly lower revenue for the entire year but defendants refused to include such information in its earnings guidance. (*Id.* ¶¶ 37-38.)  The Company also represented in August 22, 2007 that its earnings guidance was based in part on the positive revenue growth experienced from the After Hours acquisition when, in fact, that Company was experiencing a significant loss of revenue because the After Hours business model had been altered. (*Id.* ¶¶ 44-47.)

The amended complaint alleges that starting in mid-October 2007, the Company disclosed it would revise its earnings guidance downward because of weak sales and problems with the After Hours merger. (Compl. ¶ 68.)  The Company, however, did not

fully disclose the negative sales trend and problems associated with the After Hours integration.  *Id.*  Then in November 2007, the Company again lowered its earnings guidance citing deteriorating sales and less than expected revenue from After Hours stores (*Id.* ¶ 69-72.)  Again, the defendants did not fully disclose that it had cancelled its fourth quarter advertising campaign and that K&G management expected a 25 percent revenue reduction as a result of this decision (*Id.* ¶ 73.)  Finally, on January 9, 2008, defendants dramatically lowered the prior fourth quarter guidance because of "lower traffic levels at all the company's retail stores" and "anticipated continued weak traffic trends" (*Id.* ¶ 74.)  After the January 9, 2008 disclosure and revised earnings guidance, the stock price dropped by 30 percent (*Id.* ¶ 75.)

The January 9, 2008 statements about weak sales and traffic levels at all stores and the substantial revision in fourth quarter and 2007 earnings guidance disclosed that the  earlier earnings guidance in March 2007, May 2007, August 2007, and November 2007 were grossly inflated.   Plaintiffs allege that defendants knew or recklessly disregarded that the earnings guidance and related statements made in the first, second and third quarters of 2007 were false or misleading because they grossly downplayed the negative sales trend data and the negative impact of the After Hours merger.  Under the "corrective disclosure" loss causation theory, plaintiffs' allegation that the January 2008 disclosure corrected the prior misrepresentations alleged in the amended complaint clearly satisfies the plausibility standard articulated in *Dura* and *Lormand* and provides defendants with fair notice of plaintiffs' theory of economic loss. Indeed, it's difficult to imagine a more direct economic loss resulting from a "corrective disclosure."  The plaintiffs complain that specific earnings guidances and related statements were

materially misleading.  The defendants later revise the misleading earnings guidance and related statements and when the market learns about the revised guidance, there is a significant depreciation of the stock.

Furthermore, under the "materializing risk" theory of loss causation, the dramatic deterioration in sales and traffic trends was a risk that defendants concealed from investors.  The earnings guidance and related statements in March 2007, May 2007, August 2007 and November 2007 fraudulently concealed that defendants knew that negative sales trend data and merger inefficiencies would substantially reduce revenue in the fourth quarter 2007.  As noted above, any acknowledgement of moderating sales trends by defendants during the Class Period was accompanied by optimistic statements either affirming or increasing the 2007 GAAP diluted earnings per share guidance defendants issued in March 2007.  Again, these allegations satisfy Rule 8(a)(2)'s plausibility standard for pleading loss causation and provide defendants with fair notice of the plaintiffs' theory of economic loss.

On a final note, defendants cite *In re Dell Inc. Secs. Litig.*, 591 F. Supp. 2d 877 (W.D. Tex 2008), for the proposition that "mere failure to meet earnings guidance is insufficient to establish loss causation."  This principle is inapplicable when, as in this case, ***the plaintiffs allege that the earnings guidance itself was the material misrepresentation***.  In *Dell*, and the cases cited therein, the alleged misrepresentations concerned accounting irregularities.  The *Dell* court simply noted that a missed earnings guidance (without more) does not disclose accounting fraud.  However, if the claim is that the earnings guidance was fraudulently overstated, then a missed earnings guidance necessarily corrects the prior fraudulent guidance.

**F.      The Control Person Liability Claims Should Not Be Dismissed**

Defendants' only argument in support of their motion to dismiss plaintiffs' claims pursuant to Section 20(a) is that plaintiffs have not alleged a primary violation of Section 10(b).  However, as demonstrated above, plaintiffs' claim for violation of Section 10(b) has been adequately pleaded.  Accordingly, defendants' motion to dismiss plaintiffs' claim against the individual defendants should be denied.

<u>CONCLUSION</u>

For all of the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.  In the unlikely event this Court dismisses the complaint, plaintiffs should be granted leave to amend the complaint and cure any deficiencies.  Fed. R. Civ. P. 15(a); *Foman v. Davis,* 372 U.S. 178, 182 (1962).

DATED:   May 12, 2010                          WHATLEY DRAKE & KALLAS, LLC

                                     /s/ Deborah Clark-Weintraub
                                    Joe R. Whatley, Jr.
                                    Deborah Clark-Weintraub
                                    Richard P. Rouco
                                    1540 Broadway, 37th Floor
                                    New York, New York  10036
                                    Telephone:  (212) 447-7070
                                    Facsimile: (212) 447-7077
                                    *Lead Counsel*

                                    SCHWARTZ, JUNELL, GREENBERG &
                                    OATHOUT, LLP Roger B. Greenberg
                                    Federal I.D. No. 3239
                                    Texas State Bar No. 08390000
                                    Thane Tyler Sponsel III
                                    Federal LD. No. 690068
                                    Texas State Bar No. 24056361
                                    909 Fannin Street, Suite 2700
                                    Houston, Texas 77010
                                    Telephone: (713) 752-0017
                                    Facsimile: (713) 752-0327
                                    *Liaison Counsel*