| | | |
|---|---|---|
| United States District Court | | Southern District of Texas |

Material Yard Workers Local 1175  §
Benefit Funds for Itself and §
Similarly Situated Others, §
 §
      Plaintiff, §
 §
versus §    Civil Action H-09-3265
 §
Men's Wearhouse Inc., et al., §
 §
      Defendants. §

## Opinion on Dismissal

1.    *Introduction.*

A men's clothing company had publicly-traded common stock. A union's benefit fund bought some in the secondary market. The fund now says the company and two of its senior officers issued misleading statements about the company's business and earnings prospects. The fund has brought this action for all others who bought the stock between March 7, 2007, and January 9, 2008.

2.    *Parties and Claims.*

Men's Wearhouse, Inc., is the largest retailer of men's suits in the United States and Canada. George Zimmer is its co-founder, chairman, and chief executive. Neill Davis is its financial officer, executive vice president, and treasurer.

The company operates as Men's Wearhouse and K&G in the United States and as Moores Clothing for Men in Canada. Wearhouse and Moores cater to middle and upper-middle income men; K&G caters to lower-income men. In 2007, Wearhouse acquired After Hours Formalwear, Inc., the largest men's formal-wear chain in the United States.

Material Yard Workers Local 1175 is a labor union, and it has a benefit fund for its members. The fund bought common stock in Wearhouse between March 7, 2007, and January 9, 2008.

It says that Wearhouse, Zimmer, and Davis announced inflated expectations for earnings for fiscal-year 2007 and that the baseless report artificially induced the market for the company's stock to rise. It says that "insiders" knowing the company's true prospects sold over 340,000 shares for more than $16.7 million; later, the price declined 63%.

The fund sued Wearhouse, Zimmer, and Davis under § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, and Zimmer and Davis under § 20(a) of the Act.

3. *First-quarter Expectations.*

In March of 2007, Wearhouse issued its expected earnings for the fourth-quarter and year-end of 2006 at $0.95 and fiscal-year 2006 at $2.71. Earnings ordinarily means diluted earnings per share. Zimmer predicted that the diluted earnings for fiscal-year 2007 would increase to be between $2.80 to $2.91. He based this estimate on (a) same-store sales growth of 1% to 2% in the United States and 3% to 4% in Canada, (b) 5% to 7% growth in total sales, new store growth, and (c) increasing gross margins combined with flat expenses as a percentage of sales. He also anticipated operating-income margins to increase. He expected first-quarter earnings between $0.63 to $0.67.

Zimmer and Davis elaborated on these predictions during a call with analysts, saying that same-store growth would show modest slowing from the previous year. They also said retail sales of tailored clothing in the United States would be soft, although gains in the tuxedo-rental business and a strong demand for tailored clothing in Canada would partially offset this. The stock price later rose 9% – from $43.30 to $47.36.

In mid-April, the company updated its expected first-quarter earnings; the new number fell between $0.63 to $0.67 on the lower end of its initial forecast, apparently from slowing sales in the United States.

4. *First-quarter Earnings and Second-quarter Expectations.*

In May, the company released its results for first-quarter 2007, which showed earnings of $0.75. The acquisition of After Hours furnished $.08 to the total. The company issued a second-quarter 2007 earnings forecast between $0.88 to $0.92, with After Hours being

expected to contribute between $0.15 to $0.17. Same-store sales growth was expected to rise by 1% in the United States and by 4% to 6% in Canada. The expected fiscal-year 2007 earnings were adjusted from $2.84 to $2.94. On the other hand, the fiscal 2007 expectations for same-store sales were -1% to 0% in the United States and 3% to 5% in Canada, from evidence of slower traffic and weaker demand in the United States. After Hours was expected to contribute between $0.03 to $0.05 to the year's earnings.

On a call with analysts, Davis said that despite a 1.3% drop in same-store sales in the United States, the earnings were better than the company's mid-quarter update had predicted because of higher sales at Wearhouse stores, lower payroll costs, stronger margins in Canada, and a stronger Canadian dollar. Davis added that the company did not expect a sharp decline due to increasing margins, private-label penetration, and increasing the share of tuxedo rentals to offset lower same-store sales. After this announcement, the stock price rose by 10%, from $45.54 to $49.98.

In July, the company issued a mid-second-quarter update. It now expected to meet or exceed the higher end of its initial expectations for the quarter due to stronger than expected sales at Wearhouse stores.

5.  *Second-quarter Earnings and Third-quarter Expectations.*

In August, the company released its second-quarter 2007 results, which showed a diluted earnings of $1.00, with After Hours contributing $0.24. The company also released its third-quarter forecast, which showed the expected diluted earnings to be between $0.70 to $0.73, with After Hours contributing between $0.06 to $0.07. Same-store sales were expected to grow by 1% in the United States and by 2% to 4% in Canada. The fiscal-year 2007 diluted earnings were later increased to be between $2.98 to $3.02. Same-store sales expectations decreased by 0% to 1% in the United States and by 4% to 5% in Canada. After Hours was expected to contribute between $0.10 to $0.12 to the fiscal-year diluted earnings.

On a conference call with analysts, Zimmer said that both the tuxedo rental and the apparel business had reduced sales volatility, which could be seen through earnings surpassing targets. He explained that K&G continued to suffer from the recession and that opening new stores took business away from existing ones. Although same-store sales decreased by 6.9% in the second-quarter, he said that operating income was expected to remain the same through mitigation and continued advertising. Zimmer also said that although the financial situation

could still weaken, the company wanted to make it clear that it could afford a $100 million stock repurchase.

In October, the company issued its update for the mid-third-quarter, predicting that it would miss its initial expectations. The company now predicted earnings between $0.66 to $0.70. Davis gave two reasons for this: (a) weaker same-store sales than expected for K&G and (b) operating changes at After Hours stores that had lowered the number of rentals. He remained optimistic, however, on the potential return of investment in After Hours. On this news, the stock price fell 9%, from $48.48 to $44.16.

6. *Third-quarter Earnings and Fourth-quarter Expectations.*

In November, the company released its results for the third-quarter of 2007, showing earnings of $0.69, with After Hours contributing $0.05. The company also forecast its earnings for the fourth-quarter of 2007 to be between $0.43 to $0.48, with After Hours losing between $0.31 to $0.32. It expected same-store sales to fall in the single-digit range in the United States but rise by up to 2% in Canada. The fiscal-year 2007 earnings were raised to be between $2.87 to $2.92. Same-store sales expectations fell to between -1.0% to 0% in the United States and rose 2% to 4% in Canada. After Hours was expected to contribute between $0.05 to $0.06 to the fiscal-year earnings.

On a call with analysts, Davis said that the actual third-quarter earnings were only slightly below the original forecast and at the high end of the revised one. Once again, margin expansion more than offset increases in expenses. He admitted that the fourth-quarter would be challenging and require modest changes to promotions. Although fourth-quarter 2007 estimates were lower than fourth-quarter 2006 results, Davis explained that fourth-quarter 2007 would cover (a) one fewer week of business, (b) higher effective tax rates, (c) relocation expenses of the Houston offices, and (d) low point of tuxedo rentals. In response, the stock price fell by 16%, from $42.05 to $34.33.

In January of 2008, the company issued its mid-fourth-quarter update to be between $0.16 to $0.18. The fiscal-year 2007 earnings forecast also fell to between $2.60 to $2.62. Davis said that this was caused by substantially lower traffic at all stores in December and January. In response, the stock price fell 30%, from $25.44 to $17.84.

7.  *Fourth-quarter and Fiscal-year Earnings.*

In March, the company released its results for fourth-quarter 2007 and fiscal-year 2007 – earnings of $0.28 and $2.73. These exceeded the mid-fourth-quarter revisions, but they were below the initial guesses – $0.43 to $0.48 for the quarter and $2.80 to $2.91 for the year.

8.  *Undisclosed Sources.*

The fund supplies opinions and potential facts from four "confidential witnesses." One is represented to have been a senior manager at K&G. He says K&G knew that (a) its largely urban customers were susceptible to economic downturns and (b) the slowing economy that began in 2006 would be quickly reflected in 2007 sales. He opines that it became apparent in the second-quarter of 2007 that K&G would suffer a 20% decrease in revenue for that quarter and the remaining year. This signaled a need to revise the earnings guidance.

According to him, by allowing for only an 8% to 10% drop in the forecast, the company pressured the operating presidents to forecast higher revenue than their data supported. Despite telling investors that the company would continue to fund advertising, Wearhouse decided not to repeat K&G's fourth-quarter marketing plan from 2006. He also says that the company ignored both (a) his warning of a 25% loss in sales from cancelling the advertising and (b) his insistence that K&G only show a 12% loss against the forecast.

The second person is said to have been a district sales manager for Wearhouse. He says that, in 2006, every district had missed its sales goals. In 2007, his zone sales were down by 15% to 20% from 2006, despite the company's having a higher earnings forecast.

The third one is said to have been an executive with After Hours. He says that Wearhouse promptly dismissed After Hours's founders and key management after its acquisition. It also standardized rental wear in the stores, leading to a loss of local business, despite his warning about the negative effect of these changes.

The final person without the courage of his convictions is said to have been a manager with After Hours. He says that he told Wearhouse executives about the importance of (a) After Hours's relationship with David's Bridal and (b) the structure of its sales force. After the acquisition, however, Wearhouse rearranged its sales force and harmed the relationship, causing lower sales.

9. *Economy.*

The fund says that statements by the company in the March and May 2007 announcement and calls were materially misleading. The statements were about earnings, same-store sales, and increasing margins to offset weakening sales. The fund says that:

- The company knew that K&G's customers were particularly susceptible to recessions and that the recession had already affected K&G's sales.
- The company should have known that because it had already missed its 2006 goals, it would not be able to meet its 2007 goals.

A. *Ignoring Lower-Management.*

The fund says that the calls were misleading because the company did not disclose the information that the secret witnesses had given management. For the August statements about K&G, Wearhouse used forecasts far less negative than what K&G's management had originally prepared. Davis discounted K&G management's projections by a 20% loss in its third-quarter forecasts. The company also did not announce that it was significantly discounting its prices beyond what was customary.

For these same reasons, the fund says that statements published in the November 2007 press release were misleading. The company failed to announce that a 25% reduction in sales could result from its decision not to advertise in the fourth-quarter.

B. *Ruin of After Hours.*

The company altered the After Hours business model after its acquisition, despite being warned that this would hurt revenue. The fund complains that the company continued to laud the new business model in its financial disclosures, even after it knew sales were down.

10. *Private Securities Litigation.*

For a company to be responsible for an investor's losses, the investor must show that (a) the company omitted or misstated a material fact knowingly, (b) the investor relied on that fact, and (c) his reliance directly caused his loss.[1]

---

[1] Securities Exchange Act, 15 U.S.C. § 78(a) (1934); *Flaherty & Crumrine Preferred Inv. Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009); *R2 Invs., LDC v. Phillips*, 401

Investors must know facts – facts that are a sound predicate for an inference of deliberate, purposeful dishonesty. Fraud is not bad management. Earnings estimates are not results. Once an investor has initiated an action, it will be dismissed unless he: (a) has pleaded the falsely represented facts with specificity and identified how he knows each statement is false; (b) raised a strong inference of intent to deceive; and (c) shown a causal relationship between the falsehood and the loss by showing at least that the loss occurred after the truth was disclosed.[2] Predictions, like forecasts of earnings, are not misleading if they are (a) presented as predictions and (b) uttered without actual knowledge of their falsity.[3]

11. *Fiction.*

The company did not issue misleading statements about its business. Categorically, earning less than predicted, by itself, is not fraud.[4] The company warned investors – through analysts – that its results were dependent on the slowing economy's effect on the demand for tailored clothing. It reported that demand had weakened in the United States, especially for K&G.

No one listening to Wearhouse would have confused its references to *projections* as one thing and *results* as another. The press releases between March 2007 and November 2007 disclosed that performance "may be significantly impacted by various factors, including unfavorable local, regional and national economic developments." The conference calls were accompanied by a warning that the predictions depended on uncertainties that may affect results.

The tentativeness and variability of the estimates were shown when the company revised three of the four statements. Of these six guesses, the results showed three to have been over-estimates and three to have been under-estimates. The frequency of revision suggests a thoughtful response to the company's owners rather than an effort to cheat them.

---

F.3d 638, 641 (5th Cir. 2005).

[2]15 U.S.C. §§ 78u-4(b)(1), (2),(4); *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509–10 (2007); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005).

[3]*See* 15 U.S.C. § 78u-5.

[4]*Rosenzweig v. Azurix Corp.*, 198 F. Supp.2d 862, 882 (S.D. Tex. 2002).

No specific communications or reports have been shown to contradict Zimmer's or Davis's public statements. Instead, the fund's imagined deception is dispelled by the company's having been substantially high in its estimates for one-quarter – fourth quarter of 2007. In response to data suggesting that it had been wrong within that quarter, Wearhouse lowered its estimate – too far as that quarter's business turned out.

Wearhouse achieved its forecasted first-quarter earnings, exceeded its second-quarter forecast, came within $.01 of its revised third-quarter forecast, exceeded its revised fourth-quarter forecast, and missed its original full-year earnings guidance by less than 3%.

The fund has presented the public disclosures of estimated and actual earnings for one year. From nothing but the disparity between the estimates and earning, it expects reasonable people to conclude that Wearhouse deliberately misled the market. In that year, consumer spending was down 3.7% – the biggest drop in 28 years. Wearhouse adjusted its estimates up and down as they perceived the circumstances to have been changing.

12. *Office Gossip.*

A party who presents the stories of unnamed people is neither giving the court nor the defendant a plain statement of the facts. When the fund offers facts from people whom it will not name, it is dissembling. A secret witness is not far above a false witness.[5]

Assuming that when unmasked they would testify, their statements do not support the claim. These people disagreed with their superiors about the policy and strategy of Wearhouse executives. Their prediction of financial ruin – what became only a modest loss in actuality – shows their misplaced understanding of the facts at the time and their inability to anticipate the economy, consumer, and management.

The witnesses say that the operating president felt pressured to raise estimates. In essence, they indict the operating officers as corrupt or craven. Three witnesses were from K&G and After Hours; the other was from Wearhouse. None were privy to the big picture.

Wearhouse acquired After Hours in late 2006. It reorganized and discarded some of the old executives. The fund argues that Wearhouse knowingly mishandled both its acquisition of After Hours and its advertising campaign for K&G. An intentional attempt to harm After

---

[5] *See Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756–57 (7th Cir. 2007).

Hours or K&G would have driven the company's stock price down, hurting company insiders. It would have been completely irrational. The company revised its earnings forecast when it had more data, and the stock price responded.

The stock price rose and fell in a market whose price naturally fluctuates from all of the things that affect it – from the expectations of the economy as a whole to first-quarter results and everything else. The fund simply equates a dropped stock price to fraud.

13.  *Stock Sales.*

The law prohibits people from trading stock on non-public information derived from a relationship with the company of the stock. This obviously covers the higher executives. Zimmer and Davis sold stock in 2007. Although sales by executives in suspicious amounts or at suspicious times might support an inference that they were using company secrets, that an executive sold stock before the price dropped does not show that he knew the price would drop.[6]

Beginning in March of 2007, Zimmer sold 37,500 shares a month under a trading plan allowed by Rule 10b5-1. In June of 2007, he adopted a new plan; it stopped the monthly stock sales in October 2007. Between March and October, Zimmer sold 265,000 shares – less than 7% of his 3.8 million share holding.

The fund says the timing and amount of Zimmer's sales show that he knew the stock price would decrease. This temporal connection is nonexistent; his timing was disclosed to the Securities and Exchange Commission. The Commission allows insiders not to disclose their plans publicly.

Zimmer decided to sell his stock. He later decided to hold the rest of it. The fund says that both selling and not selling the stock are evidence of insider trading. In June, the second-quarter, Zimmer decided to stop selling his stock in October. By October, the fourth-quarter, the market price had dropped 60%. Zimmer had decided to not sell long before the price dropped.

The fund says that Zimmer avoided the November loss by holding his stock. In common with all other holders of Wearhouse shares, the value of Zimmer's shares dropped. For tax

---

[6]*Southland Sec. Corp. v. InSpire Ins. Soulutions Inc.*, 365 F.3d 353, 368 (5th Cir. 2004).

purposes, he had an unrealized loss – or more precisely, less of an unrealized gain. The fund's bad economics does not make Zimmer liable.

Zimmer's actions were regular and reported. He harmed neither the fund nor the market. If he had known that the After-Hours acquisition in late 2006 was long-term drain, he would have sold more stock than he did.

Davis sold 14,002 shares between March 7, 2007 and January 9, 2008. 12,000 of those shares were sold in March 2007, almost seven months before the stock price began to drop.

14. *Conclusion.*

The Pension and Benefit Fund of Material Yard Workers Local 1175 has done exactly what the law was reformed to stop. It has taken an unfortunate result – the drop in the price of stock in Men's Wearhouse – and says that it was cheated. It only knows what everyone else in the market knows – at what price others were buying and selling the company's stock, what the company said, and what was happening in the economy and society as a whole. Armed with grand statements from four ex-employees who refuse to identify themselves, the plan seeks to attack the company and, by economic consequence, its owners, workers, and suppliers.

The fund has lawyer friends. They talk. The fund decides to let them initiate a securities case. If the fund is wrong, it walks away with no responsibility for having wasted the company's owners' wealth. This lack of reciprocity creates what economists call a perverse incentive.

The fund cloaked its ephemeral facts with the jargon of three laws. None of the facts suggests a violation of them.

This case will be dismissed.

Signed on July 22, 2011, at Houston, Texas.

Lynn N. Hughes
United States District Judge

| Time | Predicted EPS | Actual EPS | Deviation | Shares Sold |
| --- | --- | --- | --- | --- |
| Fiscal 2006 | | $2.71 | | |
| 1st quarter 2007 | $0.63 – $0.67* | $0.75** | | Zimmer: 75,000<br>Davis: 12,002 |
| 2nd quarter 2007 | $0.88 – $0.92 | $1.00 | + 8.7% | Zimmer: 112,500 |
| 3rd quarter 2007 | $0.70 – $0.73 | $0.69 | (1.4%) | Zimmer: 78,000 |
| Revised | $0.66 – $0.70 | | — | Davis: 0 |
| 4th quarter 2007 | $0.43 – $0.48 | $0.28 | (34.9%) | Zimmer: 0 |
| Revised | $0.16 – $0.18 | | + 55.5% | Davis: 0 |
| Fiscal 2007 | $2.80 – $2.91* | $2.73 | (2.5%) | Zimmer: 265,500 |
| Revised | $2.60 – $2.62 | | + 4.2% | Davis: 14,002 |

*The contribution of the pending acquisition of After Hours was not included.

**The contribution of the acquisition of After Hours added $0.08.